```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3

 4    UNITED STATES OF AMERICA

 5         VS.                        CRIMINAL NO. CCB-06-0057

 6    JOHNNIE BUTLER, et al.

 7                      DEFENDANTS

 8                                     Baltimore, Maryland
                                       June 2, 2006
 9

10

11         The above-entitled case came on for a motions

      hearing before the Honorable Catherine C. Blake,
12
      United States District Judge
13

14
                     A P P E A R A N C E S
15

16    For the Government:

17         Philip S. Jackson, Esquire

18
      For Defendant Butler:
19
           Kenneth W. Ravenell, Esquire
20         Demetrios T. Zacharopoulos, Esquire

21

22    For Defendant Wright:

23         David R. Solomon, Esquire

24

25    Gail A. Simpkins, RPR
      Official Court Reporter
```

<u>P R O C E E D I N G S</u>

THE COURT:  Mr. Jackson.

MR. JACKSON:  Your Honor, good morning.  For the record, Phil Jackson here on behalf of the government, in the case of United States of America versus Calvin Wright and Johnnie Butler.  It's Case Number CCB-06-0057.  To my immediate left is my case agent, Special Agent Thomas Love of the Bureau of Alcohol, Tobacco and Firearms.  We are here today in the posture of the defendants' pretrial motion to suppress evidence.

THE COURT:  All right.  Thank you.  Let's see.  Mr. Ravenell, you're here for Mr. Butler?  Is that right?

MR. RAVENELL:  Yes, Your Honor, with Mr. Zacharopoulos, who is also at the trial table with us.

THE COURT:  All right.  Thank you.

Solomon, you are here for Mr. Wright?

MR. SOLOMON:  Yes, I am.

THE COURT:  So we have everybody here.

There are several related motions, as I understand it, that we have to decide relating to -- let's see.  There is an initial search of an apartment on June 19th.  There is then an arrest relating to Mr. Wright in a Jeep Cherokee, and later there is a stop

1        and arrest of Mr. Butler and a search of some storage

2        lockers.

3               I guess preliminarily, the search of the

4        apartment, and I know the legal issues have been

5        addressed about the manager calling the police to go

6        into the apartment with him.

7               It is not clear to me that either Mr. Wright or

8        Mr. Butler -- I'm not sure, I'm not quite sure if Mr.

9        Butler is even asserting it -- have standing to

10       challenge the search of the apartment.

11              MR. RAVENELL:  Your Honor, Mr. Butler has not

12       asserted standing, nor are we claiming standing as to

13       the search of the apartment.

14              THE COURT:  Thank you.

15              MR. SOLOMON:  Your Honor, Mr. Wright is

16       maintaining that he does have standing to contest the

17       search of the apartment.  I can reiterate what was

18       written in our motion or our memorandum, but I think

19       the standing is reasonably clear based on the case law

20       that's extant up to now, if the Court wishes to hear

21       argument.

22              THE COURT:  Yes, and perhaps I may have missed

23       something in the record.  That's certainly possible.

24              My understanding is that Mr. Wright certainly

25       had a key with which he entered the apartment.

4

1          MR. SOLOMON:  That's correct.

2          THE COURT:  That he said he didn't know who

3     lived there, that the apartment itself is leased in

4     someone else's name, and that the apartment appeared

5     to be in the process of being used for various

6     drug-related activities.

7          I'm not aware if any personal effects of Mr.

8     Wright or anyone else were located there, but again,

9     perhaps I missed something.

10         MR. SOLOMON:  No.  Those are the facts. However,

11    I would assert based on the law, as I've indicated in

12    the memorandum, that even standing alone, without any

13    further testimony from Mr. Wright in order to

14    establish the standing, he would have sufficient

15    standing under the circumstances.

16         I think that the Court has to look at the

17    fundamental inquiry, which is whether the individual

18    has a reasonable expectation of privacy in the

19    premises or item.

20         In the memorandum, of course we cite Mancusi

21    versus DeForte, 392 U.S. 364, 1968.  The factors that

22    Mancusi and then the later case of U.S. versus Payne,

23    119 F.3d 637 (8th Cir. 1997) case listed, in

24    determining whether the standing is appreciated under

25    the circumstances, would be, one, the historical use

1    of the property or the item, the ability to regulate

2    access, the totality of the circumstances surrounding

3    the search and seizure, the existence or non-existence

4    of a subjective expectation of privacy in the premises

5    or item, and the objective reasonableness of the

6    expectation of the privacy considering the specific

7    facts of the case.

8         The next case that the Court was asked to review

9    would have been the early case of Jones versus United

10   States, 362 U.S. 257, a 1960 case.  In that particular

11   case, that Court rejected subtle distinctions as in

12   licensee, lessee, invitee and guest in determining

13   whether in fact the standards for identifying

14   individuals who were aggrieved by searches existed.

15        The case that came after Jones which I cited in

16   my memorandum would have been Rakas, and that being

17   Rakas versus Illinois, 439 U.S. 128, a 1978 case.  In

18   that case, the Court indicated that individuals could

19   acquire standing, assuming it could be established

20   that those individuals exercised dominion and control

21   over the premises or at least more than simply casual

22   visitors.

23        The Rakas court, as I said, a 1978 decision,

24   seemed to reject the Jones court's formulation that

25   one need be legitimately on the premises where a

6

1    search is conducted before the challenge can be

2    generated to the search of the premises, and they

3    basically indicated that there is a consideration,

4    which is whether society is prepared to recognize the

5    interest of the aggrieved person in the premises in

6    question.

7         Moving forward then to Minnesota versus Olson,

8    495 U.S. 91, which is a 1990 case, that was a matter

9    where the Court found the defendant, who was an

10   overnight visitor, guest at his girlfriend's house,

11   and who was present at the home at the time of the

12   warrantless police entry, had sufficient standing to

13   contest that entry.  The Court concluded that it was

14   unimportant, that there existed a host with the

15   ultimate control of the house, inasmuch as the guest

16   had a legitimate expectation of privacy in the house,

17   which was conferred upon him by the host.

18        They also rejected the contention that the guest

19   need have complete dominion and control, something

20   that the Olson court indicated as well, that shorter

21   term guests do not lack standing.

22        The cases then go on to cite Rose versus U.S.,

23   which is a D.C. appellate court case from 1993, 629

24   F.2d 526, which indicated that the Olson court said

25   that to be an overnight case guest in and of itself is

1    sufficient to challenge a search or seizure in a

2    residence other than one's own home.

3         It also extends to a holding in United States

4    versus Fields, 113 F.2d 313.  It's a Second Circuit

5    case, 1997.  That even if the activities are illegal,

6    that does not bar one from maintaining an establishing

7    that in fact standing exists.

8         There are other cases as well.

9         THE COURT:  If you want to move forward to

10   Minnesota versus Carter, and tell me how you are

11   distinguishing Minnesota versus Carter.

12        MR. SOLOMON:  Well, Minnesota versus Carter was

13   a case in which the defendant, as we indicated before,

14   was an overnight guest.

15        THE COURT:  Minnesota versus Carter, not

16   Minnesota versus Olson.

17        MR. SOLOMON:  I'm sorry.

18        THE COURT:  Minnesota Carter, which is a 1998

19   case from the Supreme Court, which is where the two

20   people are observed in the apartment bagging white

21   powder.

22        MR. SOLOMON:  Well, the difference, a

23   significant difference between that case and this case

24   is that in this case, Mr. Wright has a key which

25   provides him with access to the apartment.  Ostensibly

1     so, he would then have the right to regulate access

2     into and out of the apartment.

3          He was seen going into the apartment with that

4     key, providing him the necessary access under the

5     circumstances.  Notwithstanding the statements, that

6     he said he didn't know who lived there, he did have a

7     key, and I think the Court can make the necessary

8     inference from the finding of the key on his person

9     that in fact he was an individual with access, he was

10    an individual who could regulate access to the

11    apartment.

12         There was no one else there at the time that he

13    went in, which would also seem to indicate that he,

14    and perhaps only he had the right to enter into the

15    apartment under the facts and circumstances in this

16    particular case, notwithstanding the statements that

17    may have been made by Mr. Wright, and we have to bear

18    in mind, of course, that he was not seen bagging drugs

19    at the time.  He was only intercepted as he entered

20    into the apartment.

21         He was in possession of that key and the

22    necessary effects in order to suggest that he was

23    someone with dominion and control over the apartment

24    and the items contained in the apartment.

25         We are prepared, if the Court should see that

1    it's a close issue or that in fact Mr. Wright does not

2    have standing based on the facts that are at least

3    established up until now, to place Mr. Wright on the

4    stand, to have him testify with regard to the standing

5    issue.

6         THE COURT:  Okay.  Mr. Jackson, is there

7    anything you want to comment on?

8         MR. JACKSON:  Only that in the cases where they

9    have found standing for a defendant, it's where the

10   person has demonstrably testified or at least made a

11   proffer that he did have some interest, however

12   temporary, in that location.

13        It is equally plausible under the facts before

14   the Court right now that the defendant had been given

15   a key by somebody else, to go and meet that person at

16   a time distant at that apartment; i.e., a person who

17   doesn't have, in which case he would not have an

18   interest that would be protected by the Fourth

19   Amendment, as it is on the evidence we have right now,

20   that he has dominion and control over it.

21        He is not the leaseholder of that apartment.  He

22   has by his own admissions, as we will get into later,

23   indicated that he had no knowledge of who lived there

24   or what was going on in that apartment.  I would

25   suggest to the Court by his own words and by the facts

1    before it right now, the defendant has not surmounted

2    the hurdle of showing standing in that particular

3    apartment.

4         MR. SOLOMON:  Your Honor, as I said before,

5    we're prepared to place Mr. Wright on the stand and to

6    testify to the limited nature of his expectation of

7    privacy in that apartment.

8         THE COURT:  I think if you would like to press

9    standing, then that's probably what we need to do.  It

10   seems to me that, again, based on the factual record

11   in front of me so far, the only thing in Mr. Wright's

12   favor in terms of standing is that he has a key, but I

13   think there is no evidence that he had the only key,

14   that he could keep other people out, that he had ever

15   spent the night there, was a guest there, that he had

16   the permission of the person that did lease the

17   apartment to be there.  He said he didn't even know

18   who lived there.

19        Minnesota versus Carter also makes a distinction

20   between whether you're on the premises for essentially

21   a business or commercial reason, which this would

22   appear to be, as compared to some sort of personal

23   residential purpose.

24        Yeah.  I see very little on the record in front

25   of me, so if you would like to go forward.

1              MR. SOLOMON:  I'm prepared to call Mr. Wright to

2        the stand.

3              THE COURT:  If you would just like to advise Mr.

4        Wright about his rights in that regards.

5              MR. SOLOMON:  Mr. Wright, let me advise you that

6        for purposes of the suppression hearing and for

7        purposes of establishing standing at this time, you

8        are being called upon to take the stand to testify.

9        If you wish not to testify, the Court will simply view

10       the evidence as it has been presented to the Court up

11       until now and make a decision insofar as standing is

12       concerned.

13             If you wish to testify, I am going to ask you

14       questions on direct examination and the government may

15       choose to ask you questions on cross-examination, as

16       might the Court.  Do you understand that?

17             DEFENDANT WRIGHT:  Yes.

18             THE COURT:  Do you wish to take the stand at

19       this time?

20             DEFENDANT WRIGHT:  Yes.

21             THE COURT:  Let me also just continue.  My

22       understanding would be you have, actually, you have an

23       absolute right to testify.  If you do testify, what

24       you testify at this proceeding could not be used

25       against you at the trial of the case, with one

1       exception.

2               If you testify now, and if this case goes

3       forward to trial and you testify at the trial, if you

4       testify to something different at the trial from what

5       you said here, then your testimony today could be used

6       against you in cross-examination to discredit or try

7       to discredit what you said at the trial.

8               Do you understand that also?

9               DEFENDANT WRIGHT:  Yes.

10              MR. SOLOMON:  And he has been advised of that.

11              THE COURT:  Okay.

12              MR. SOLOMON:  But thank you for reiterating

13      that.

14              THE COURT:  Sure.  Yeah.  I'm sure you have been

15      over it.

16              All right.  Take the witness stand right here,

17      Mr. Wright.

18              You mentioned government counsel and the Court

19      possibly asking questions.  I assume it is also

20      possible that Mr. Ravenell may have a question.

21              MR. SOLOMON:  That's correct.

22              THE CLERK:  Raise your right hand, please.

23                      CALVIN EUGENE WRIGHT, II

24      a Defendant, having been previously duly sworn, was

25      examined and testified as follows:

1          THE CLERK:  Be seated.  Scoot up and speak

2      directly toward the mike.  State your name and spell

3      it for the record, please.

4          THE DEFENDANT:  Calvin Eugene Wright, II.

5      C A L V I N, E U G E N E, W R I G H T, II.

6          MR. SOLOMON:  If I may?

7          THE COURT:  Okay.  Thank you.  Go ahead.

8      Proceed.

9                        DIRECT EXAMINATION

10     BY MR. SOLOMON:

11     Q      Mr. Wright, you have heard argument coming from

12      the government with regard to your matter.  Do you

13      remember back on June 19, 2002, where you were, that

14      being the date in question?

15     A      Yes.

16     Q      Where were you?

17     A      At the apartment.

18     Q      What apartment would that be?

19     A      10 Breezy Tree Court.

20     Q      You were found at that time with a key in your

21      procession.  Would you indicate to the Court, how long

22      had you been in possession of that key to the

23      apartment?

24     A      Like a month.

25     Q      Can you tell me, how was it that you obtained

14

1      the key?

2      A       Through the leaseholder.

3      Q       Was that through management?

4      A       Yes.

5      Q       How many keys were distributed, if you know, at

6       the time that you obtained the key?

7      A       Two.

8      Q       Two keys?

9      A       Yes.

10     Q       During the one month period during which you had

11      the key, how many times had you gone to the Breezy

12      Court residence, if you know,

13     A       Four, five.

14     Q       I'm sorry?

15     A       Like four or five.

16     Q       On the four or five occasions that you went, did

17      you use the key to gain access to the apartment?

18     A       Yes.

19     Q       How long typically would you stay in the

20      apartment on the dates that you would go in?  On

21      average.

22     A       Like 10 hours, 12.

23     Q       Had you ever stayed over, slept there?

24     A       Yes.

25     Q       On how many occasions had you slept there?

```
 1    A       Maybe twice.

 2    Q       Did you know in whose name the apartment was

 3     listed?

 4    A       Yes.

 5    Q       What was that name?

 6    A       Linnea Worthington.

 7    Q       Did you -- did she obtain a key to the

 8     apartment, if you know?

 9    A       I mean I got it from her.

10    Q       Was she aware of the fact that you had the key

11     to the apartment?

12    A       Yes.

13    Q       Did she grant you access to the apartment when

14     you wanted to use it?

15    A       Yes.

16    Q       Had you ever been in the apartment on any

17     occasions when she was there?

18    A       No.

19    Q       To the best of your knowledge, had she ever been

20     in the apartment to stay overnight?

21    A       No.

22    Q       On this particular occasion, do you recall

23     approximately what time you arrived?

24    A       Like 10 o'clock, 10:30.

25    Q       That would be in the evening?
```

```
 1    A      Yes.

 2    Q      Were you alone or with someone else?

 3    A      I was with someone else.

 4    Q      Who was the person you were with?

 5    A      Jemarl Jones.

 6    Q      Did he have a key to the apartment?

 7    A      No.

 8    Q      How was it that he was to gain access to the

 9     apartment without a key?

10    A      By me.

11    Q      By you letting him in?

12    A      Yes.

13    Q      Had you ever gone to the apartment on those four

14     or five previous occasions by yourself?

15    A      Yes.

16    Q      On how many times, on how many occasions had you

17     gone by yourself?

18    A      Like three.

19    Q      You testified that you had stayed over.  On how

20     many occasions, slept there?

21    A      Like two.

22    Q      Was there a bed in the apartment, to the best of

23     your knowledge?

24    A      No.

25    Q      Where would you sleep then when you slept?
```

1    A       Just lay on the floor.

2    Q       When you had slept in the apartment on those

3     occasions, had you ever stayed there with anybody else

4     or was it by yourself?

5    A       By myself.

6    Q       Again, the individual's name who was on the

7     leasehold, her name was?

8    A       Linnea Worthington.

9    Q       Did you have to obtain permission from her to

10    stay over in the apartment when you went?

11   A       No.

12   Q       Was it understood from her that you could use

13    the apartment at your convenience?

14   A       Yes.

15   Q       Did you keep any things in the apartment?

16   A       Yes.

17   Q       What did you have in the apartment?

18   A       Drugs.

19   Q       And were there any other items, personal

20    effects, clothing, furniture, radios that may have

21    belonged to you that you kept in the apartment?

22   A       Yeah.  There was a radio in there.

23   Q       Whose radio was that?

24   A       Mine.

25   Q       And did you use the radio on the occasions that

1    you went to the apartment?

2    A      Yes.

3    Q      Now there's testimony or there is information in

4     this case that a radio had been playing at the time

5     that you came to the apartment.  Do you know who left

6     that radio on?

7    A      I did.

8    Q      How soon before the arrest in this case had you

9     been in the apartment?

10   A      Like two days before.

11   Q      And you left the radio on?

12   A      Yes.

13          MR. SOLOMON:  Begging the Court's indulgence.

14   Q      On this particular occasion, how long did you

15    intend, if you can estimate, on staying over in the

16    apartment?

17   A      Oh, I was going to leave in the morning.

18   Q      You were going to sleep there that evening?

19   A      Yeah.

20   Q      Where would you have slept?

21   A      On the floor.

22   Q      What about the individual who came with you?

23    Was he given permission by you to sleep in the

24    apartment?

25   A      Yeah.  I mean if he wanted to, yeah.

```
1    Q      Do you know who, if anyone else, had a key to
2     the apartment?
3    A      Yes.
4    Q      Who else would have had it?
5    A      Johnnie Butler.
6           MR. SOLOMON:  Begging the Court's indulgence.
7    Q      Had you ever stayed over in the apartment on
8     occasions when you were not using it for the purposes
9     of cutting drugs?
10   A      No.
11   Q      Was there a phone service in the apartment so
12    far as you know?
13   A      No.
14          MR. SOLOMON:  I have nothing further.
15          MR. JACKSON:  Briefly, if I may, Your Honor.
16                        CROSS-EXAMINATION
17    BY MR. JACKSON:
18   Q      Mr. Wright, good morning.  Is it your testimony
19    then that you had an arrangement with Ms. Worthington
20    regarding this apartment of some sort?
21   A      Yes.
22   Q      And what was that arrangement?
23   A      That she just leased the apartment for me.
24   Q      Is it your testimony then that she was really
25    not the true occupant of that apartment?
```

```
1    A       No.

2    Q       Are you saying that she was the true occupant of

3     the apartment?

4    A       I'm saying that she wasn't.

5    Q       She wasn't the true.  This was an arrangement

6     between you and she?

7    A       Yes.

8    Q       Any rent that was paid on this, did she pay it?

9    A       No.

10   Q       Did you pay it?

11   A       Yes.

12   Q       Do you have any receipts to show that you paid

13    it?

14   A       It was four or five years ago.

15           MR. JACKSON:  Your Honor, no further questions.

16           THE COURT:  Okay.  Mr. Ravenell?

17           MR. RAVENELL:  No questions, Judge.

18           MR. SOLOMON:  No redirect, Your Honor.

19           THE COURT:  All right.  Thank you.

20           Mr. Wright, you can step down.

21           MR. JACKSON:  Your Honor, the government will

22    concede on that testimony that he does have standing.

23           THE COURT:  Okay.  The government is conceding

24    standing as to the apartment as to Mr. Wright.

25           MR. JACKSON:  Yes, Your Honor.
```

21

```
1              THE COURT:  In that case, I suppose the logical
2       next step is to have some testimony about the
3       circumstances relating to the search.
4              MR. JACKSON:  Yes, sir.
5              THE COURT:  What witnesses do you have
6       available?
7              MR. JACKSON:  There are three witnesses for the
8       combined issues, Your Honor.  The first issue, that
9       being the entry into the apartment, the government
10      will call Officer Kevin Fisher of the Baltimore County
11      Police Department.
12             THE COURT:  Just to get a scheduling idea, you
13      have three witnesses.  Is that total for all the
14      issues?
15             MR. JACKSON:  Total for the whole shooting
16      match.  Yes, Your Honor.
17             THE COURT:  At this point, Mr. Ravenell, do you
18      know whether you are calling witnesses?
19             MR. RAVENELL:  Very likely one.
20             THE COURT:  Very likely one.  Okay.
21             Do you know if you have additional witnesses?
22             MR. SOLOMON:  I believe, although I don't want
23      to be held to it, but I believe that we will not call
24      any witnesses.
25             Your Honor, if it hasn't been done so already,
```

1    and I know that the government has been adhering to

2    it, but we would move for sequestration.

3         MR. JACKSON:  The officers are outside, Your

4    Honor, and I've already instructed them not to discuss

5    their testimony amongst themselves.

6         THE COURT:  All right.  I will assume that there

7    are no fact witnesses, nobody present in the courtroom

8    who is likely to be called as a witness.

9         MR. RAVENELL:  That's correct.

10        THE COURT:  If counsel can verify that.  All

11   right.  Thank you.

12        THE CLERK:  Raise your right hand, please.

13                    KEVIN FISHER

14   a witness called on behalf of the Government, having

15   been previously duly sworn, was examined and testified

16   as follows:

17        THE CLERK:  Speak directly towards the mike and

18   state your name and spell it for the record, please.

19        THE WITNESS:  It's Officer Kevin Fisher, F I S H

20   E R.

21                  DIRECT EXAMINATION

22   BY MR. JACKSON:

23   Q     Officer Fisher, good morning.

24   A     Good morning.

25   Q     Sir, what's your current rank?

```
1    A       Patrol officer first class.

2    Q       How long have you been a patrol officer with the

3     Baltimore County Police Department?

4    A       Five years.

5    Q       Were you so assigned as a Baltimore County

6     police officer back in June of '02?  That is 2002.

7    A       Correct.

8    Q       At that time, how long had you been on the

9     force?

10   A       About a year.

11   Q       So that would make it roughly five years that

12    you have been a police officer altogether?

13   A       Correct.

14   Q       Have you been assigned to that same precinct the

15    entire time?

16   A       Yes.

17   Q       What precinct is that specifically?

18   A       It's the Cockeysville precinct.

19   Q       Does your precinct include and address known as

20    10 Breezy Tree Court?

21   A       Yes, it does.

22   Q       Can you describe what kind of structure, what

23    kind of neighborhood contains 10 Breezy Tree Court?

24   A       It's an enclosed, as you can see from the

25    picture, it's an enclosed development there with
```

24

1      several apartment buildings.  Each one has three

2      floors and four apartments per floor, and most of them

3      look the same as that, the tan and brown color on the

4      outside.

5    Q      Now you made reference to a picture.  For the

6      record, there on the easel is an item that is marked

7      Government's Exhibit 1 for identification purposes at

8      this point.  Do you recognize what is depicted

9      thereon?

10           (Government's Motion Exhibit Number 1 was marked

11     for identification.)

12   A      Yes, I do.

13   Q      What is that?

14   A      That is a picture of Breezy Tree Court.

15   Q      Would it be more fully described as an aerial

16     photograph of the area around that?

17   A      Yes.

18   Q      Does that fairly and accurately represent from

19     an aerial view what the environs in and around 10

20     Breezy Tree Court were back in June of 2002?

21   A      Yes, it does.

22   Q      Does it more or less look the same now?

23   A      Yes.

24   Q      Are you still patrolling in and around that

25     area?

1    A      Yes, I am.

2    Q      Can I specifically direct your attention to the

3    19th of June 2002?  Do you have a recollection of

4    whether you were working that day?

5    A      Yes.  I was working.

6    Q      Do you have a recollection of what shift you

7    were working that day?

8    A      That would be seven in the morning until three

9    in the afternoon.

10   Q      Did you have a particular patrol area that you

11   were assigned to for that day?

12   A      Yeah.  Yes.  My area included most of the

13   apartment communities around Cranbrook Road and

14   Girdwood Road.

15   Q      Is that an area that, how should we say, that

16   has a lot of apartment complexes?

17   A      Yes.  It is mainly apartment complexes.

18   Q      Did there come a time in your shift that day

19   that you responded to 10 Breezy Tree Court?

20   A      Yes.

21   Q      What were the circumstances of that?  Why did

22   you go?

23   A      911 dispatched me to a call.  I believe it was

24   entitled a check on location, and they advised that

25   the apartment manager from Henderson-Webb apartment

26

1     company, which is the property managers for Breezy

2     Tree Court, the apartments in there, were at the

3     location and they were requesting police assistance to

4     check on the well-being of occupants inside the

5     apartment.

6     Q     About what time did that call reach you?

7     A     10:56.

8     Q     10:56 in the morning?

9     A     Yes.

10    Q     Did you respond pursuant to that call to that

11    area?

12    A     Yes.  I believe I arrived around a little after

13    11, 11:07.

14    Q     What happened on your arrival?

15    A     When I arrived there --

16          While I was on the way, police dispatch had

17    advised me that they conducted a search of all the

18    calls for the past few days to check and see if there

19    were any other prior calls.  They said that there had

20    been several calls the previous night on the midnight

21    shift for noise complaints from 10H Breezy Tree Court,

22    which is where the apartment managers wanted me to

23    respond to.

24          The calls they received overnight were for noise

25    complaints.  Apparently midnight officers had

27

1    responded out there, heard loud noises from a radio,

2    tried to contact the people inside, no one answered,

3    and so they left.

4    Q       You indicated that there did come a time that

5    you responded to the specific call about in or around

6    11 o'clock on the 19th; is that correct?

7    A       Yes.

8    Q       And did you meet anybody there once you arrived?

9    A       Yes.

10   Q       Who was that?

11   A       There was a subject who identified himself as

12   the property manager for Henderson-Webb.  He was

13   dressed in a Henderson-Webb uniform.

14        He stated to me that several of the residents in

15   that apartment building had called the rental office

16   that morning and complained that there was loud music

17   coming from this Apartment H and that it had been

18   coming from that apartment since 10 o'clock the night

19   before.

20        The apartment manager said he had been knocking

21   on the door for at least ten minutes before my arrival

22   and had gotten no response from anyone inside.  He was

23   worried about the safety of anyone that would be

24   inside.  He said that he was going to go in to check

25   the apartment for anyone that was injured or may need

```
1      help, and he requested that I accompany him inside for

2      his safety, as well as in case there was a subject in

3      need of help, that there would be some kind of

4      emergency responder there with him.

5   Q      Before you entered it --

6          Well, did there come a time that you entered

7      that apartment?

8   A      Yes.

9   Q      What was that specific apartment number?

10  A      Apartment H.

11  Q      H as in Harry?

12  A      Correct.

13  Q      Before you actually entered it and after you had

14     received this information, was any other attempt made

15     to discern if anybody was inside that apartment?

16  A      Once I arrived there, he did continue to knock

17     for a few minutes before we went in.  I insisted that

18     he try again after I got there.

19  Q      And was there any response to his knocks?

20  A      No.

21  Q      Could you as you stood there hear music coming

22     from within that apartment to the outside?

23  A      Yes.  You could clearly hear that it was coming

24     from that apartment.

25  Q      Before that date and even after that date, have
```

1    you in your normal duties as a patrol officer been

2    called on by apartment managers like you were this day

3    to respond to apartments where nobody was responding

4    to a knock on the door?

5         MR. SOLOMON:  Objection.

6         THE COURT:  Overruled.

7    A    Yes, I have.

8    Q    Have you ever found, and if so, how many times,

9    people who have failed to respond to a knock on the

10   door who had been in distress, in need of assistance,

11   met their demise, anything along those lines?

12        MR. SOLOMON:  Objection.

13        THE COURT:  Overruled.

14   A    Yes.  I can think of at least three cases off

15   the top of my head where I found people that had

16   either committed suicide, had expired from natural

17   causes, or even elderly people that had fallen in a

18   bathroom or a shower and were unable to reach a phone

19   or otherwise get help.

20   Q    Did there come a time that you and/or the

21   landlord entered the apartment, that apartment,

22   Apartment H?

23   A    Yes.

24   Q    Can you describe how you proceeded in that

25   fashion?  How did you gain entry?

1   A      The property manager had a key to the apartment.

2   He unlocked the door and he opened it, went inside,

3   and I went in behind him.

4   Q      Can you describe the outlay of that particular

5   apartment once you went inside?  What would you first

6   encounter room-wise when you would go inside?

7   A      When you first come into the apartment, there is

8   a large, call it a living room that you first walk

9   into that's connected to a kitchen.  There was very

10  little in the living room.  There was no furniture to

11  speak of, and the only thing actually in the living

12  room I believe was a shirt laying on the floor and a

13  plastic trash bag laying on the floor.

14  Q      Did your search stop there?

15  A      No.  We continued into the kitchen.  You can

16  observe the whole kitchen from the hallway that we

17  were in once you left the living room.  You could

18  easily check the kitchen from the hallway.  There was

19  nothing in there to speak of, no subjects or anything

20  in the kitchen really.

21         We continued down the hallway.  There's a

22  bathroom on the left side.  The door was open, and we

23  could visually check in there, and there was no one in

24  there as well.

25  Q      Did there come a time that you found the room

1    from where that music was emanating?

2    A      Yes, at the end of the hallway.  You could

3    clearly hear the music coming from a room at the end

4    of the hallway, and the door to that room was shut.

5    So we could not see inside of it.

6    Q      What did you do having found that?

7    A      I opened the door to go in.  Once I opened the

8    door, it was a large single bedroom.  The radio that

9    was producing the noise was at the far side of the

10   bedroom.  It was like a long bazooka-type boom box.

11          There were also two card tables there in the

12   middle of the room.  They were covered with newspaper

13   almost like you were going to cover it to eat crabs,

14   only it was covered with like a white powdery film,

15   and also off to the side of the room there was I

16   believe two garbage bags that looked like they were

17   full, but they were also covered with what looked like

18   the same white powder.

19   Q      Did you look inside the garbage bags at that

20   time?

21   A      No.

22   Q      Did your search for anybody inside that

23   apartment end at that point?

24   A      No.  There was one other doorway leading off of

25   the bedroom.  I wanted to check that.  I didn't know

1    what was behind that doorway.  I opened that door, and

2    it led to a small closet, but it was big enough that

3    you could actually walk into it.

4    Q     And what did you see once inside there?

5    A     Inside the closet, on a shelf, pretty much at

6    eye level, I could make out there were ten, that I

7    could just quickly see, like soap, bar of soap sized

8    bars neatly stacked that were labeled mannite.

9          There was also a black duffel bag on the floor

10   that was covered in that same white powder from the

11   bedroom.  It was partially open.  There were

12   respirators sticking out of the bag.  There were

13   small, small fist-size bags of white powder in the

14   duffel bag, and there were also boxes of empty

15   sandwich bags that were sticking out of the duffel

16   bag.

17         There was also a large Rubbermaid type, clear

18   view container also right there by the duffel bag.

19   You could see inside since it was clear, and it was

20   about a third of the way full of white powder as well.

21   Q     Did you have to make an opening in any of these

22   objects or the containers of these objects or in any

23   way disturb any of them to make the observations you

24   just described for the Court?

25   A     No.

1    Q       What happened after you made these observations?

2    A       Once we determined that there was no one in the

3    apartment, I called for some additional units to come

4    up there and meet me.  While I requested that, me or

5    myself and the apartment manager left, left the

6    apartment and secured it from the outside.

7    Q       Why did you contact other units?

8    A       I knew what I had as far as the objects inside.

9    They obviously were suspicious to me, and I wanted

10   some other units up there to help me with surveillance

11   on the outside of the apartment.

12   Q       Suspicious in what way?

13   A       From the academy training, when the narcotics

14   unit comes down to teach the recruits, one of the

15   things they cover is cutting agents for narcotics, and

16   mannite is one of the largest ones they talk about.

17          With the bars clearly labeled mannite, and then

18   you also have the tables and the white powder over

19   everything, it appeared to me to be some kind of cut

20   house for narcotics.

21   Q       Did that end your, as you left that apartment

22   that day, did that end your connection with this

23   investigation?

24   A       No.

25   Q       What happened next as far as your role in it?

1    A      I contacted our CDVIT unit, which is our

2    precinct-level narcotics unit.  They responded to the

3    precinct.  I met with them, told them what I had

4    observed, and we together wrote a search warrant for

5    the premises.

6    Q      For the benefit of the court reporter and the

7    record, could you spell CDVIT?

8    A      C D V I T.

9    Q      Do you know what that stands for?  It sounds

10    like an acronym.

11    A      Community Drug and Violence Interdiction Team.

12    Q      Was there a specific detective you worked with

13    in that regard; that is, preparing a search warrant?

14    A      That would be Detective Joe Blake.

15    Q      What was his assignment at that time?  Do you

16    know?

17    A      He was part of the CDVIT unit.

18    Q      About what time did you start, that is, to sit

19    down with Detective Blake and prepare a search

20    warrant?

21          THE COURT:  Let me just interrupt for one

22    second.  I'm sure everybody knows.  I have no

23    relationship with Joe Blake.

24          MR. JACKSON:  Thank you, Your Honor.

25    Q      You may answer the question, if you recall it.

1    A       It took -- Joe was off at the time.  Detective

2    Blake was off at the time.  It took him a while to get

3    there.  I would say at least an hour to an hour and a

4    half after we cleared the apartment.  So that would

5    make it around --

6    Q       If you can approximate the time.

7    A       Early afternoon, 1:30, 2 o'clock in the

8    afternoon.

9           MR. JACKSON:  If I may approach the witness,

10   Your Honor.

11          THE COURT:  Sure.

12   BY MR. JACKSON:

13   Q       Detective, I'm showing you an item that has been

14   marked as Government's Exhibit 2 for identification

15   purposes.  Do you recognize that item?

16          (Government's Motion Exhibit Number 2 was marked

17   for identification.)

18   A       Yes.  This is the search warrant that we

19   prepared.

20   Q       Is it fair to state you were a co-affiant on

21   that?

22   A       Yes, I was.

23   Q       Along with Detective Blake?

24   A       Yes.

25   Q       Did there come a time that you actually got

1    judicial authorization to search that apartment,

2    Apartment H at 10 Breezy Tree Court?

3    A      Yes, we did.  I believe it was around 6:10 in

4     the evening.

5    Q      From whom did you receive that authorization ?

6    A      That would be Judge Cahill from Baltimore County

7     District Court.

8    Q      So you have taken us forward to about 6 o'clock

9     that afternoon or evening.  What happened after you

10    secured that search warrant?

11   A      After we secured the search warrant, we went

12    immediately back to the apartment, got back there

13    around 6:40 in the evening, and made entry into the

14    apartment to serve the search warrant.

15   Q      So did you participate in the actual execution

16    of the search warrant?

17   A      Yes.

18   Q      I want to direct your attention to the last few

19    pages there of Exhibit 2.  Can you describe what they

20    contain for the benefit of the record?

21   A      These are objects that we recovered, a digital

22    scale, respirator masks.

23   Q      You don't have to read it into the record, but

24    can you describe generally what that is, what those

25    items are?

1    A      Okay.  Most of the items on here are, you know,

2    the bars of mannite.  I believe it was 48 in total.

3    There is also a large amount of plastic baggies that

4    had already been prepacked with this powder.

5         There was some surveillance equipment that we

6    recovered, closed-circuit TV, TVs and things like that

7    that weren't hooked up to anything at the time, some

8    other bags of substance that we recovered from the

9    kitchen that appeared to be heroin.

10   Q      Is that basically in sum and substance the list

11   of the items you seized pursuant to that warrant?

12   A      Yes.

13   Q      While executing that warrant, did there come a

14   time that you had any contact with any of the other

15   residents of the bigger apartment building of 10

16   Breezy Tree Court?

17   A      It's hard to conduct any kind of police

18   operation in an apartment without drawing some

19   attention from the neighbors.  So yes, we did talk to

20   some of them.

21   Q      What was the nature of your conversation with

22   them?

23   A      They were inquiring as to what was going on.  We

24   were trying to get some information about maybe who

25   lived there.  More than -- I believe it was three

38

1       different people told us that the only people that

2       they had ever seen come in and out of Apartment H were

3       four to five black males, and they usually arrived, if

4       they came, they would usually arrive right around 10

5       o'clock at night in a gray Jeep Grand Cherokee.

6               MR. JACKSON:  Your Honor, I have no further

7       questions of this witness.

8               THE COURT:  Okay.  Mr. Solomon.

9               MR. SOLOMON:  Thank you, Your Honor.

10                          CROSS-EXAMINATION

11      BY MR. SOLOMON:

12      Q       Good morning, officer.

13      A       Good morning.

14      Q       When you received word of the noise complaint

15      coming from 10 Breezy Court, as of that time, that

16      moment in time, had you ever received any information

17      regarding a rash of burglaries in that particular

18      apartment complex?

19      A       Not that I can recall.  No.

20      Q       Now you testified that your assignment was the

21      Cranbrook Road area as well as --

22              I think you said another road, but I wasn't --

23      A       Girdwood Road.

24      Q       Those are areas which are basically dotted with

25      different apartment complexes?

1    A       Correct.

2    Q       So your assignment was to more or less

3     reconnoiter the apartment complexes in the area to

4     make sure there was no criminal activity; is that

5     right?

6    A       Correct.

7    Q       You hadn't received any information as of that

8     time with regard to any crimes occurring at 10 Breezy

9     Court, had you?

10   A       No.

11   Q       And you hadn't received any information,

12    tangible information that there were crimes about to

13    be committed at 10 Breezy Court, had you?

14   A       No.

15   Q       You didn't have any information at the time that

16    you received this call that there were in fact any

17    individuals inside the apartment who had fallen victim

18    to some type of criminal harm, had you?

19   A       No.  I did not.

20   Q       Now up until the time that you conducted the

21    first entry, not the search, but the first entry, you

22    never personally spoke to any of the other apartment

23    complex residents, had you?

24   A       No.

25   Q       The only information you had at that time was

40

1    what came to you from the manager of Henderson-Webb;

2    is that right?

3    A      Besides the information from police dispatch

4    about the multiple noise complaints, he was the one,

5    he was the one that I talked to at the scene.

6    Q      Right.  The individual, the manager from

7    Henderson-Webb didn't indicate to you that he

8    suspected that there was foul play based on any

9    tangible information he had received, did he?

10   A      He was basing his information on the complaints

11   from the neighbors about the noise --

12   Q      About the noise.

13   A      -- and he indicated to me that he was worried

14   for the safety of anyone inside.

15   Q      But there was no tangible information that he

16   related to you at least that came from the neighbors

17   to the effect that they had seen individuals enter the

18   apartment and they were concerned for those

19   individuals' safety, correct?

20   A      Correct.

21   Q      The information also, you had gotten the initial

22   call I think you testified at around 10:56 a.m.; is

23   that correct?

24   A      Correct.

25   Q      The apartment manager from Henderson-Webb said

1      that he had been getting complaints and they had

2      started the night before.  Was that right?

3   A      Yes.

4   Q      Did he identify who the parties were who had

5      complained to him?

6   A      No.

7   Q      Did he indicate to you with any concrete

8      semblance of surety that in fact the individuals who

9      had called him had expressed concern for the safety of

10      individuals inside the apartment?

11   A      No.  He did not.

12   Q      The apartment manager didn't indicate to you

13      then that, for instance, shots had been heard

14      emanating from either the apartment complex or

15      specifically from that apartment, did he?

16   A      No shots.

17   Q      There was nothing with regard to the information

18      that the apartment manager had heard up until that

19      point in time as related by the tenants who called him

20      that they had heard, for instance, scuffling outside

21      the apartment or inside the apartment?  Had they?

22   A      No scuffling.

23   Q      There was no information either that screams or

24      any sounds came from the apartment other than the

25      radio playing; is that right?

1    A       No screams or sounds.

2    Q       Did the apartment manager indicate to you at

3     that point in time whether he was aware of any elderly

4     individuals living in that apartment?

5    A       He didn't indicate that he knew about elderly

6     persons.

7    Q       The information that you received from the

8     apartment manager was in fact that the only people he

9     had seen going into and out of the apartment were in

10     fact black males.  I take it they were young?

11    A       No.  The apartment manager didn't indicate that

12     he knew who had gone in or out.  That information was

13     obtained later from other residents in the apartment.

14    Q       That was after the fact?

15    A       Correct.

16    Q       Did the apartment manager volunteer anything to

17     you to the effect these are the people whose names are

18     on the leasehold or I know that by, or customarily,

19     the individuals who come into this house are young,

20     old, black, white?

21    A       No.

22    Q       So there is no information that he had with

23     regard to profiling the individuals, correct?

24    A       Correct.

25    Q       The information that you had -- you had been

1     patrolling this area for about a year?

2     A      Yes.

3     Q      During the time period that you had been

4     patrolling the area, had you received an unusual

5     amount of complaints regarding, say, burglaries or

6     other criminal activity emanating from this particular

7     apartment building?

8     A      No.

9     Q      Do you have any independent recollection as to

10    whether, during the one year that you had patrolled

11    the area, were there any complaints of criminal

12    activity in this particular complex?

13    A      I can't imagine or I can't recollect a specific,

14    but we have calls all the time for every apartment

15    complex up there.

16    Q      But you don't have any independent recollection --

17    A      Of a specific incident?

18    Q      -- of a specific apartment?

19    A      No.

20    Q      Now you when got to the apartment, you spoke

21    with the manager.  Is that right?

22    A      Yes.

23    Q      You met him at the office or you met him outside

24    the apartment?

25    A      I met him outside the apartment.

1    Q      When you got to the apartment, did you notice

2     whether there were any foul odors coming from the

3     apartment?

4    A      No.

5    Q      Now in you experience as a Baltimore County

6     police officer, based on training and based on

7     practical experience, you have been trained and

8     advised as to what happens when bodies decompose.  Is

9     that right?

10   A      Correct.

11   Q      You know for a matter of, or as a matter of fact

12    that decomposing bodies emanate a foul smell?

13   A      After a period of time, yes.

14   Q      After a period of time.  You didn't detect

15    anything to that effect, correct?

16   A      No.

17   Q      While you had been in the academy in Baltimore

18    County, you had also been trained at least to a

19    certain extent with regard to the detection of

20    controlled dangerous substances and odors that may be

21    caused by those substances?

22   A      Yes.

23   Q      In your experience, up until that time, the one

24    year that you had been patrolling, had you ever

25    arrested anybody for possession of marijuana?

1    A      Yes.

2    Q      In the course of arresting those individuals,

3    had you ever smelled the odor that comes from burning

4    marijuana?

5    A      Yes.

6    Q      You didn't smell that when you came to the

7    apartment door, did you?

8    A      No.

9    Q      When you knocked on the door, and I take it

10   before you actually went into the apartment complex,

11   you didn't immediately open it.  You knocked again,

12   didn't you?

13   A      I had the apartment manager knock again in my

14   presence.

15   Q      Okay.  And did you hear anything inside the

16   apartment?

17   A      Other than the radio, no.

18   Q      Okay.  Had anybody provided any information, the

19   apartment manager or anyone, whether he got the

20   information secondhand or whether he provided it to

21   you firsthand from his own observations, as to whether

22   any other sounds besides the radio were heard coming

23   from the apartment?

24   A      The only information he had was the radio.

25   Q      Okay.  Aside from the smell of CDS, you were

1    also trained as an officer and also simply in the

2    course of your experience as a human being to detect

3    the smell of cigarette smoke.  Is that right?

4    A      Yes.

5    Q      Did you smell any type of smoke or any kind of

6    unusual odor coming from this particular apartment

7    when you first approached?

8    A      Not that struck me at the time, no.

9    Q      Okay.  To the best of your knowledge, did you

10   receive any information that the apartment itself had

11   been abandoned by the tenants?

12   A      No.

13   Q      Did the manager indicate whether he had

14   attempted to make phone calls to the tenants?

15   A      He didn't indicate that.

16   Q      Did the manage provide you with any information

17   with regard to who had signed the application for the

18   apartment leasehold?

19   A      I believe he did have a copy of the lease.

20   Q      On the lease was there information, as there

21   customarily is, regarding the name and emergency

22   numbers of people to contact?

23   A      I don't recall that.

24   Q      Do you know whether he had emergency numbers to

25   contact?

```
 1    A      I don't know that he had an emergency number.

 2     There was a name on it, but no phone number that I can

 3     remember.

 4    Q      So to the best of your knowledge, there had

 5     never been any calls made by the apartment complex to

 6     any individuals who may have had responsibility for

 7     maintaining the lease.  Is that right?

 8    A      I don't know that they had done that.  No.

 9    Q      Or its people who may have been listed on the

10     application as emergency contacts?

11    A      Correct.

12    Q      As far as you know.

13    A      (The witness nodded in an affirmative fashion.)

14    Q      Is that right?

15    A      Correct.

16    Q      The information that the manager had received

17     from the co-tenants -- did he identify who those

18     tenants were who said they heard the radio?

19    A      No.

20    Q      He didn't say whether they were in adjacent

21     rooms or adjacent apartments, did he?

22    A      No.

23    Q      Was H an upper floor?  Was it a ground floor, a

24     basement?

25    A      It was a middle floor.
```

48

1    Q      A middle floor.  Would that constitute a second

2    level or was that the actual ground level of the

3    apartment?

4    A      It would be the second level.

5    Q      Okay.  Did anybody, including you, make an

6    effort to, say, put a ladder on the outside of the

7    apartment complex, climb to where the windows were to

8    see whether there was any activity or any individuals

9    seen inside the apartment?

10   A      There were blinds that you could see from the

11   outside on the window.

12   Q      Were all windows closed?

13   A      Yes.

14   Q      Did the apartment manager ever indicate to you

15   whether these blinds were always closed, whether

16   sometimes he saw them up?  Do you know?

17   A      He didn't say anything about that.

18   Q      Okay.  Now I noted in your supplemental report,

19   and by way of your testimony as well, that when you

20   first opened the apartment with the help of the

21   apartment manager, you were able to see inside the

22   apartment.  Is that right?

23   A      Yes.

24   Q      The apartment, at least as you have described

25   it, consisted of a living room area and a kitchen, at

1    least when you first went in; is that right?

2    A      Yes.

3    Q      Was the living room basically an open-ended,

4     sort of an open space with what you might consider to

5     be a dining room adjoining it?

6    A      Yes.  You could call it that.

7    Q      So you could see that entire area?

8    A      Yes.

9    Q      When you opened the apartment, did you yell out

10    or did the apartment manager yell out is anybody here?

11   A      Yes.  Whenever we go into something like that,

12    we're going to announce our presence as police.

13   Q      And was there a response?

14   A      No.

15   Q      You were able to see in plain view as you walked

16    into the apartment that there was little or no

17    furniture there, correct?

18   A      Correct.

19   Q      You saw one shirt.  Now was that an undershirt

20    or was that actually a button-down shirt?

21   A      I don't know.

22   Q      Did you see any signs as you walked into the

23    apartment to suggest that foul play had been committed

24    there?

25   A      No.

1    Q      Did you see any signs to suggest that perhaps

2    someone had been injured and knocked over items in the

3    course of injuring one's self?

4    A      No.

5    Q      Besides the living room with the shirt and I

6    think the kitchen, what else did you see in that open

7    area?

8    A      There was a trash bag and a shirt on the floor.

9    Q      Now this particular trash bag didn't have any

10   white powder on it as you've described the others,

11   correct?

12   A      Not that I recall.

13   Q      Was the trash bag open or was it closed, if you

14   know?

15   A      I don't remember.

16   Q      Who was it who led into the apartment?  Was it

17   you or the manager?

18   A      The apartment manager.

19   Q      You say the apartment manager also called you

20   for his own safety; is that right?

21   A      Correct.

22   Q      Because did he express to you that he suspected

23   there might have been criminal activity taking place

24   inside?

25   A      He was unsure of what happened and wanted to

1      make sure that nothing had happened.

2      Q      So then you were called not only to determine

3      whether there might be someone who was in distress,

4      but you were also called because there was a question

5      in the apartment manager's mind as to whether criminal

6      activity had taken place there, correct?

7      A      He was more concerned about the safety of the

8      persons inside and not necessarily any criminal

9      activity.

10     Q      Okay.  Then he didn't need you for safety,

11     correct?

12     A      Well, if there was some kind of a dead body or

13     something, he would need me.  If there was someone in

14     need of help, he wanted to have an emergency responder

15     there who would be able to summon help quickly.

16     Q      Well, in that regard, had anybody called for

17     ambulances up until that time?

18     A      We usually don't, no.  But no.

19     Q      Or paramedics or anybody else to aid if somebody

20     in fact had been in distress?

21     A      No.

22     Q      Okay.  So after you walked around in the living

23     room, dining room and kitchen area and you saw

24     nothing, you said you then went down to an adjoining

25     hallway?

1    A      Yes.

2    Q      Now the adjoining hallway, how many doors were

3     there in that hallway, if you recall?

4    A      Two.

5    Q      Two.  Were they both bedrooms or as you've

6     described, one bedroom with one walk-in closet?

7    A      There was a bedroom with the door closed and

8     there was a bathroom off of the hallway with the door

9     open.

10   Q      What was the first door that you crossed?

11   A      The bathroom.

12   Q      Did the bathroom, was there anything in the

13    bathroom that your could see at least in plain view to

14    suggest that anybody had been injured or was in

15    distress?

16   A      No.

17   Q      Did you notice whether -- strike that.

18          The inside of the apartment, was the flooring

19    carpet or was it hardwood, if you know?

20   A      Carpet.

21   Q      Did the carpet look as if it had any stains on

22    it to suggest that there was blood?

23   A      Nothing to suggest blood.

24   Q      Was there anything on the apartment floor, the

25    carpet, to suggest that foul play had been committed

1      inside or that anybody for that matter had injured

2      one's self?

3      A      No.

4      Q      So when you went by the bathroom, you took a

5      quick like inside the bathroom, and you saw nothing?

6      A      Correct.

7      Q      So that left then two more doors?

8      A      Just one.

9      Q      Just one door, that being the main bedroom?

10     A      Correct.

11     Q      And that's where the radio was coming from?

12     A      Yes.

13     Q      Did you knock on the bedroom door or did you

14     simply open it right away?

15     A      I knocked and then went in.

16     Q      And there was no response?

17     A      Correct.

18     Q      Now when you opened the bedroom door, a quick

19     cursory look would have revealed that there was nobody

20     there, correct?

21     A      Correct.

22     Q      As a matter of fact, there was no furniture in

23     the bedroom, just as there was no furniture in the

24     rest of the apartment.  Is that right?

25     A      There were the two card tables with the white

1    powder?

2    Q      But you didn't see the white powder until you

3    actually walked into the bedroom, correct?

4    A      You could plainly see it from the doorway.

5    Q      You saw that all in one cursory glance?

6    A      Correct.

7    Q      Okay.  You then said there was one other sort of

8    a hallway door, which was a walk-in closet or maybe a

9    linen closet?

10   A      Yes.  If you open the door into the bedroom, the

11   door opens inward and the door to the closet was on

12   the right-hand side, but you actually had to the walk

13   into the apartment to see that door.

14   Q      By the way, had the apartment manager provided

15   you with any information to the effect that the

16   occupants of the apartment had not paid their rent or

17   it was due or it was overdue?

18   A      No.

19   Q      No information was communicated to that effects?

20   A      No.

21          MR. SOLOMON:  Begging the Court's indulgence.

22   Q      Did you ask the apartment manager at any time

23   prior to entering into the apartment who he

24   communicated with in order to receive rent and/or just

25   simply to communicate regarding the apartment?

1    A      The apartment managers that we deal with

2     normally don't deal with the billing aspect of it.

3     They are more along the maintenance end, general

4     property.  They deal with the problems, the daily

5     problems of the apartment, not necessarily the

6     billing.

7    Q      Like a broken window or the heat not working?

8    A      Correct.

9    Q      Had he indicated to you at that point in time

10    whether he had had some communications, untoward or

11    otherwise, with any of the occupants during the course

12    of the tenancy?

13   A      No.

14   Q      Did he give you any information with regard to

15    the occupants during the course of the tenancy before

16    walking into the apartment?

17   A      No.

18          MR. SOLOMON:  Begging the Court's indulgence.

19          THE COURT:  Uh-huh.

20          MR. SOLOMON:  I have nothing further.

21          THE COURT:  Thank you.

22          Mr. Ravenell, did you have any questions on this

23    issue?

24          MR. RAVENELL:  I do have a few questions.

25                      CROSS-EXAMINATION

1    BY MR. RAVENELL:

2    Q     Sir, you indicated that you went to the location

3     with Detective Blake to execute the search and seizure

4     warrant, correct?

5    A     Yes.

6    Q     You told Your Honor -- strike that.

7          What time and what day did your involvement in

8     this investigation end?

9    A     Did it end?

10   Q     Yeah.

11   A     The following morning, which would be the 20th,

12    around 7 o'clock in the morning.

13   Q     Did you remain at the -- after you came back to

14    execute the search and seizure warrant, did you remain

15    at the apartment and the apartment complex the entire

16    time, until 7 a.m.?

17   A     No.  I accompanied the evidence back to the

18    station to package it.

19   Q     So you went in, the warrant was execute, items

20    were found, and I think you said the warrant was

21    executed around 6:56 p.m. on June 19, 2002, correct?

22   A     Correct.

23   Q     After the warrant was executed and evidence was

24    obtained, you left with the evidence to go to the

25    precinct?

1    A      Correct.

2    Q      Approximately what time did you leave the

3    apartment complex to accompany the evidence to the

4    precinct?

5    A      It was late, much later than when we entered.

6    There was a lot of evidence.  I believe it was 122

7    pieces.  Some of it was quite bulky, and we needed to

8    average for alternate transport.  We couldn't fit it

9    in the cars and the vehicles that we had.

10          I don't remember what time.  It would be

11   probably before, at least before 10 o'clock I was back

12   at the station.

13   Q      Around 10 o'clock p.m. you were back at the

14   station?

15   A      Correct.

16   Q      After you arrive back at the station around 10

17   o'clock p.m., did you ever go back to the apartment

18   and the apartment complex that evening?

19   A      No.

20   Q      Okay.  You indicated to Your Honor that at some

21   point you spoke to some people who told you that there

22   were four to five black males that they had seen in or

23   around or in that apartment or enter the apartment.

24   What day did you have that conversation with the

25   people who were giving that information?

58

1    A      That would be on the 19th, the same day.

2    Q      Approximately what time?

3    A      It was while we were waiting after the search

4    warrant, after we had obtained the evidence.  I

5    believe a lot of the people were coming home.  So

6    around 5, 5:30.

7    Q      Did you alone have the conversation with these

8    people or did other officers, including Detective

9    Blake, engage in those conversations with the people?

10   A      No.  That was myself having that conversation.

11   Q      Do you remember the name of any particular

12   person you spoke to?

13   A      No, I don't.

14   Q      How many individuals did you speak to regarding

15   anyone who may have been in and out of that apartment?

16   A      At least three.

17   Q      You got the names of none of those three

18   individuals?

19   A      No.

20   Q      Did you make any notation in any file or any

21   report that you had spoken to those three individuals?

22   A      I don't recall if it's in the report or not.  I

23   can check if you want.

24   Q      Sure.  Please do that.

25          (Pause.)

59

```
 1    A       No.  It's not noted in the report.

 2    Q       Now when you said the report, what are you

 3     looking at, sir?

 4    A       This would be the statement of charges.

 5    Q       Now when you allegedly learn this information

 6     from the three people or so regarding potential

 7     individuals who had gone in and out of that apartment,

 8     did you give that information to Detective Blake who

 9     was now running the investigation?

10    A       Yes.

11    Q       The statement of charges that you're referring

12     to, that is a statement of charges written by

13     Detective Blake?

14    A       Correct.

15    Q       And Detective Blake makes no reference to this

16     information you said you allegedly learned that

17     evening; is that correct?

18    A       Correct.

19    Q       Now you actually wrote a police report as well

20     regarding this incident, correct?

21    A       Yes.

22    Q       Do you have a copy of that report with you?

23    A       I do.

24    Q       That report is dated June 27th of 2002, correct?

25     At the bottom, on the right corner.
```

1    A       That would be the approval date.  It was

2     actually written on the 19th.

3    Q       So written right after.  That was actually the

4     day of the incident, correct?

5    A       Correct.

6    Q       And then approved by your supervisor on June 27,

7     '02?

8    A       Yes.

9    Q       Now the report that you wrote regarding this

10     incident actually indicates that you were present,

11     actually mentions that there was a search warrant

12     obtained and that the search warrant was actually

13     executed, correct?

14    A       Yes.

15    Q       It kind of details your involvement from the

16     point where you actually received the call that

17     morning and went to the location, up until the search

18     and seizure actually occurred and actual items were

19     recovered, correct?

20    A       Yes.

21    Q       In the report that you wrote, did you make any

22     reference to speaking to three individuals or even any

23     individual other than the apartment representative?

24    A       No.

25    Q       Did you make any reference to anyone telling you

1    about four to five black males coming to that

2    location?

3    A     No.

4    Q     Did you make any reference to anyone telling you

5    that they normally arrived at 10 p.m.?

6    A     No.

7    Q     Did you make any reference to a Jeep Cherokee?

8    A     No.

9    Q     And on what are you basing this information that

10   you are imparting to Your Honor today that, I guess

11   some four years later that you were told by these

12   people of about four to five black males coming to

13   that apartment around 10 p.m. in a Grand Jeep

14   Cherokee?

15   A     I specifically remember talking to these people

16   and it struck me that of the ones that I talked to,

17   the ones that knew anything about the people in this

18   apartment all specifically said 10 p.m. and a gray

19   Jeep Cherokee.  When I relayed that information to

20   Detective Blake, he made the officers, the officers at

21   the scene aware of this information, and it struck me

22   that, while I was back at the station packaging some

23   of the evidence that we had that we were able to take

24   back with us at the time, almost exactly at 10 p.m., I

25   heard over the radio that there was a gray Jeep Grand

1       Cherokee coming into the apartment complex.

2       Q       Now since this struck you so much that this was

3       apparently unusual, when you wrote that report, why

4       did you leave it out?

5       A       I didn't have any involvement with the gray Jeep

6       Cherokee when it came into the complex.

7       Q       No, not the gray Jeep Cherokee.  Why did you

8       leave out the information that you allegedly had been

9       given?

10      A       It didn't seem like it was a part of my

11      involvement, that it wouldn't make a difference.

12      Q       It wouldn't make a difference?  That's why you

13      left it out of the report that you wrote?

14      A       (The witness nodded in an affirmative fashion.)

15              MR. RAVENELL:  Nothing further, Your Honor.

16              THE COURT:  Mr. Jackson.

17              MR. JACKSON:  Very briefly on redirect.

18                          REDIRECT EXAMINATION

19      BY MR. JACKSON:

20      Q       Officer Fisher, Mr. Solomon had asked you about

21      whether the landlord was concerned about criminal

22      activity inside that apartment when you were

23      approached on this matter.  Did he at any time, he,

24      the landlord, at any time -- I say landlord.  I mean

25      the property manager -- indicate that he was concerned

63

1    about criminal activity?  Did he ever say anything

2    along those lines?

3    A      No.  He was more, as I said, he was more

4    concerned for the safety of anyone inside.

5    Q      You mentioned this walk-in closet both on direct

6    and on cross.  As you opened that, what turned out to

7    be a walk-in closet, did you know that it was a

8    walk-in closet at the time you opened it?

9    A      No.  There was no way to tell from the outside.

10   It had a regular entry door.

11          MR. JACKSON:  Your Honor, I have no further

12   question of this witness.

13          THE COURT:  Anything further?

14          MR. SOLOMON:  No.  Thank you.

15          MR. JACKSON:  Excuse the witness, Your Honor?

16          THE COURT:  Yes.  Thank you.

17          MR. JACKSON:  The next witness, Your Honor,

18   would be Sergeant Dennis O'Neill of the Baltimore

19   County Police Department.

20          MR. SOLOMON:  Your Honor, may we take a brief

21   recess?  Mr. Wright indicated he has to go to the

22   bathroom.  Would that be okay?

23          THE COURT:  We'll take a ten-minute recess.

24          MR. SOLOMON:  Thank you.

25          (A recess was taken.)

 1          THE COURT:  Mr. Jackson, you had another

 2     witness?

 3          MR. JACKSON:  I do, Your Honor.  If I may fetch

 4     him?

 5          MR. O'NEILL:  Good morning, Your Honor.

 6          THE COURT:  Good morning.

 7                         DENNIS O'NEILL

 8     a witness called on behalf of the Government, having

 9     been previously duly sworn, was examined and testified

10     as follows:

11          THE CLERK:  Be seated.

12          Speak directly towards the mike.  State your

13     name and spell it for the record, please.

14                       DIRECT EXAMINATION

15     BY MR. JACKSON:

16     Q     Sergeant O'Neill, good morning.

17     A     Good morning, sir.

18     Q     Could you identify yourself for the record and

19     describe your current assignment?

20     A     My name is Sergeant Dennis O'Neil, O N E I L L,

21     Baltimore County police, narcotics.

22     Q     How long have you been with the Baltimore County

23     Police Department?

24     A     I'm in my 33rd year.

25     Q     How long have you been a sergeant with the

1    Baltimore County Police Department?

2    A      Since 1987.

3    Q      Do you have a specific assignment within the

4    Baltimore County Police Department?

5    A      I work on the major case narcotics unit.

6    Q      How long have you been with that particular

7    unit?

8    A      Since 1991.

9    Q      So you have been a sergeant in the Baltimore

10   County Police Department during that entire time also;

11   is that correct?

12   A      That's correct.

13   Q      Were you so assigned back in June of 2002?

14   A      Yes, I was, to Baltimore County.

15   Q      Did there come a time in your duties that day

16   that, excuse me, on the 19th of June 2002, that you

17   responded to the vicinity of 10 Breezy Tree Court in

18   Cockeysville, Maryland?

19   A      Yes, sir.

20   Q      What were the circumstances of that?  Why were

21   you called there?

22   A      I was contacted by the sergeant working in that

23   particular unit out of Cockeysville.  There is

24   narcotics unit out of Cockeysville.  He contacted me

25   and asked for assistance.

1    Q      About what time of day was that?

2    A      It was approximately around 6 o'clock he had

3     contacted me.

4    Q      So that your first contact in reference to

5     anything that happened on Breezy Tree wasn't until the

6     evening; is that correct?

7    A      That's correct.

8    Q      You see before you what has been marked as

9     Government's 1.  Do you recognize that, detective?

10   A      Yes, sir.

11   Q      What is it in your understandings?

12   A      That's the Breezy Tree part of the community

13    there.

14   Q      Now to your right, excuse me, my right, your

15    left, there is a laser pointer I believe.  Can you see

16    it there?

17   A      Yes, sir.

18   Q      Are you from that position able to hit

19    Government's 1 with the laser pointer?

20   A      This is Breezy Tree.

21   Q      Was there a specific address that was called to

22    your attention?

23   A      Yes, sire.  We were responding to 10 Breezy

24    Tree, Apartment H.

25   Q      You said we.  Were you alone in this response?

67

1    A       No, sir.  I sent some detectives to that

2     location in advance of me arriving there.

3    Q       Can you, for the benefit of the Court and the

4     record, use that laser pointer to show which of those

5     various apartment houses actually is the 10 Breezy

6     Tree.

7    A       Right there, sir.

8    Q       Could you describe for the benefit of the

9     record, since the record is not going to reflect what

10    is depicted there, sort of the street layout?  Is

11    Breezy Tree on a, for instance, a through street?

12   A       No, it's not.  It's a circle there that goes

13    back out to Grindwood or Greenwood Road, which is

14    located right here at the bottom.

15   Q       Is Girwood or Grindwood, whatever, is that the

16    through street off of Breezy Tree?

17   A       Yes, sir.

18   Q       If you come off the through street and you want

19    to get to 10 Breezy Tree Court --

20   A       Yes, sir.

21   Q       -- how many turns do you have to make to get

22    there?

23   A       Two.

24   Q       Directing your attention back to that specific

25    apartment and the reasons you were there that day, did

68

1    there come a time that you participated in the

2    execution of a search and seizure warrant at that

3    location?

4    A      Yes, sir, I did.

5    Q      Did you have the opportunity to observe whatever

6    evidence was seized from that apartment at that time?

7    A      Yes, sir, I did.

8    Q      Can you describe what if any contraband was

9    seized from that apartment?

10   A      There were numerous items recovered from there

11   during the execution of the warrant, approximately two

12   and a half kilos of heroin.  There were numerous

13   bricks of mannite.  There were respirators.  There

14   were gel caps.  There were mixers.

15   Q      And you personally witnessed this?

16   A      Yes, sir.  I saw them in the apartment.

17   Q      Did there come a time that you participated in

18   the arrest in reference to this investigation of

19   Calvin Wright?

20   A      Yes, sir.

21   Q      Can you describe for the Court and for the

22   record the circumstances under which that happened?

23   A      We had maintained an outer surveillance of the

24   apartment.  We had additional knowledge that someone

25   might appear there around 2200 hours, operating a gray

1       Cherokee.  So several units were stationed outside of

2       the apartments while the search was being conducted.

3       Q       And where were you when this was taking place?

4       A       I was inside the apartment.

5       Q       Was the apartment door, the front door at that

6       time open to anyone to walk in or out?

7       A       No.  It was locked.

8       Q       Was there still a search ongoing at that point?

9       A       Yes.

10      Q       Were there radios that allowed communication or

11      some kind of communication device that allowed

12      communication among the various officers that were on

13      the scene at that location?

14      A       Yes, sir.

15      Q       Did you have one of those devices?

16      A       Yes.

17      Q       Were you able to stay in contact with other

18      officers that had these devices?

19      A       Yes, sir.

20      Q       Did you personally observe a gray Cherokee

21      arrive at that location?

22      A       No.

23      Q       Did there come a time that you were made aware

24      of one?

25      A       Yes.

1    Q       How did that happen?

2    A       Over the police radio.

3    Q       What if any other communications were told to

4    you about the arrival of that vehicle?

5    A       Well, over the police radio, two individuals,

6    two black males exited a gray in color Cherokee.  They

7    did give out the tag number at the time, and those

8    individuals walked towards the apartment building in

9    which we were in.

10   Q       This is all while you are in the apartment; is

11   that correct?

12   A       That's correct.

13   Q       Did you actually see them walk toward the

14   apartment building of 10 Breezy Tree?

15   A       No.

16   Q       What happened next?

17   A       Obviously we just stayed quiet until they

18   entered the building.  They entered the building and

19   the one individual opened the door with a key to the

20   location.

21   Q       When you say they entered the building, do you

22   have knowledge of whether there is a common area for

23   all the apartments in that building that contains 10

24   Breezy Tree Court, Apartment H?

25   A       Yes, there's a common area.  Yes, sir.

1    Q      Now when you're saying they entered the

2     building, they being the two black males I take it?

3    A      That's correct.

4    Q      When they entered the building, is that what

5     you're referencing, the common area?

6    A      Yes, sir.

7    Q      What happened after they entered the common area

8     as you understood through the police communication?

9    A      They walked to the door of Apartment H and an

10     individual placed a key in the door and opened,

11     unlocked the door?

12    Q      What happened at that point?

13    A      They walked into the door or inside the door,

14     and Mr. Wright was the first individual into the room.

15     The second individual walked into the room also, and

16     they were placed under arrest.

17    Q      Do you know which of the two individuals had the

18     key that opened the door?

19    A      No, I don't.

20    Q      What happens after Mr. Wright and the other

21     individual were arrested?

22    A      They were placed under arrest and they were

23     transported back to Precinct 7 for processing.

24    Q      Did you go with them or did you stay at the

25     seen?

1    A       I stayed at the apartment.

2    Q       Why did you stay at the scene?

3    A       We had a lot of evidence that we had recovered

4     and we were waiting for transportation of the

5     evidence, also waiting for the bomb squad to return or

6     to come there and recover canisters of substance,

7     which I don't know what was in the canisters.

8    Q       Why the bomb squad?

9    A       Well, our rules and regulations won't allow us

10    to transport any canister in a police vehicle.  So we

11    had the bomb squad respond in any of those situations

12    to recover that.

13   Q       About what time was the arrest of Mr. Wright

14    made?

15   A       Approximately 2200 hours, which is 10 o'clock.

16   Q       Ten o'clock in the evening?

17   A       Yes, sir.

18   Q       When did you finally leave the vicinity of 10

19    Breezy Tree Court?

20   A       I stepped outside on several occasions because

21    it was hot and it was warm in there to do things.  But

22    I didn't leave there until about three or four in the

23    morning.

24   Q       In between the time of Mr. Wright's arrest and

25    the time you left, did you participate or witness

1    anybody else's arrest?

2    A      Yes, I did.

3    Q      Who else besides Mr. Wright's arrest did you

4     either witness or participate in?

5    A      Mr. Butler, seated at trial table.

6    Q      Can you describe the circumstances of Mr.

7     Butler's arrest?

8    A      Yes, sir.  I was, I was standing outside right

9     here on the sidewalk.

10   Q      For the record, indicating with the laser

11    pointer where he was situated.

12   A      In that general area.  There were several

13    officers and detectives standing there taking a break

14    from what we were doing, waiting for the truck to

15    arrive.  I was right about here.

16   Q      For the record, just so we have something to put

17    on the record beyond the laser pointer, would that be

18    the area that seems to be --

19   A      In front of 10 Breezy Tree.

20   Q      10 Breezy Tree Court?

21   A      That's correct.

22   Q      Were you in uniform at the time?

23   A      No.

24   Q      You're a sergeant.  Okay.

25          You indicated you.  And were there other

1    officers present?

2    A      Yes.  There were several.

3    Q      Were standing out in front of that apartment

4    building; is that correct?

5    A      That is correct.

6    Q      What happened next?

7    A      Well, approximately, I believe it was around 1

8    o'clock in the morning, a white vehicle entered right

9    about, well, entered here and made a right and came up

10   here towards the apartment complex.

11   Q      Indicating for the record a turn off of the main

12   through road and onto Breezy Tree Court?

13   A      That's correct, sir.

14          When the vehicle approached this area here, it

15   slowed down considerably.  The operator then

16   accelerated and went on by quickly and came around and

17   started to leave the complex.

18   Q      What if any police action took place at that

19   time?

20   A      Sergeant Cannon was stationed in this general

21   area and he immediately blocked the roadway and then

22   stopped the vehicle and identified himself.

23   Q      What happened --

24          You say there was a white vehicle that slowed

25   down and sped up.  Were you able to make an

1      observation of who was inside the vehicle?

2      A      All I could tell at the time, it appeared to be

3      two black males.  That was all I could tell.

4      Q      And did you recognize either of the black males?

5      A      No.

6      Q      Where approximately was the vehicle stopped?

7      A      Right about here, before it entered that exit

8      way onto the main road.

9      Q      Were you able to observe that stop?

10     A      Yes, I did.

11     Q      And who effected that stop?

12     A      Sergeant Cannon.

13     Q      Who is Sergeant Cannon?

14     A      Sergeant Cannon is or was a Baltimore City

15     police officer assigned to Group 54 HIDTA, working out

16     of that.

17     Q      Is that H I D T A?

18     A      Yes.  Actually it's a DEA task force in the

19     HIDTA group.

20     Q      Now they are not part of the Baltimore County

21     Police Department, are they?

22     A      No, they are not.

23     Q      Why were they?

24     A      Because the names of the individuals that were

25     arrested were known to them, and they responded when I

76

1    contacted them, which I normally do on anything of a

2    large nature.

3    Q      They were known to Sergeant Cannon?

4    A      Sergeant Cannon and other members of the group

5    that were assisting.

6    Q      Were known to them how?

7    A      As being involved in drug activity.

8    Q      Let's be clear.  Were being involved in drug

9    activity in reference to what just happened there or

10   on other days?

11   A      Other days, on the organization itself.

12   Q      How was it communicated to Sergeant Cannon who,

13   if anyone, was involved in this?

14   A      Well, at first, I contacted by public service

15   and explained what we had and gave him the names, and

16   he immediately responded with members of his squad and

17   himself.

18   Q      Between the time of Mr. Butler's stop, or the

19   stop of the white vehicle --

20   A      Yes.

21   Q      -- and the arrest of Mr. Wright, did there come

22   a time that you learned of the identity of, or at

23   least the registered identity of the owner of the

24   Cherokee that Mr. Wright had driven to the location.

25   A      Yes, I did.

1    Q        How did you find that out?

2    A        We ran a listing of the vehicle through

3     communications.

4    Q        When you say a listing, what is the basis of,

5     what is the database or the records that are drawn on

6     by your --

7    A        The Motor Vehicle Administration.  We provided

8     the tag on the vehicle.  If you need the tag, I have

9     it right here.

10   Q        Well, more importantly, for my purposes, who

11    was, to your knowledge at that time, the registered

12    owner of the vehicle that Mr. Wright had driven that

13    day?

14   A        Mr. Johnnie Butler.

15   Q        After the vehicle, that is the white vehicle was

16    stopped by Sergeant Cannon, what did you do?

17   A        I immediately ran or jogged towards the vehicle

18    to assist, if I could.

19   Q        Can you describe what happened once the vehicle

20    was stopped?

21   A        The passenger was out of the vehicle when I got

22    to him.  The sergeant asked a name and I overhead it

23    the second time, and he said his name was Butler, Mr.

24    John Butler.

25   Q        Do you see that individual in the courtroom here

1    today?

2    A       Yes, sir, seated next to Mr. Ravenell.

3    Q       What happened after that identification was

4     made?

5    A       He was placed under arrest by Sergeant Cannon

6     and immediately searched.

7    Q       Do you know what if anything was found on Mr.

8     Butler?

9    A       There were two keys and two cards.

10   Q       What kind of cards, sir?

11   A       Like swipe cards for storage lockers or things

12    of that nature.

13   Q       Directing your attention, diverting your

14    attention for a moment, you've indicated that you have

15    been a police officer for 30 plus years; is that

16    correct?

17   A       Yes, sir.

18   Q       During your tours of duty or tour of duty as a

19    police officer, have you ever been summoned to an

20    apartment complex to check out what if anything has

21    happened to an occupant who is not answering a door?

22   A       Yes, sir, on numerous occasions.

23   Q       During the course of your experience, have you

24    ever, once entering an apartment complex on request of

25    a landlord or a property manager, found somebody in

79

1    distress or in need of assistance who was unable to

2    answer the door?

3    A      Yes.

4    Q      On approximately how many occasions would you

5    estimate?

6    A      Over 30.  Well, 20, 10 to 20 easy.

7           MR. JACKSON:  Thank you.

8           Begging the Court's indulgence for just a

9    moment.

10          Your Honor, I have no further questions.

11          THE COURT:  All right.  Thank you.

12          Mr. Ravenell.

13          MR. RAVENELL:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. RAVENELL:

16   Q      Good morning, Sergeant O'Neill.

17   A      Good morning, sir.  How are you today?

18   Q      Fine.  Thank you.

19          You indicated that you were actually on the

20   sidewalk in front of 10 Breezy Tree Court.  You were

21   near the entrance of the apartment building when you

22   first observed this white vehicle; is that correct?

23   A      In that general area, yes, sir.

24   Q      And you observed the white vehicle, I think you

25   indicated, pull, drive into -- well, strike that.

1      Where were you when you first observed the white

2  vehicle?

3  A     I was standing right about in this general area.

4  Q     Where was the white vehicle when you first

5  observed it?

6  A     It was turning right here.

7  Q     Now when the vehicle turned, you said it drove

8  towards the front of the apartment building?

9  A     Yes, sir.

10  Q     The vehicle you said was traveling in the

11  correct, it was traveling in the proper direction it

12  appeared; is that correct?

13  A     Yes, sir.  It was traveling in this direction.

14  Q     Okay.  From your knowledge and observation,

15  there are about 12 apartments in 10 Breezy Tree Court,

16  correct?

17  A     I believe there is, sir.

18  Q     Okay.  When you saw the vehicle, there was

19  nothing, this white vehicle, there was nothing about

20  the white vehicle that associated it with apartment

21  ten or any apartment in 10 Breezy Tree Court, correct?

22  A     That's correct.

23  Q     I believe you, what you told Your Honor is that

24  from your recollection, you saw two males in the

25  vehicle?

1    A       It appeared to be two males.  Yes, sir.

2    Q       And police officers were standing, including

3     yourself, were standing in front of the apartment

4     building, correct?

5    A       That's correct.

6    Q       How many police officers were standing in front

7     of 10 Breezy Tree Court when the white vehicle

8     approached in front of that building?

9    A       Several, sir.

10   Q       Five, ten?

11   A       Yes, sir, in that, five or ten.

12   Q       Okay.  Some of those officers were in fact in

13    uniform?

14   A       That's correct.

15   Q       Now you told us that the vehicle was stopped

16    close to the point where it was about to exit the

17    turnaround or the drive around, the circle, and go

18    back towards the main street, correct?

19   A       Yes, sir.

20   Q       You told us that one vehicle, actually Sergeant

21    Cannon pulled in front of the vehicle?

22   A       I believe it was in front of the vehicle.  Yes,

23    sir.

24   Q       There was another vehicle that pulled in the

25    rear of the vehicle as well?

1    A       I believe, sir.

2    Q       Okay.  The marked unit or, excuse me, the unit,

3     particularly Sergeant Cannon's unit that pulled in

4     front of the vehicle, obviously had enough time to

5     position itself in front of that vehicle before the

6     vehicle ever exited the circle, correct?

7    A       Yes, sir.

8    Q       You had not seen Johnnie Butler prior to seeing

9     the vehicle, the white vehicle as it was driving

10    through that circle on June 19th of 2002, correct?

11   A       That is correct.

12           THE COURT:  I'm sorry.  To be clear, was that a

13    question whether he had ever seen Mr. Butler or

14    whether he had seen him in connection with the car

15    that evening?

16   Q       No.  Whether you had seen him earlier, had seen

17    Mr. Butler earlier that day when you first saw him in

18    the vehicle.

19   A       I have never seen the man before.

20   Q       Thank you.  No one had indicated that they had

21    seen Mr. Butler near or about that apartment earlier

22    that day, correct?

23   A       Not to my knowledge, sir.

24   Q       The vehicle was stopped because it slowed down

25    as it drove past the front of 10 Breezy Tree Court and

1    then, as you said, sped away, correct?

2    A      That's correct.

3    Q      Now when you say the vehicle -- well, of course,

4     the vehicle never -- strike that.

5           When you said the vehicle actually sped away,

6     you mean the vehicle actually kind of sped up from the

7     slow down position that it was in or traveling,

8     correct?

9    A      Yes, sir.

10   Q      The white vehicle never actually stopped in

11    front of 10 Breezy Tree Court.  It slowed to about

12    three to five miles per hour, correct?

13   A      Almost stopped, sir.

14   Q      It had slowed, sir, to about three to five miles

15    per hour?

16   A      I would say yes.

17   Q      Okay.  Do you know what the speed limit is in

18    the area --

19   A      No, sir, I don't.

20   Q      -- in that development?

21   A      I don't.

22   Q      Did you ever check to see whether it was ten

23    miles per hour?

24   A      No.

25   Q      You had no, you as a police officer in the

84

1    police department, had no information about that white

2    vehicle prior to seeing that vehicle come into the

3    circle, correct?

4    A      No.

5    Q      Now you told us you had been outside of the

6    apartment periodically, in and out because it was too

7    hot in the building, correct?

8    A      Yes, sir.

9    Q      You would come out for about five to ten minutes

10    and go back in, do some searching, come back out for

11    five to ten minutes, correct?

12    A      Yes, sir.

13    Q      Now you testified previously at a detention

14    hearing involving Mr. Wright -- Mr. Butler on February

15    the 6th of 2006.  Do you recall that?

16    A      Yes, sir.

17    Q      At the time you indicated that you were definite

18    that there were two males in the vehicle, the one that

19    Mr. Butler was in.  Is that correct?

20    A      I think I testified that it appeared to be two

21    males in the vehicle, yes.

22    Q      When you got to the location where Mr. Butler

23    was, who was in the vehicle with Mr. Butler?

24    A      Mr. Butler and another subject, later identified

25    as Mr. Caldwell.

1    Q      As Mr. Who?

2    A      Caldwell.

3    Q      Caldwell?

4    A      I believe, yes, sir, Caldwell.

5    Q      Is Mr. Caldwell mentioned anywhere in the police

6     report?

7    A      Is he mentioned in the police report?

8    Q      Yes.

9    A      I'm sure it's in there somewhere.

10   Q      Okay.  Would you look?  Do you have a copy of

11    the report, sir?

12   A      I have it all here, sir.

13   Q      Sure.

14   A      It will take, it will take hours to go through

15    and see if it's in there.

16   Q      Hours?

17   A      Yes, sir, because I didn't write this report.

18   Q      The statement of charges I have is about 11

19    pages long.

20   A      Okay.

21   Q      Why would that take hours?

22   A      Well, there are numerous police reports in

23    addition to a statement of charges.

24   Q      Okay.  Well, I don't think it will take hours,

25    but if you can tell us whether there is a reference to

1    a Caldwell?

2         THE COURT:  Why don't we look at that over a

3    recess or I'll be happy to skim through the statement

4    of charges myself.  It's nothing you can point to at

5    this moment I gather?

6         MR. JACKSON:  No.  We can check on that over the

7    course of whatever recess we have, Your Honor.

8         THE COURT:  Why don't we check on that.

9         MR. RAVENELL:  Sure.

10   BY MR. RAVENELL:

11   Q     This Mr. Caldwell, was that a black male?

12   A     That's correct.

13        MR. RAVENELL:  Nothing further at this time,

14    Your Honor.  Actually, I do have a couple.

15   Q     What time was it when Mr. Butler was first or

16    the vehicle that he was in was first observed?

17   A     I believe it was approximately 1 o'clock when --

18   Q     1 a.m.?

19   A     I'm sorry, sir.  When who was there?

20   Q     The white vehicle?

21   A     Approximately 1 o'clock.

22   Q     Now you told Your Honor that you had additional

23    information that there was going to possibly be two

24    black males or someone actually come in a gray Jeep.

25    Do you recall that testimony?

1    A      Yes, sir.  I was told that.

2    Q      Who told you that?

3    A      One of the detectives, one of the detectives at

4     the scene.

5    Q      Do you recall which detective told you that,

6     sir?

7    A      No, sir.  I can't.

8    Q      Did you make any notations, sir, that you had

9     information about a gray Jeep that was supposed to be

10    arriving approximately 10 o'clock?

11   A      Did I.

12   Q      Yes.

13   A      No, sir.  I did not.

14   Q      The police reports that you have that you

15    indicated that were numerous, do you have all those

16    police reports there?

17   A      I should, sir.

18          MR. RAVENELL:  Your Honor, obviously we will

19    check.  We've been given discovery by the state -- by

20    the government.  Excuse me.  We don't have that many

21    reports.  So we'll certainly want to look at those

22    reports.  If it becomes a lot of discovery that we

23    haven't gotten, we will certainly bring that to the

24    Court's attention.

25          THE COURT:  Sure.  At an appropriate recess, I

1    am sure you can look and see if there are reports that

2    are relevant that you don't have and whether they say

3    anything about a gray Jeep Cherokee.

4         MR. RAVENELL:  Thank you, Your Honor.

5         I have a couple photographs, Your Honor.  May I

6    approach the witness, Your Honor?

7         THE COURT:  Sure.

8    BY MR. RAVENELL:

9    Q    In fact, I'm going to show you eight photographs

10   and see if you can look at these and see if you are

11   familiar with the area that is depicted there.  Not

12   particularly the cars, but the area.

13        THE COURT:  These are defense exhibits?

14        MR. RAVENELL:  It would be Defense 1 through 8.

15   I just want to have him view these first.

16        THE WITNESS:  This appears to be the 10 --

17   BY MR. RAVENELL:

18   Q    If you would just look through all of them first

19   and then I will ask the question.

20   A    Oh, okay.

21   Q    Have you had a chance to review all eight of the

22   photographs?

23   A    I've looked at them, sir.  Yes, sir.

24   Q    Tell me, can you tell the Court from looking at

25   those what those appear to depict to you sir?

```
 1    A       An apartment complex with an island in the
 2     center and several cars parked there.
 3    Q       Is that familiar to you of anything that you
 4     observed as to how the location looked at 10 Breezy
 5     Wood Court?
 6    A       It appears to be 10 Breezy.  It appears to me.
 7    Q       Okay.  From your knowledge of 10 Breezy Wood
 8     Court and from actually being out there on June 19th
 9     of '02, this appears to be a photograph representative
10     of the area around 10 Breezy Wood Court?
11    A       It appears to me, sir.  Yes, sir.
12            THE COURT:  Breezy Tree Court we're talking
13     about?
14            MR. RAVENELL:  10 Breezy Tree Court.  Did I say
15     something else?
16            THE COURT:  You said Breezy Wood.  I assume you
17     meant Breezy Tree.
18            MR. RAVENELL:  Your Honor, I move Defense 1
19     through 8 and I would ask the officer some questions
20     of what's depicted there.
21            THE COURT:  Sure.  Can I take a look at them?
22            MR. RAVENELL:  Sure.
23            THE COURT:  Any objection from the government?
24            MR. JACKSON:  None, Your Honor.
25            (Defendant Butler's Motion Exhibits 1 through 8
```

1    were received.)

2         THE COURT:  Okay.  Did you want to use the

3    evidence presentation system or are you planning to do

4    this just at the --

5         MR. RAVENELL:  Actually, Your Honor, I'll be

6    happy to use the presentation system.  It will be

7    easier.  If I can get some assistance from Madam

8    Clerk.

9         THE COURT:  Either that or perhaps Mr. Jackson

10   knows how to use it.  Is the system turned on?

11        MR. RAVENELL:  Actually, I am near the end.  If

12   we are going to be taking a break, I probably can get

13   in so I can review the reports at the same time too.

14        THE COURT:  Well, at this point, let's just go

15   ahead.  I did look at the pictures, so I have a

16   general idea of what you are going to be asking him.

17   Perhaps after you have asked him about a particular

18   picture, you can hand it back to me.

19        MR. RAVENELL:  Okay.

20        THE COURT:  We will try to see if we can get

21   this working.  But let's not wait for that.

22        MR. RAVENELL:  I am sure it's working.  It's

23   just that we don't how to work it.

24        THE COURT:  We need somebody that knows how to

25   make it get to the electronic vision part.

1       BY MR. RAVENELL:

2       Q       Sir, I'm showing you first what is Defense 1.

3       To the best of your recollection, what is depicted in

4       this photograph?

5       A       It appears to me to be -- you know, once again,

6       I can't say a hundred percent that that would be 10

7       Breezy Court, but it's an apartment complex with trees

8       and automobiles parked and one moving.  It appears to

9       be ready to move.

10      Q       Showing you Defense 2, what is depicted there,

11      sir?

12      A       Once again it is an apartment complex with an

13      island in the center partially snow covered, with

14      several vehicles parked, facing in and out, and one

15      appears to be making a turn.

16      Q       Defense 3?

17      A       It looks like a green vehicle.  It looks like an

18      Acura to me.  It has, it looks like a Maryland tag.

19      It's in front of building marked number 6.  It looks

20      like an apartment complex with three vehicles --

21              MR. RAVENELL:  I think we may have the system

22      working.  It may be on now, Judge.  Let me try to stay

23      back step back there.  It will be easier.

24              THE COURT:  Okay.

25      Q       I'm going to continue with three when I get

1    there, officer.

2         I show you now what is depicted as Defense 3 and

3    ask you to start again with your representation of

4    what you observed, sir.

5    A    Do you want me to continue on that particular

6    one?

7    Q    Yes.

8    A    Okay.  Once again, it looks like an Acura

9    vehicle in front of an apartment complex with a number

10   6 on it.  It appears to be another island there snow

11   covered, and the vehicle is in the roadway or

12   driveway.

13   Q    I show you next Defense 4.  Can you see that,

14   sir?

15   A    Yes, sir.  That is a photograph of what appears

16   to be a minivan parked in front of an apartment with

17   what appears to be a white male standing between the

18   station or the van and a white vehicle.

19   Q    Sir, pointing to -- there are some numbers right

20   above.  Can you see where the ink pen is pointing,

21   sir?

22   A    I can't see it, sir.

23   Q    You can't see it from there?

24        THE COURT:  I can see it.  It appears to be ten

25   from here.  But is that --

1          MR. RAVENELL:  It's what it appears to be, but I

2     want to make sure.

3     Q      I'll bring the photograph closer to you.

4     A      All right, sir.

5          MR. RAVENELL:  If I may, Your Honor?

6          THE COURT:  Uh-huh.

7          THE WITNESS:  It's very visible here, sir.

8     Number 10 appears over the doorway, the common

9     doorway.

10    BY MR. RAVENELL:

11    Q      Now you indicated that you were standing, you

12    told Your Honor, in front of 10 Breezy Wood Court.

13    You indicated this appears to be that location.

14         Can you point to approximately where, or tell us

15    approximately where it was that you and the other

16    officers were standing when you saw the white vehicle?

17    A      I was standing right around this general area,

18    sir.

19    Q      You can use the photograph.

20         THE COURT:  You can actually -- if you touch the

21    screen, sir.

22    A      Oh.  I was to the right of this, right through

23    this general area here.

24    Q      Okay.  You were actually on the sidewalk that

25    would be in front of the vehicles there?

94

1    A      I can't tell you if I was standing on that

2    sidewalk or on the grass, but I was in front of the

3    building.

4    Q      You indicated that there were at least from five

5    to ten other officers.  Were all the officers in the

6    same general vicinity, standing where you were in

7    front of the building?

8    A      Generally milling around, sir, taking a break.

9    Q      I show you Exhibit 5.

10           If you could touch the screen.  Okay.  Thank

11   you.

12           Now does this appear to be the same area?  You

13   can see the same van.  I'll point to that van in front

14   of ten.  I will put these both on the screen together.

15           Do you see the van that is in front of 10 Breezy

16   Wood?

17   A      Yes, sir.  I see the van.

18   Q      This is on Defense 4.

19   A      Yes, sir.

20   Q      You see the van again in Defense 5.

21           Now the area where this vehicle that I am

22   pointing to is moving, is that the area that's in

23   front of the building that we would say is kind of a

24   common drive area through in front of the building?

25   A      Yes, sir.

1    Q      Okay.  Showing you Defense 8, actually, strike

2    that, Defense 7, I don't know if you can see it on

3    that photograph, but where I am pointing, it appears

4    to be a number.  It looks like 12.  But if you can't,

5    I'll bring it to you.

6    A      Not on this screen, sir.  I can't see it.

7    Q      I'll bring it to you.

8           THE COURT:  This is number seven?

9           MR. RAVENELL:  Number seven, Your Honor.

10          THE COURT:  Thank you.

11          THE WITNESS:  It appears to be a one and the

12   bottom of a two.  It appears to be.

13          MR. RAVENELL:  Your Honor, I don't think you can

14   see it on the screen.

15          THE COURT:  Okay.

16   BY MR. RAVENELL:

17   Q      Now if one were to continue driving past the

18   Building 10, as you indicated earlier was on the

19   exhibit, you would then reach Building 12, as this car

20   continues to drive around, this 12.  We saw 6 and then

21   we saw 10 as the car was moving through that area.

22   Would 12 have been next to 10

23   A      It is, but I can't tell you which way it would

24   be.

25   Q      Okay.  I'm going to show you last Defense 8.  If

1    you can't see it, I will bring it to you.  Where I am

2    pointing to there is a door.  There appears to be a

3    number above it.  It appears to be 14 to me.  But I am

4    going to walk up to you and actually show you the

5    photograph.

6    A    This one?

7    Q    Yes.

8    A    I can't determine if that is 12 or what it is at

9    this point.

10        MR. RAVENELL:  Your Honor, I will present it to

11   you.

12        THE COURT:  I have to say I can't tell either

13   from this picture.  It's certainly two digits, but I'm

14   not sure what they are.

15        MR. RAVENELL:  I don't know if this actually

16   magnifies, Your Honor.  I know it enlarges, but I

17   don't think it magnifies.  I think you have the best

18   view with the photograph actually in front of you than

19   anything the machine will give us from an enlargement.

20   BY MR. RAVENELL:

21   Q    Now, sir, when the vehicle, the white vehicle

22   that you indicated drove around -- you can use your

23   pointer.  I will walk over here.

24        You indicated that the vehicle got near, correct

25   me if I am wrong, this area before it was stopped?

```
 1    A      I believe it was stopped right -- yes, sir.

 2    Q      Right around here?

 3    A      Right through this general area.

 4    Q      Sergeant Cannon, do you recall which direction

 5     he came from?

 6    A      I'm not a hundred percent sure, but I believe he

 7     was stationed somewhere near this.  I'm not a hundred

 8     percent sure, sir.

 9           MR. RAVENELL:  Nothing further.

10           THE COURT:  All right.  Thank you.

11           Mr. Solomon, did you have any questions?

12           MR. SOLOMON:  No.  Thank you.  I have no

13     questions.

14           THE COURT:  Mr. Jackson, anything further?

15           MR. JACKSON:  No redirect, Your Honor.  Thank

16     you.

17           THE COURT:  Just in case I missed it, there were

18     photographs that were 1 through 8.  Were there any

19     questions about number 6.

20           MR. RAVENELL:  I didn't actually questions the

21     six, but I do have six.

22           THE COURT:  You've got six.  Okay.  Fine.  There

23     they are.

24           MR. RAVENELL:  I will give all the photographs

25     to Madam Clerk.
```

1          THE COURT:  Then may this witness be excused?

2          MR. JACKSON:  Yes, Your Honor.

3          THE COURT:  Thank you, sir.

4          THE WITNESS:  Thank you, Your Honor.

5          MR. JACKSON:  Finally, Your Honor, Detective

6     Joseph Blake from the Baltimore County Police

7     Department.

8          THE COURT:  If the reports can stick around long

9     enough for you all to check them at a recess.

10          MR. JACKSON:  Sergeant, don't leave.

11          THE WITNESS:  I'll be here.

12          MR. JACKSON:  Thank you.

13          THE CLERK:  Raise your right hand, please.

14                         JOSEPH BLAKE

15     a witness called on behalf of the Government, having

16     been previously duly sworn, was examined and testified

17     as follows:

18          THE CLERK:  Please be seated.

19          Please speak directly toward the mike, state

20     your name and spell it for the record, please.

21          THE WITNESS:  Ma'am, I didn't hear you.  I'm

22     sorry.

23          THE CLERK:  Speak directly toward the mike,

24     state your name, and spell it for the record, please.

25          THE WITNESS:  Sure.  Detective Joseph Blake.

1        Last name is B L A K E.

2                          DIRECT EXAMINATION

3        BY MR. JACKSON:

4        Q       Detective, good afternoon.  If you could --

5        well, you have already identified yourself for the

6        record.  Can you describe your current assignment?

7        A       Sure.  I'm currently assigned to the Baltimore

8        County narcotics unit.

9        Q       How long have you been with the Baltimore County

10       Police Department altogether?

11       A       Approximately ten years.

12       Q       How long as a Baltimore County narcotics

13       detective?

14       A       Approximately seven of those years.

15       Q       I want to direct your attention back to June of

16       2002.  What was your assignment at that time?

17       A       I was assigned to Cockeysville Community Drug

18       Violence Interdiction Team?

19       Q       Is that what's popularly termed CDVIT?

20       A       CDVIT, yes, sir.

21       Q       How long in your tour of duty with the Baltimore

22       County Police Department were you specifically

23       assigned to the Cockeysville area CDVIT?

24       A       Five and a half years.

25       Q       During the course of that time, did you become

1    familiar, and are you still familiar with the area in

2    and around Cockeysville --

3    A      Yes.

4    Q      -- part of Baltimore County?

5    A      Yes, sir.

6    Q      Is the 10 Breezy Tree Court, the apartment

7    complex that contains that, is that an area that's

8    within your knowledge by virtue of having been

9    assigned to the Cockeysville region?

10   A      Yes, sir.

11   Q      I'm going to direct your attention back

12   specifically to the 19th of June 2002.  Were you on

13   duty that day, sir?

14   A      I was actually off.

15   Q      Okay.

16   A      I was called in.

17   Q      Was there a time when you came on duty?

18   A      Yes, sir.  I was called in.

19   Q      About what time was that?

20   A      Approximately 11 o'clock in the morning.

21   Q      What was that in reference to?  Why were you

22   taken off your free time?

23   A      I was called in reference to patrol receiving

24   information of a stash house, and they were trying to

25   prepare a warrant for that location.

1    Q      Did you assist in the preparation of a warrant

2     for that location?

3    A      Yes, sir.

4    Q      Did there come a time in your role in that

5     investigation that you became aware of an arrest of

6     Calvin Wright?

7    A      Yes.

8    Q      About what time of the day were you made aware

9     of that arrest?

10   A      I guess approximately 10:30 at night.

11   Q      Did there come a time that you in fact met

12    Calvin Wright?

13   A      Yes.

14   Q      Can you describe for the Court and the record

15    the circumstances under which that meeting happened?

16   A      Sure.  He was arrested at the scene I believe of

17    Breezy Tree and he was transported to Cockeysville

18    precinct.  Once he was transported, I had the liberty

19    of interviewing him.

20   Q      Were you at the Cockeysville precinct at the

21    time of his arrest then?

22   A      Yes, sir.

23   Q      In interviewing him, did there come a time that

24    Mr. Wright was apprised of his rights per Miranda v.

25    Arizona?

1      A      Yes.

2      Q      How did you go about doing that?

3      A      I read from a Miranda card.

4             MR. JACKSON:  May I approach the witness, Your

5      Honor?

6             THE COURT:  Sure.

7             MR. JACKSON:  Thank you.

8             THE WITNESS:  Yes.

9      BY MR. JACKSON:

10     Q      Detective, I am showing you what has been marked

11     for identification purposes as Government's 3.  Do you

12     recognize that item, detective?

13            (Government's Motion Exhibit Number 3 was marked

14     for identification.)

15     A      Yes.

16     Q      Can you describe what it is for the record?

17     A      It's a Miranda card I keep in my wallet, in my

18     possession.

19     Q      Well, is that actually the card you keep or is

20     that a copy of the card you keep?

21     A      That's a copy.  I'm sorry.

22     Q      That's quite all right.

23            Could you read for the record what is written on

24     that Miranda card?

25     A      Sure.  It states Miranda rights.  You are hereby

1    advised that you have an absolute right to remain

2    silent.  Anything you say can or will be used against

3    you in a court of law.

4         You have the right to talk with a lawyer at any

5    time before or during any questioning.

6         If you want a lawyer and cannot afford one, you

7    can request a court to appoint a lawyer prior to any

8    questioning.

9         If you agree to answer questions, you may stop

10   at anytime and no further questions will be asked of

11   you.

12   Q    Were those rights read to Mr. Wright on his

13   arrest?

14   A    Yes.

15   Q    Did he indicate a comprehension of those rights?

16   A    Yes.

17   Q    How did he indicate a comprehension of those

18   rights?

19   A    He stated that he understood.

20   Q    Did he appear intoxicated at that time?

21   A    No.

22   Q    Were there any other promises made to Mr.

23   Wright?

24   A    No.

25   Q    Any threats?

1    A      No.

2    Q      Any physical disability that he had?  For

3    instance, was he in shackles at that time?

4    A      He may have been.  He may have had cuffs on.

5    Q      He may have had cuffs on.  But that was the

6    extent of any restraint of his liberty?

7    A      Yes.

8    Q      Once you read him those rights and he indicated

9    a comprehension of those rights, what if anything

10   happened next?

11   A      I just started to interview him in reference to

12   the incident at Breezy Tree.

13   Q      What if anything did he indicated in response to

14   your questioning?

15   A      He was questioned about the vehicle that he

16   drove up to the location in and the location of the

17   apartment.  He stated that he knew nothing about the

18   owner of the vehicle or who owned the apartment.

19   Q      In your years as a Baltimore County Police

20   Department officer and detective, have you had

21   occasion to be called to an apartment to assist a

22   property manager regarding someone who is not

23   responding to a knock at a door?

24   A      Yes.

25   Q      On approximately how many occasions has that

1      happened?

2      A      Approximately four or five.

3      Q      Four or five.  In the course of your experience

4      with the Baltimore County Police Department, have you

5      ever found, in response to aiding a property manager

6      in that fashion, anybody in distress or in need of

7      assistance inside of an apartment?

8      A      Yes.

9      Q      On how many occasions?

10     A      Probably two or three of those occasions.

11     Q      What was the nature of their needs?

12     A      There were two that were suicides and there was

13     another that actually was fine.  He just wasn't

14     answering the door for his family.

15           MR. JACKSON:  No further questions for the

16     witness.

17           THE COURT:  I was not entirely clear.  Could you

18     tell me again what Mr. Wright said regarding the

19     vehicle?

20           THE WITNESS:  Yes, ma'am.  He stated upon

21     interviewing him that he did not know who owned the

22     vehicle that he was driving and he did not know who

23     was the lessee of the apartment they were in.

24           THE COURT:  All right.  Thank you.

25           THE WITNESS:  Sure.

1          THE COURT:  Mr. Solomon.

2          MR. SOLOMON:  Very briefly.

3                          CROSS-EXAMINATION

4     BY MR. SOLOMON:

5     Q      Detective, when you received these calls, they

6     were regarding distress, people in the apartments?

7     A      We didn't know the situation, what they were.

8     It was an unknown situation, check on location.

9     Q      Did you then speak with the manager of the

10    apartment complex?

11    A      Yes.

12    Q      Did the manager of the apartment complex give

13    you information with regard to individuals who might

14    or might not be inside?

15    A      I guess yes.  They pretty much advised that they

16    weren't aware of who was inside and exactly what the

17    call was.  It could have been a family member that

18    stated they hadn't heard from these people, stuff like

19    that.

20    Q      So basically, typically the three or four times

21    that you testified you have gone to apartment

22    complexes, a family member might be making an inquiry

23    as to a known individual inside the apartment complex?

24    A      Yes.

25    Q      And the manager also would have had knowledge of

1      a known individual inside the apartment itself as

2      well?

3      A      Yes.

4             MR. SOLOMON:  I have nothing further.

5             MR. JACKSON:  No redirect, Your Honor.

6             MR. RAVENELL:  May I have a couple questions?

7             THE COURT:  Mr. Ravenell.

8                          CROSS-EXAMINATION

9      BY MR. RAVENELL:

10     Q      Detective Blake, you actually authored with

11     Officer Fisher the search and seizure warrant to enter

12     and search 10, Apartment H, 10 Breezy Tree.  Is that

13     correct?

14     A      Yes.

15     Q      After you executed those warrants and found

16     items in the vehicle, excuse me, inside of that

17     apartment, you then authored two additional search and

18     seizure warrants, correct?

19     A      That's correct.

20     Q      One of those was to search the Jeep and another

21     was to search a storage facility, actually two storage

22     facilities after Mr. Butler had been arrested around 1

23     a.m.  Is that correct?

24     A      That's correct.

25     Q      After you came to the location to execute the

1     search and seizure warrant, which I think was around 6

2     o'clock or thereabouts, 6:56 p.m., correct?

3     A     Approximately.

4     Q     When did you leave that location, the apartment

5     complex?

6     A     I left the location within a couple hours after

7     the search.  We were searching.  We had to transport

8     property from the location back to the precinct.

9     That's when I left, within a couple hours.

10     Q     Did you ever come back to the apartment complex

11     after you left that night?

12     A     I'm not really sure.

13     Q     Did you ever have any conversation with Officer

14     Fisher regarding knowledge of anyone who allegedly

15     frequented that apartment?

16     A     I spoke to Officer Fisher in reference to them

17     receiving information about subjects that frequent

18     that location.

19     Q     And what information did you receive from

20     Officer Fisher about subjects who allegedly frequent

21     the location?

22     A     From what I understand, I believe that there

23     were several officers that were knocking on neighbors'

24     doors to find out information about the subjects

25     there.  They were advised from several neighbors that

1      at approximately 10 o'clock at night, there would be

2      several black males that would be arriving in an SUV.

3      They would frequent that location nightly from 10

4      o'clock till early in the morning, and then they would

5      leave.

6      Q      And it was actually, you were told, around 10

7      o'clock when they normally arrived?

8      A      Yes.

9      Q      Now after you learned that information, you

10     authored two search and seizure warrants and

11     affidavits, correct?

12     A      That was after I believe the arrest and all.

13     Q      So you didn't learn this information until long

14     after the arrest of Mr. Butler at 1 a.m.?

15     A      No.  We heard that information, but we didn't

16     prepare the search warrants until later.

17     Q      Okay.  That's what I'm saying.  You prepared the

18     search warrant after you learned this information?

19     A      Yes.

20     Q      This information that you allegedly learned

21     about, black males frequenting that apartment around

22     10 p.m., did you include that information in either of

23     the two search and seizure affidavits that you

24     authored after you learned that information?

25     A      I don't recall that.  I would have to look.

```
1    Q      Okay.  Would you please do that?

2    A      Sure.

3           MR. RAVENELL:  Your Honor, I think you actually

4     have the search and seizure affidavits attached as an

5     exhibit to the government's motion.

6           MR. JACKSON:  They are Exhibits B and C, Your

7     Honor.

8           MR. RAVENELL:  Exhibits B and C.

9           THE COURT:  I don't recall that information

10    being in there.

11          MR. RAVENELL:  I reviewed it, Judge, and it's

12    not in either.  But so that I can ask the next

13    question, I'm going to give the officer a chance to

14    review it.

15          THE WITNESS:  I agree.  I don't see that.

16    BY MR. RAVENELL:

17    Q      Now that was information you would consider to

18     be important, correct?

19    A      Yes, sir.

20    Q      Can you tell Your Honor why you left that

21     information out of either of the search affidavits

22     prepared after you allegedly learned that information?

23    A      I know -- I guess it was overlooked and it

24     wasn't put in, but I know this was cut from the

25     statement of charges that I wrote.  So I didn't put
```

1    that in there.  I just didn't put it in there.

2    Q      You said you knew it was important, but you

3    didn't put it in there?

4    A      I didn't.  No, sir.

5    Q      Well, did you make note of that information

6    anywhere, in any police report after you learned it?

7    A      I guess not, sir.  No, sir.  I don't believe I

8    did.

9    Q      You actually wrote an 11-page statement of

10   charges regarding this matter after arrests were made

11   of Mr. Wright and Mr. Butler and others; is that

12   correct?

13   A      That's correct.

14   Q      In that 11-page statement of charges, where you

15   set forth the facts that you learned that evening,

16   there is no reference to anyone ever telling you about

17   black males visiting that location at 10 p.m. in an

18   SUV, correct?

19   A      That's correct.

20   Q      Is there a reason why you left it out, this

21   important information out of that police report?

22   A      Just I know there was a lot going on that day.

23   There were a lot of us that did interviews.  I know I

24   had certain things to take care of.  I just left it

25   out.  I didn't even put it in there.

1    Q      Now do you have any police reports that anyone

2     else wrote, any other officer wrote regarding this

3     incident where that information is included that you

4     reviewed?

5    A      Not that I reviewed, but there are a couple

6     that -- I mean it's four years ago.  I would have to

7     look at exactly what other ones wrote.

8    Q      But you have other police reports there?

9    A      I just have a handwritten one.  I'm not sure if

10    that's --

11         MR. RAVENELL:  Your Honor, we would like to take

12    a chance to review those reports also at the break.

13         THE COURT:  Sure.

14         MR. RAVENELL:  I have nothing further at this

15    time.

16         THE COURT:  Anybody else?  Any more questions?

17         MR. JACKSON:  No, Your Honor.

18         THE COURT:  All right.  Thank you very much,

19    sir.  You're excused.

20         MR. JACKSON:  Your Honor --

21         THE COURT:  Again, if we could just hang onto

22    the reports.

23         MR. JACKSON:  Your Honor, as far as live witness

24    testimony goes, that would be it from the government.

25    There are other searches that are contested by defense

1       counsel, among them being the search of the Jeep

2       Cherokee, the search of the white vehicle, well, the

3       storage locker and the other vehicle.

4           But they all attack the fruit of the poisonous

5       tree, the primary taint being alleged the stops, the

6       arrests, the searches that we've already had

7       discussion on.

8           There is no contest, and correct me if I'm

9       wrong, there's no contest but the fact that items that

10      were seized at those locations were seized at those

11      locations.  It would be purely whether they were

12      overcome by a primary taint, that which the Court has

13      already heard.  So there is no need, as I discern it

14      right now, for live testimony in that regard.

15          THE COURT:  Okay.  No further live testimony

16      from the government.

17          Mr. Solomon, any live testimony?

18          MR. SOLOMON:  No live testimony for the

19      defendant.

20          THE COURT:  Mr. Ravenell?

21          MR. RAVENELL:  Just one witness, Your Honor.

22          THE COURT:  All right.

23          MR. RAVENELL:  We call Monique Jackson.

24          THE CLERK:  Please raise your right hand,

25      please.

1                       MONIQUE JACKSON

2       a witness called on behalf of Defendant Butler, having

3       been previously duly sworn, was examined and testified

4       as follows:

5             THE CLERK:  Be seated.  You can scoot up.  Speak

6       directly toward the mike and state your name for the

7       record, please.

8             THE WITNESS:  Monique Jackson.

9                       DIRECT EXAMINATION

10      BY MR. RAVENELL:

11      Q       Good afternoon, Ms. Jackson.

12      A       Hi.

13      Q       Ms. Jackson, I am going to ask you to keep your

14       voice up and speak into the mike as you were asked to

15       do.

16             Ma'am, do you know the young man seated next to

17       me, Johnnie Butler?

18      A       Yes.

19      Q       What relationship do you and Mr. Butler have, if

20       any?

21      A       We have a son together.

22      Q       What's your son name?

23      A       Jameel.

24      Q       How old is Jameel?

25      A       Five.

1    Q      Let me draw your attention back to June 19th of

2    2002.  How old was Jameel then?

3    A      Two.

4           THE COURT:  I'm going to have to ask you, ma'am,

5    just really yell into the mike, if you would.

6           THE WITNESS:  Oh, I'm sorry.  Two.

7    BY MR. RAVENELL:

8    Q      On June 19th of 2002, ma'am, were you with and

9    in the presence of Johnnie Butler?

10   A      Yes.

11   Q      Where were you and Mr. Butler earlier that

12   evening?

13   A      We were at Union Memorial Hospital.

14   Q      And why were you at Union Memorial Hospital?

15   A      Because our son had fell and I had to rush him

16   to the hospital.

17   Q      When you left Union Memorial Hospital, did you

18   and Mr. Butler drive somewhere?

19   A      Yes.

20   Q      Did you have occasion to go to an apartment

21   complex in Cockeysville?

22   A      Yes.

23   Q      Who was in the vehicle with you and Mr. Butler

24   when you went to that apartment complex?

25   A      Our son and my sister?

```
1    Q      Your sister's name is?

2    A      Tenesha.

3    Q      Your son, Jameel?

4    A      Jameel, yes.

5    Q      Who was driving the vehicle, ma'am

6    A      I was.

7    Q      Where was Mr. Butler?

8    A      The passenger seat.

9    Q      Did there come a time after you drove to that

10   apartment complex where police officers stopped your

11   vehicle?

12   A      Yes.

13   Q      Were you driving when the police officer stopped

14   the vehicle?

15   A      Yes.

16   Q      Was Mr. Butler in the passenger seat still?

17   A      Yes.

18   Q      Were your sister and your child in the back

19   seat?

20   A      Yes.

21   Q      After the police stopped the vehicle, what if

22   anything was done with you?  Were you released from

23   the scene?

24   A      No.  I was taken somewhere.

25   Q      And where were you taken?
```

1    A       I believe to a police station.

2    Q       Did there come a time later that morning when

3     you were in fact released by the police?

4    A       Actually, they drove me to my home, where we

5     stayed for hours.

6    Q       I'm sorry?

7    A       They had drove me to my home because my son has

8     asthma and we needed to give him a treatment.  So the

9     detectives drove me there and they stayed there.

10          MR. RAVENELL:  Nothing further.

11          MR. JACKSON:  I guess it's my turn.

12          THE COURT:  Mr. Jackson, I guess it's your turn.

13                     CROSS-EXAMINATION

14    BY MR. JACKSON:

15    Q       Ms. Jackson, good afternoon.

16    A       Hi.

17    Q       I just have a few questions for you.  I'll be

18     very brief.  I promise.

19          I'm less than a little clear on what happened

20     after the car was stopped.  Were you in fact taken to

21     the precinct or did the police officers take you back

22     to your residence or go with you to your residence?

23    A       The precinct.

24    Q       Okay.  You went to the precinct.

25    A       Right.

```
 1    Q       And how long were you there?

 2    A       Maybe two to three hours.

 3    Q       Then to your residence?

 4    A       Right.

 5    Q       Which is where?

 6    A       That was in Nottingham, Maryland.

 7    Q       In Nottingham, Maryland?

 8    A       Uh-huh.

 9    Q       That over toward like the White Marsh side of

10     the county?

11    A       White Marsh, yes.

12    Q       So you don't live in the Breezy Tree Court

13     apartments, do you?

14    A       No.

15    Q       Does your sister live in the Breezy Tree Court

16     apartments?

17    A       No.

18    Q       Your son -- it's Jameel, right?

19    A       Yes.

20    Q       He lives with you.  He doesn't live in the

21     Breezy Tree Court apartments.

22    A       No, he doesn't.

23    Q       Where does Mr. Butler live?

24            MR. RAVENELL:  Objection, irrelevant.

25            THE COURT:  Overruled.
```

1    Q       You may answer the question.

2    A       Well, at the time we were in a relationship.  So

3     he should have been staying with me the nights he was

4     home.

5    Q       So you were driving a car to a location that

6     nobody in that car lived at when you were stopped?

7            MR. RAVENELL:  Objection.

8    Q       Is that correct?

9    A       Well, anyone in the car, no.

10   Q       Nobody lived there.  You didn't live there.

11    Your sister didn't live there.

12   A       Right, no.

13   Q       Mr. Butler didn't live there.

14   A       Right.

15           MR. JACKSON:  Thank you.  No further questions.

16           THE COURT:  Mr. Solomon.

17           MR. SOLOMON:  No.  Thank you.

18           THE COURT:  Mr. Ravenell, anything further?

19           MR. RAVENELL:  Just one.

20                       REDIRECT EXAMINATION

21    BY MR. RAVENELL:

22   Q       What color was your car, ma'am?

23   A       White.

24           MR. RAVENELL:  Thank you.

25           THE COURT:  Anybody else?

1          MR. RAVENELL:  Nothing.

2          MR. JACKSON:  No.  Thank you, Your Honor.

3          THE COURT:  Thank you very much.  Ms. Jackson,

4     you are excused.

5          MR. RAVENELL:  No further witnesses for Mr.

6     Butler.

7          THE COURT:  Okay.  So no more, no more live

8     witness from anybody?

9          MR. JACKSON:  No, Your Honor.  We just have to

10    check on the volume of police documents that I think

11    Mr. Ravenell had a question about.

12         THE COURT:  I gather there are two questions,

13    the information about the neighbors observing people

14    arriving around 10 o'clock and also any identification

15    of a Mr. Caldwell in the white vehicle, are the two

16    issues you wanted to check on.

17         MR. JACKSON:  With any luck, Your Honor, perhaps

18    the detective or the sergeant was actually looking

19    through it while we were proceeding with the rest of

20    the proceedings.  Would you like me to check and see?

21         THE COURT:  Why don't you check and see if he is

22    doing that.

23         MR. JACKSON:  Okay.

24         (Pause.)

25          Your Honor, I can proceed by proffer, unless

1          you all would want live testimony.

2               Detective O'Neill and Detective Blake both

3     checked the volume to see if there was any reference,

4     one, to Mr. Caldwell and the answer is no, there was

5     no other reference in any report to Mr. Caldwell or

6     any police documents with reference to Mr. Caldwell.

7               And two, there was no reference in any document

8     or other police report or handwritten note to anybody

9     indicating that around 10 o'clock on evenings, four or

10    five black males regularly show up in a gray Jeep

11    Cherokee.

12              I believe that would satisfy Mr. Ravenell's

13    inquiry in that regard.

14              MR. RAVENELL:  The second one does, Your Honor.

15    The latter does.  First I wanted to see whether there

16    is any report that indicated there are two black males

17    in the white car, not just Mr. Caldwell.

18              Obviously the evidence we introduced is that

19    there were not two black males in that vehicle when it

20    was stopped.  Officer O'Neill has indicated there were

21    definitely two black males, whether it was Caldwell or

22    not.  I wanted to see if there was any report that

23    even said there were two black males.  I do want to

24    see if they confirm that as well.

25              THE COURT:  Ask them to look at -- yes.  It

1    would seem to me any information regarding the

2    occupants of the vehicles would be helpful.

3         MR. RAVENELL:  Thank you.

4         (Pause.)

5         MR. JACKSON:  There is not a reference to

6    another black male being in the vehicle.  There is no

7    police report that indicates that.

8         THE COURT:  Okay.  Is there a police report that

9    indicates anything about the other people in the car

10   or just --

11        MR. JACKSON:  What I was just told was that

12   there was a reference to only that Mr. Butler was a

13   passenger in the vehicle.  They don't have any further

14   description of what other occupant there was.  I can

15   further check on that.

16        THE COURT:  So by implication, somebody was

17   driving, but there is nothing in the report to

18   indicate male or female, etcetera.  Okay.

19        MR. RAVENELL:  Your Honor, I want to get copies

20   of all the reports because we are entitled to them

21   anyway.  So if we are going to take a break, I would

22   like to actually see the reports that the officers are

23   referring to, not just rely on their proffer at this

24   point if we are going to take a break anyway.

25        THE COURT:  At some point we certainly will.  So

1    if you want to look at the reports, that's fine.

2         It seems to me the first issue that comes up

3    chronologically is Mr. Solomon's issue I guess, which

4    is the warrantless entry into Apartment H and whether

5    that was justified under I guess what the Fourth

6    Circuit has referred to as the community caretaking

7    exception.  If you want to be heard on that, Mr.

8    Solomon.

9         MR. SOLOMON:  Well, Your Honor, it is the

10   government's burden.

11        THE COURT:  All right.  Mr. Jackson, would you

12   like to go first?

13        MR. JACKSON:  Well, Your Honor, the bottom line,

14   the Fourth Amendment demands that we only do

15   reasonable searches, that is, the government only does

16   reasonable searches.

17        So on the day that the officer, in this case,

18   Officer Fisher comes to the scene, he is not looking

19   with bad intent to go trample on somebody's

20   constitutional rights.  He said he is there to service

21   a constituent who is concerned about the welfare of

22   somebody in an apartment who, since the early morning

23   hours, has not responded to a call there.

24        The fact that there was no odor of a decaying

25   body there, that there were no shots that rang out,

1    that there was no other indicia of violence taking

2    place within that apartment really doesn't matter

3    because there are a variety of things that could have

4    happened to somebody in that apartment in that

5    situation, an epileptic seizure, a stroke, a suicide

6    attempt, a heart attack, that would have not resulted,

7    and all of them being recent, would not have resulted

8    in a malodorous condition.  It would not have resulted

9    in anybody hearing any violence happening.  It would

10   not have had any kind of indicia of foul play or bad

11   things happening.  So somebody may be sitting there at

12   that moment in dire need of assistance.

13        So the bottom line is is it reasonable for the

14   police at that point to walk away and say no, we can't

15   help the person in there because we haven't smelled an

16   odor, we haven't heard of any reports of gunshots, and

17   we haven't heard of any reports of any fighting or

18   anything along those lines and just let somebody

19   possibly perish because they are unable to walk into

20   the apartment and do what is a caretaking function;

21   that is, find out whether, in good faith, somebody is

22   in distress in that apartment and in need of

23   assistance?

24        The bottom line is if they did such a thing and

25   somebody was in need of assistance and the police's

125

1    negligence or, rather, indifference was found out at

2    that point, they certainly would be open to a heck of

3    a lawsuit.

4         But in this case, the officers did the diligent

5    thing.  He did the reasonable thing on the basis of

6    not only his experience, but also other officers'

7    experience.  That is if somebody doesn't answer a

8    knock at a door after many hours, and apparently it

9    had been recently occupied because there is a radio

10   blaring or some sort of appliance blaring music at all

11   hours, then it's reasonable to infer yes, somebody may

12   be in there, it's not definitive, but yes, somebody

13   may be in there in need of police assistance over the

14   course of hours.  It is the prudent thing, the

15   reasonable thing for the police to be allowed to go in

16   with the landlord or the property manager at that

17   point to inspect it to see if somebody is in distress

18   at that point.

19        That is the bottom line, Your Honor, the

20   reasonableness of the situation, and that is the

21   government's entire position.

22        There isn't a great deal of, really, law that

23   you can say is on all fours with the current situation

24   here.  There is the Presler case.  But in that case,

25   as Mr. Solomon I'm sure will be quick to point out,

1       there was an odor that the police could reasonably

2       infer perhaps was a decaying body.

3            But really, that doesn't mitigate the emergency

4       or the possible emergency that the police faced here.

5       If anything, the fact that it wasn't malodorous makes

6       it more urgent than the fact that somebody may have

7       freshly hurt themselves, not a situation where you're

8       going to find a corpse inside the apartment where no

9       amount of aid would have assisted.

10           It's more important for the police to get the

11      message that under these circumstances, that they

12      should be able to enter an apartment, do the limited

13      search that they did to see if somebody was in fact in

14      distress and then exit the apartment rapidly if they

15      didn't find anybody in distress.

16           THE COURT:  All right.  Thank you.

17           Mr. Solomon.

18           MR. SOLOMON:  Thank you, Your Honor.

19           Your Honor, what we are dealing with here, as

20      the Court well knows, is really I think the Fourth

21      Circuit would probably characterize it as a hybrid,

22      exigency community caretaking function argument

23      because, as Mr. Jackson rightly says, there is not a

24      tremendous amount of case law; although, there is

25      enough case law that would suggest that there is more

1      that is required in order to exercise such a function

2      than was had in this particular case.

3            We know, of course, from Payton versus U.S. and

4      other cases that derive from Payton that there has to

5      be a sufficient objectively reasonable exigency in

6      order to cross the threshold of a door without use of

7      a warrant.

8            Now we know that in this particular case, we

9      have information.  The question is is it objectively

10     reasonable under the circumstances to go through the

11     threshold, to pass the threshold without a warrant or

12     was it a subjective brief, however much it may be a

13     good faith belief, but a subjective belief on the part

14     of the officers?

15           Now what I thought was telling was the second

16     witness who testified, and that was I think Sergeant

17     O'Neill.  What Sergeant O'Neill said, and he probably

18     didn't realize it, was that he had received some 10 to

19     20 calls regarding distress of individuals in the past

20     during his career, all of whom he had or all of which

21     he had responded to.

22           The last officer who testified as well, that

23     being Detective Blake, testified as well and how we

24     can discriminate between his testimony and the

25     testimony of Officer Fisher is that he said in the

1        three or four instances in which he had responded to

2        an apartment complex, the information that they had

3        received came from family members who were concerned

4        for the welfare and well-being of individuals inside

5        the apartment.  Compare that to what we have in this

6        case, which is simply the blaring of a radio without

7        more.

8            What we know is that there was a radio that had

9        been heard perhaps overnight and that tenants had

10       complained about loud music.  We do know, however,

11       that there was no reading, as far as we know, of

12       incidents that it had occurred in the past.  There was

13       nothing to connect prior untoward incidents in the

14       past to this particular complex.  There were no

15       reports that burglaries had been committed in the past

16       such that they could conjecture from that that there

17       was foul play that had been committed.

18           Now the government cites U.S. versus Presler,

19       which is 610 F.2d 1206, a Fourth Circuit case from

20       1979.  That is the immediate aid emergency doctrine.

21       What this Court has to determine is were the facts,

22       without more in this case, sufficient to constitute an

23       emergency such that state action, and we do have state

24       action in this particular case, was warranted?

25           The Presler case was followed by another Fourth

1    Circuit case, that being U.S. versus Moss, 963 F.2d

2    673.  As I said, that's a 1992 case.

3         The standard that was enunciated by the Fourth

4    Circuit was is there an objectively reasonable belief

5    that an emergency existed that required immediate

6    entry to render assistance or prevent harm to persons

7    or property within?  It cannot be a vague assertion of

8    a need to render assistance.

9         The example that they used in Moss, which was

10   justification enough to in fact use this doctrine, was

11   a situation where a park ranger had entered into a

12   private cabin.  He stated he believed a break-in had

13   occurred and that the cabin occupants might require

14   medical assistance as a result.

15        Now the quote from the Moss court was as

16   follows:

17        "If the cabin was being illegally occupied,

18   there was no indication that any illegal occupant was

19   inside.  There was no immediate danger that the cabin

20   itself would be damaged, or that entry into it would

21   prevent that.  There was in consequence no objectively

22   reasonable basis upon which it could have been thought

23   necessary immediately to enter the cabin either to

24   verify a suspicion that it was being illegally

25   occupied or to apprehend the culprits.  Neither was

1    there anything in the circumstances confronting [the

2    Ranger] that warranted any objectively reasonable

3    perception of an emergency that required immediate

4    identification of the occupants in order to give them

5    assistance or indeed that assistance was needed."

6         So the Fourth Circuit makes it very clear that

7    we are talking about an objective basis upon which to

8    believe that something untoward was happening.  At

9    least in Moss, what the ranger had was a belief,

10   founded or not, that there was an illegal break-in,

11   and as a result of an illegal break-in, property could

12   possibly have been destroyed and/or lives could have

13   been placed in danger.

14        In this particular case, we have nothing with

15   regard to whether there was a suspicion of property

16   being destroyed, no untoward sounds coming from the

17   apartment complex or the apartment itself, no

18   suspicion that in fact someone had been -- well, I'll

19   retract that.

20        Suspicion perhaps that somebody might be inside,

21   but without more, nothing to suggest that harm had

22   befallen anybody inside the apartment, other than the

23   fact that a radio was playing at I guess a fairly high

24   decibel level, but nothing more to suggest that there

25   were individuals inside who were in need of immediate

1        aid.

2            The Presler case, which is the seminal case in

3        the Fourth Circuit, 610 F.2d 1206, 1979, in that

4        particular case, the police had gotten a call from the

5        landlady of this particular apartment complex or

6        apartment that an occupant had not been seen for a

7        long time and that she had begun to detect an unusual

8        odor emanating from a room.  Police entered as a

9        result, found the occupant lying in a pool of blood

10       and vomit, and in fact that the occupant had died.  In

11       that particular case, the landlady's observations

12       logically corresponded to a person in distress.

13           In this particular case, the information that we

14       have from management, as told to us by Officer Fisher,

15       was that a female was on the lease.  That's all that

16       they knew, that there was no information, specific

17       information at least that there was suspicion of a

18       crime that had been committed in the area or in the

19       actual vicinity of the apartment.

20           There was no information that an individual who

21       lived in the apartment had been gone for any length of

22       time.  I asked about goings and comings of individuals

23       into the apartment.  Nobody was able to provide any

24       such information to verify that there were either

25       goings and comings or an absence thereof.

1          Perhaps if the landlord, the management had said

2     yes, we know that Individual X and Individual Y live

3     there and the tenants, the co-tenants, not the

4     co-tenants, but the neighboring tenants had indicated

5     that there was a lack of activity and no one had been

6     seen coming and going for days on end, that might rise

7     to an objectively reasonable basis on which to enter

8     into the apartment.

9          But again, here we have a bald allegation and a

10    bald conclusion that there was harm befallen

11    individuals in an apartment from which all we know

12    sound was emanating, nothing more to suggest absence,

13    nothing more to suggest high traffic, which might be

14    suspicious in and of itself.

15         Under the community caretaking exception, we

16    also know that the majority of the circuits in this

17    country have been loathed to apply it to dwelling

18    houses and storehouses.  They have found as a matter

19    of fact that the exception to the exclusionary rule

20    would exist where you might have problems involving

21    automobiles.  In fact, it has been analogized by most

22    of the circuits in this country that because of the

23    easy access to and the movement of automobiles, the

24    community caretaking function exception should apply.

25         But even in the one jurisdiction I believe where

1          it has been held to be acceptable in a dwelling, and I

2          think it is cited in my memorandum, and I think the

3          case came from the Sixth Circuit, if I am not

4          mistaken, that being U.S. versus Rohrig, which is a 98

5          F.3d 1506, Sixth Circuit case, that decision has been

6          called into question by its own circuit in U.S. versus

7          Williams, which is a case that has come since, 354

8          F.3d 497, a 2003 case.

9               The Sixth Circuit rejected the use of community

10         caretaking to validate a warrantless search of a

11         dwelling and specifically stated, "despite references

12         to the doctrine in Rohrig", which is the seminal case

13         in the Sixth Circuit, "we doubt that community

14         caretaking will generally justify warrantless entries

15         into private homes."

16              That was cited by U.S. versus Williams, 354 F.3d

17         497, at 509, a Sixth Circuit case again from 2003.

18              To further place in doubt the reason to enter

19         into an apartment under the community caretaking

20         function, in the Fourth Circuit we have a district

21         decision out of the Western District of Virginia from

22         2004, 332 F.Supp.2d 923, where they rejected the use

23         of the community caretaking doctrine in search of an

24         apartment.

25              Now it's clear again from the circumstances, I

1     think, that there was no objective belief that would

2     have been reasonable under the circumstances to

3     conclude that someone's life was in danger or that

4     some type, as I said before, of untoward activity had

5     taken place in this apartment.  The question is again,

6     is the fact that a radio has been left blaring or

7     otherwise unchecked over a period of 10 to 12 hours in

8     and of itself enough to justify state action of an

9     entry without a warrant into a residence?

10         I suggest that under the law that we have in

11    this Fourth Circuit, as well as the majority of the

12    other circuits in the United States, it is not enough.

13    There might be an argument again if the government

14    could point to something that is objective and

15    tangible to suggest that individuals were in harm and

16    placed in jeopardy inside this particular apartment.

17    But all of the cases seem to point to more than just

18    one factor in making that determination that you can

19    cross that threshold without the warrant.

20         As a result of the fact that the government did

21    not have an objective basis and a reasonable basis to

22    cross the threshold, it's our contention as well that

23    all of the derivative evidence, that being the

24    statement made by Mr. Wright at the precinct and the

25    search, as Mr. Jackson has alluded to, of the vehicle,

1    all fall under the fruits of the poisonous tree

2    doctrine and should also be suppressed as well.

3         THE COURT:  Thank you.  Any response you want to

4    make to that, Mr. Jackson?

5         MR. JACKSON:  No, Your Honor.

6         THE COURT:  Okay.  Let me suggest this.  We are

7    getting close to the lunch hour.  The argument that

8    has just been made, I want to review some more of the

9    cases that Mr. Solomon has cited.  But I'll understand

10   the argument is essentially complete on that issue.

11        Going forward, and perhaps if you have a chance

12   to look at the reports, if they are important to the

13   argument, over the recess, we can certainly do that.

14   It seems to me the next issue would be, and it would

15   be, again, be the government's burden, would be the

16   basis for the stop of the car with Mr. Butler in it

17   and, of course, the basis for the arrest of Mr.

18   Butler.

19        Let me ask this.  My understanding is that from

20   the search of Mr. Butler there were keys found, and

21   this led to some evidence in a locker.  From the

22   search of the car that Mr. Wright was driving, there

23   was some money and a title found I guess.

24        Going back to those incidents, Mr. Ravenell,

25   does your client, Mr. Butler, assert any standing or

1    are you trying to suppress anything that may have been

2    found in the Jeep Cherokee?

3         MR. RAVENELL:  Your Honor, our papers do address

4    the Jeep, and actually the Jeep, as you may recall,

5    once it was finally checked out, he actually owns the

6    Jeep.

7         THE COURT:  Right.

8         MR. RAVENELL:  So we are contesting the search

9    of the Jeep as well.

10        THE COURT:  The basis for contesting the search

11   of the Jeep?

12        MR. RAVENELL:  As to standing or as to the

13   probable cause?  Which one are you asking?

14        THE COURT:  I guess both.  I understand you are

15   saying standing is because he is the owner.

16        MR. RAVENELL:  Right.  Exactly.

17        THE COURT:  Okay.  Probable cause?  Does this go

18   back to the warrantless entry, from that point of

19   view?

20        MR. RAVENELL:  Yes.

21        THE COURT:  But your client does not have

22   standing to challenge that.

23        MR. RAVENELL:  I understand the Jeep.  Let me

24   tell Your Honor this and make it easier.  I think Your

25   Honor certainly as to Mr. Butler should focus first on

1     the stop.

2          THE COURT:  Right.

3          MR. RAVENELL:  And the actual arrest, and then

4     any fruit of any poisonous tree that leaves to the

5     search of the storage facility.  Those are our main

6     concerns.

7          THE COURT:  Right.

8          MR. RAVENELL:  I'm going to submit on the Jeep

9     because I think you are right.  If the search of the

10    apartment was correct, even if it wasn't, we don't

11    have standing.  That may have been the justified

12    probable cause to search the Jeep.

13         THE COURT:  Okay.

14         MR. RAVENELL:  Our question would be even if

15    they found drugs in the apartment, whether or not that

16    then justified probable cause to search the Jeep.

17         THE COURT:  Sure.  And on that I have the

18    evidence that a person in the Jeep came up with the

19    key and entered the apartment.  So you're going to

20    submit on that.

21         MR. RAVENELL:  Yes.

22         THE COURT:  Let me turn to Mr. Solomon.

23    Supposing hypothetically that the evidence found in

24    the lockers, the evidence found from the stop and

25    arrest of Mr. Butler was suppressed as to Mr. Butler.

1       Is your client, is your client asserting any standing

2       to challenge those searches?

3            MR. SOLOMON:  No, he is not.

4            THE COURT:  All right.  Then if we just resume

5       at 2 o'clock for continuation of the argument.

6            MR. JACKSON:  Thank you, Your Honor.

7            THE COURT:  I have just one or two more

8       questions on the, before we get to Mr. Butler's

9       issues, on the entry of Apartment H, just to follow up

10      a little bit I guess.

11           Mr. Jackson raised the question essentially of

12      well, what should the officer have done, what would

13      have been objectively reasonable for the officer to do

14      under those circumstances?  I thought I might ask you

15      that, Mr. Solomon.

16           Obviously your position is that he should not

17      have gone into the apartment, but what should he have

18      done in the face of that kind of request?

19           MR. SOLOMON:  Well, one of the questions I asked

20      the officer was whether the management had looked at

21      the application and made any calls to the individuals

22      who were listed on the leasehold, on the application,

23      as well as emergency phone numbers to contact in case

24      of emergencies.

25           The answer -- I don't want to come right out and

1    say he said I just didn't think of doing it, but I

2    don't think it was done, for whatever reason.  I think

3    he should have done that.

4        I think that there should have been an effort

5    made given the fact, and I guess it comes into play,

6    and Mr. Ravenell will argue that, you know, this is

7    probably not the case, but if in fact there was

8    information that four black males or black males had

9    been seen coming and going from the apartment and

10   driving a Jeep Cherokee, then it would have been

11   logical to have simply, and I don't want to say stake

12   it out, but --

13       THE COURT:  I don't mean to interrupt you, but

14   my clear recollection of the evidence is that that

15   information was not gained until after.

16       MR. SOLOMON:  That's correct.  That's correct.

17       THE COURT:  Okay.

18       MR. SOLOMON:  What I'm saying is that there

19   should have been an effort made by the police to have

20   interviewed other tenants in the building to have

21   found out what the comings and goings of the occupants

22   of that particular apartment would have been, what the

23   course of conduct was.

24       As I said before, I think the application

25   probably, if my experience would dictate as such, and

1    I think it does, the application probably would have

2    contained phone numbers of individuals to contact in

3    case of emergencies.  I think that's fairly standard

4    practice when it comes to applying for apartments and

5    for anything else, for that matter, and there should

6    have been an effort made then to contact the

7    individual who was either on the lease or to contact

8    the individual who is listed as an emergency phone

9    number.

10         And this goes further.  Whether that would have

11   borne fruit, I don't know, but I do know that based on

12   the bare bones that they had presented, I don't think

13   that there was enough to enter into the apartment

14   without a warrant.

15         THE COURT:  Okay.  Any other comment you want to

16   make, Mr. Jackson?

17         MR. JACKSON:  Your Honor, I don't think that

18   would have borne any fruit at all -- I realize this is

19   kind of an odd argument -- because as we understand

20   from Mr. Wright, this was sort of a sham arrangement

21   that he had with -- I believe her name was Linnea.

22         THE COURT:  Right.  But I mean we don't really,

23   we don't really evaluate the reasonableness of the

24   officer's actions going in based on what he --

25         MR. JACKSON:  That was my only observation, that

1    even if that had been done in this case, he would have

2    been in no different position than he was at the

3    threshold because Ms. Worthington wasn't even,

4    according to Mr. Wright's testimony, somebody who even

5    had a key to enter the place.

6         THE COURT:  Right.

7         MR. SOLOMON:  And the Court rightly identified

8    the problem with that, which is, of course, we don't

9    determine probable cause based on what comes after.

10   It's only what is presented at the time that the

11   action is taken.  Obviously we don't look at what

12   ultimately would have borne fruit.  We only look at

13   what reasonable measures could have been taken that

14   were not taken.

15        We don't know.  Well, we know after the fact,

16   but after-the-fact information, of course, is not part

17   of this Court's equation.  So it's my position that

18   there is an exhaustion of remedies which were not

19   undertaken by the police.

20        MR. JACKSON:  But, Your Honor, if it would have

21   borne fruit anyway, then we have an inevitable

22   discovery issue.  If he had taken those suggested

23   steps that Mr. Solomon says and nothing would have

24   come of it anyway, they would have been in the same

25   position and would have been able to then

1    warrantlessly enter the premises with justification,

2    then the police were in no different position at point

3    A than they were at point B, and all that evidence

4    would have been able to have been seized, observed and

5    then later seized.

6         THE COURT:  Okay.  All right.  Inevitable

7    discovery.

8         Thank you all.  I think, I think it's a close

9    question that I am going to reserve ruling on at least

10   a bit longer, obviously not very long because we have

11   a trial coming up soon.  But I appreciate the

12   argument.  I think I have a full picture of what the

13   evidence is, and I'll get you a ruling soon, but not

14   right now.

15        I'm ready to move to Mr. Butler's situation.  I

16   guess Mr. Jackson.

17        MR. JACKSON:  Since it was a warrantless stop

18   that initially gets the ball rolling as far as Mr.

19   Butler, it's the government's burden to persuade the

20   Court that, first, that there was articulable

21   suspicion for the stop, and then once the stop

22   occurred, that there was probable cause for the arrest

23   that supports the search incident to an arrest.

24        In that regard, I have outlined in my papers,

25   Your Honor, the factors that I believe suggest that

1      there was at least an articulable suspicion for the

2      stop; that is, that the police --

3            Although there is no indication that that is a

4      crime-ridden or a narcotics-ridden neighborhood, they

5      were immediately outside an apartment where a large

6      amount of drugs had just been seized from, that they

7      knew other people were involved in this crime, perhaps

8      as many as four or five other people, that in an early

9      morning hour a car drive off a main road, a

10     thoroughfare, specifically just to get onto this

11     court, drives by the officers, slows down appreciably,

12     and then attempts to exit that place.

13           All of those are factors that at least should

14     make the hairs on the back of the neck of an

15     investigator reasonably tingle with hey, there is

16     something suspicious here, at an early morning hour

17     when something like that happens, thus justifying, in

18     the government's mind at least, that there was a

19     reasonable articulable suspicion to stop the vehicle

20     and to ascertain the identities of the people in there

21     and to attempt to ascertain why they were doing what

22     they were doing.

23           So as far as the stop of the car, I think it's

24     entirely reasonable that police officers, in the

25     position they found themselves that morning, would do

1    what they did; that is, stop that vehicle.

2         Whether the arrest of Mr. Butler was warranted

3    or not, really, the only additional fact we have, we,

4    the government, have to support that is the fact that

5    he then identifies himself as Johnnie Butler and in

6    doing so, links himself with a vehicle that

7    transported two people that are clearly complicit in a

8    large scale narcotics trafficking concern.

9         THE COURT:  I may be remembering the evidence

10   incorrectly, but I'm not sure how, based on what came

11   out of the testimony today, his name even links him

12   with the vehicle.  I didn't -- I was not under the

13   impression that the search of the Jeep was done till

14   after.

15        MR. JACKSON:  That's correct, Your Honor.

16   However, I believe Detective O'Neill indicated they

17   had checked in the meanwhile, before they searched the

18   vehicle, they had checked with the MVA to find out who

19   in fact owned the vehicle, and the registered owner

20   came back through their check via the radio that it

21   came back to Johnnie Butler.

22        THE COURT:  Okay.  So you are relying on the DMV

23   check that he was the owner.

24        MR. JACKSON:  Exactly, the radio check, the

25   communication check they had made.  Not on what was

145

1     subsequently found in the vehicle, but rather, what

2     they knew through radio transmissions and doing a

3     record check with the MVA.

4          THE COURT:  Okay.

5          MR. JACKSON:  So that what the police now had

6     was an occupant of a vehicle, and now we know the

7     occupants of the vehicle -- well, that's again

8     prospective or retrospective.

9          But the occupants of a vehicle taking the time

10    to come off a major thoroughfare at 1 o'clock in the

11    morning, coming into a court, slowing down, and then

12    attempting to leave, without having anybody come out

13    of the car, parking the car or doing anything along

14    those lines, and this is all in proximity to a

15    location where large amounts of narcotics come out of,

16    large amounts of narcotics that somebody who had been

17    driving a car registered in the defendant's name had

18    access to.

19         It's I think logical and reasonable to conclude

20    that perhaps the person who bears the name of the car

21    that drives the conspirators to that place, and then

22    shows up himself there in the morning may have

23    something to do with what transpires there and,

24    therefore, can be --

25         It's not the strongest case in the world, but it

1    is probable cause.  Is there a substantial basis to

2    believe that this person had something to do,

3    participated in a crime?

4         Your Honor, I am not going to suggest I would

5    take that to a jury, but 1 o'clock in the morning,

6    that is a reasonable conclusion.  At 1 o'clock in the

7    morning, after the events that transpired, I believe

8    that's a reasonable conclusion, that's all I've got.

9         THE COURT:  Mr. Jackson has been trying to keep

10   a straight face during his argument.  Mr. Ravenell,

11   your turn.

12        MR. RAVENELL:  Your Honor, two aspects.  Number

13   one, we think that there is absolutely not reasonable

14   articulable suspicion even to stop the car.

15        We've cited Your Honor to two cases, the

16   Sprinkle case, the Fourth Circuit case, where the

17   Fourth Circuit makes it clear that there must be a

18   reasonable articulable suspicion that the defendant,

19   the person who is being seized, that that person has

20   committed or is about to commit a crime, not just that

21   there has been some crime afoot.

22        We don't dispute that there was some crime that

23   had been committed at that apartment, but the question

24   is reasonable articulable suspicion that the

25   defendant, at the time he was seized, before they even

1       knew his name, before they even knew who was in the

2       vehicle.

3            We will add, Your Honor, the facts that we were

4       able to glean that the Court doesn't have yet, and I

5       guess we should put into the record, which is that

6       over the break we were able to check the police

7       reports, and there was a later search and seizure

8       warrant prepared for a different address related to a

9       defendant, on a different date, where the police

10      actually do indicate, and I was given a copy of the

11      search and seizure warrant, that Johnnie Butler was in

12      the company of Monique Jackson when he was arrested

13      that morning.  We do have that report provided now by

14      the police.

15           So we don't even have that there were two black

16      males in the car.  We now know that it was Ms. Monique

17      Jackson, the defendant, and their two year old son,

18      and the 13 year old sister of Monique Jackson in the

19      vehicle.  There is nothing in this case that supports

20      a basis to stop this particular vehicle.

21           There were certainly, we believe, greater

22      objective particularized facts in Sprinkle, where the

23      Court found that there was not reasonable articulable

24      suspicion than there was in this particular case.

25           I think, Your Honor, the Sundiata case, which

1        cites Sprinkle, really kind of brings this matter to

2        home when you look at the facts in Sundiata, which in

3        many ways are very similar to this case.

4              The police knew that there was a crime that had

5        occurred.  Then they get an arrest warrant for the

6        person in that particular matter.  They were looking

7        for a person in an apartment building, similar thing

8        that we have, an apartment building.

9              They went to that particular location.  I think

10       Your Honor is aware of the facts of Sundiata.  They

11       see a Geo vehicle pull up.  It's parking, parallel

12       parking in front of the building and then sped off.

13       Now that vehicle was actually parking in front of the

14       building and the Court found that there was not

15       reasonable articulable suspicion to stop that vehicle

16       that sped away or quickly drove away.

17             Here we have a vehicle that slowed to about

18       three to five miles an hour, in the face of seeing

19       five to ten police officers milling about.  What

20       citizen normally would not be interested in seeing

21       that there are five to ten police officers in front of

22       a building that you would not slow down to see well,

23       what is going on?

24             Under the government's suggestion, everybody who

25       drives along and sees an accident, is rubbernecking,

1    basically you can stop that person if there is some

2    crime that has occurred nearby.

3        Because people rubberneck.  We all do it.  We

4    see the police presence.  We slow down.  We look and

5    then we keep going, and we speed up after we keep

6    going, as we do on 695 or I-83 or anywhere else.

7        So the fact that this was in a neighborhood and

8    they saw, someone saw five to ten police officers

9    milling about, and that the person slowed down, not

10   stopped, didn't come to a particular apartment

11   building, and in fact, didn't go to any particular

12   apartment, all they could do was associate that car

13   with driving by an apartment building in the morning

14   and then kept going, and certainly that is not a basis

15   we believe to actually stop the vehicle.  I think

16   Sundiata and Sprinkle stand for the proposition.

17       But then we go to the next step, that when they

18   stopped the vehicle, they then arrest Mr. Butler

19   because he says his name is Johnnie Butler.  There is

20   nothing that they have other than that, as Mr. Jackson

21   says, that someone ran a tag and said the tag belonged

22   to Johnnie Butler.

23       Now what's interesting, and that Mr. Jackson

24   didn't mention, is that when the police are

25   interviewing Mr. Wright at the police station, before

1     Mr. Butler is arrested, he says I don't even know the

2     person whose vehicle it is.  He doesn't even know him.

3     So all you have is that he is driving a vehicle that

4     is registered to Johnnie Butler and the person says

5     I'm Johnnie Butler, and they arrest him.

6          If that is probable cause -- Mr. Jackson I know

7     kind of spoke around it several times and said they

8     could believe that maybe he was connected.  If you get

9     past the stop, yes, you may have enough to ask more

10    questions of Mr. Butler, but to arrest him and then

11    search him?

12         If this is probable cause, then, Your Honor, I

13    think with all due respect, then I don't know what

14    isn't probable cause.  Because to arrest Mr. Butler on

15    the fact that he was present in a vehicle that the

16    police indicated they never had any information about

17    this white vehicle, had never had any information

18    about Mr. Butler, had never seen Mr. Butler before,

19    had no information that he was in that apartment that

20    day or any other day, they just saw a car and they saw

21    that he was in the vehicle, I don't see how that could

22    establish probable cause to search, to arrest him and

23    then to search.

24         Obviously, if he had not been arrested and

25    searched, they would not have found the key to the

1   apartment.  They would not have found the access

2   cards.  So they would not have even learned of the

3   locations that were later searched, and this would

4   certainly be the fruit of the poisonous tree from his

5   illegal arrest, even if the stop somehow were to

6   survive.

7          THE COURT:  Mr. Jackson.

8          MR. JACKSON:  Your Honor, I'm just going to

9   submit.  Thank you.

10         THE COURT:  Okay.  On this issue, I believe I am

11  prepared to rule.  I am going to grant Mr. Ravenell's

12  motion.  I will recite the facts.  I don't believe

13  that it even rose to an articulable suspicion

14  justifying the stop of the car.

15         The information that the police had was

16  certainly there appeared to be a stash house and drug

17  activity in that apartment.  They knew that two people

18  had arrived in a gray Jeep Cherokee earlier that

19  evening, at about 10 o'clock, and one of them had a

20  key, Mr. Wright, and Mr. Wright was arrested with his

21  companion, and that he was driving a car which, by DMV

22  information, was registered to Mr. Butler.  Mr. Wright

23  himself denied knowing the owner of the car.

24         The car that later showed up at about 1 o'clock

25  was a white vehicle that had no association noted with

1        Apartment H or Mr. Wright or Mr. Jones.  So it did not

2        correspond to what the neighbors had mentioned, a gray

3        Jeep Cherokee.  It was occupied apparently by Mr.

4        Butler, but by, in addition to him, Ms. Jackson, Ms.

5        Jackson's sister, and a child.  So there was nothing

6        that would even have fit the neighbors' description of

7        four or five black males arriving during the evening

8        and spending the time there.

9            The behavior of the car, it's not a high drug

10       area.  There is nothing other than that one apartment

11       that has been associated with narcotics or criminal

12       activity.

13           The car comes in apparently off the main

14       highway, and it is going into a limited area.  It

15       could just as easily have been coming in to turn

16       around and leave.

17           The fact that it slows down close to Apartment

18       H, as Mr. Ravenell said, this is also an area where

19       there are 10 or 15 police officers milling around.

20       You would certainly slow down.  Rubbernecking is one

21       possibility.  Trying to avoid hitting anybody is

22       another possibility.  There are certainly legitimate

23       reasons to slow one's speed at that point.

24           The car did not park.  The car did not show any

25       particular association with Apartment H.  The car then

1    continued and was stopped almost immediately as it was

2    coming around to the end of the circle.

3        I don't see that there was anything that gave

4    the officers what would rise to the level of a

5    reasonable articulable suspicion that that particular

6    car or anyone in it at the time it was stopped was

7    associated with the criminal activity in Apartment H.

8    Even if I am wrong on that, I would certainly say

9    there was no probable cause to arrest Mr. Butler.

10        The additional piece of information that his

11    name was the same as the owner of the car that Mr.

12    Wright had been driving, Mr. Wright having denied even

13    knowing Mr. Butler, there being absolutely no other

14    connection of Mr. Butler to drug activity, there is

15    clearly, clearly no probable cause for the arrest.

16        So it seems to me that any evidence that was

17    seized from Mr. Butler in the course of that arrest or

18    following up on that arrest, the access cards and the

19    key and so forth, is the product of a Fourth Amendment

20    violation and an unreasonable search.  So I'm going to

21    grant that motion as to Mr. Butler.

22        MR. RAVENELL:  Your Honor, does it also include

23    the search of the premises, the locker?

24        THE COURT:  The lockers, yes.  It seems to me

25    that the swipe cards were retrieved as a result of the

1      unlawful arrest of Mr. Butler.  So that would preclude

2      as to Mr. Butler any evidence from the storage lockers

3      coming in as well.

4           Let me back up a minute on the warrantless entry

5      of Apartment H, and partly just from the point of view

6      of efficiency.  Without making a final ruling, let me

7      go ahead and put on the record what I think the facts

8      are that relate to that warrantless entry of Apartment

9      H.  Then I can proceed perhaps with something more

10     brief in terms of a ruling as soon as I am ready to.

11          I would find in regard to the warrantless entry

12     of Apartment H that Officer Fisher, who had

13     approximately I think one year of experience at the

14     time, but he was a Baltimore County police officer,

15     responded to a request for help from the apartment

16     manager at that complex.  There was, in other words,

17     no indication that Officer Fisher initiated this

18     activity.

19          The manager related to him -- well, he first

20     heard this through dispatch.  He also learned through,

21     as I recall it, previous reports through the police

22     that there had been neighbor complaints about loud

23     music for at least a number of hours during the

24     previous evening.  He is now responding in the morning

25     of June 19th.

1        The apartment manager reiterates this

2   information that there is loud music, a radio playing

3   or something like that, loud music coming from

4   Apartment H.  The apartment manager indicated that he

5   had knocked on the door for at least ten minutes

6   trying to get some kind of response from a person who

7   might be inside the apartment.  Obviously the radio

8   had been turned on at some point by some human being,

9   and the manager indicated to the officer that he had

10  not been able to get any response to his knocking.

11       It appears at that point the officer -- what the

12  officer said, which I credit, is that the manager

13  expressed to him, the officer, a concern for the

14  safety, health, well-being of whoever might be in that

15  apartment.

16       At that point, the officer accompanied the

17  manager to the door of the apartment and had the

18  manager knock again for several minutes, with no

19  response.  Neither he, nor the manager, so far as the

20  evidence reveals, took any other, at that time, any

21  other action, such as knocking on doors of nearby

22  apartments or making inquiries of neighbors or other

23  tenants.

24       Obviously they had received complaints from

25  neighbors, as I said, or reports of this loud music,

1        but they did not make any further inquiry nor, to the

2        extent the record reflects it, as Mr. Solomon said,

3        was there any attempt to investigate who was on the

4        lease, whether there were any emergency contact phone

5        numbers or anything like that.

6            There was no particularly unusual odor or

7        anything other than the fact that the radio was

8        playing loudly and that no one was responding to the

9        repeated knocking.

10           The manager initiated this.  Unlike some other

11       cases, I will say there is absolutely no indication of

12       any criminal investigative reason for this activity at

13       all.  It was simply a response to a request for help

14       from the manager, expressing the concern that he did.

15           The officer indicated that --

16           Well, the manager, as I recall the testimony,

17       said to the officer I'm going to go in the apartment

18       because of the concern and wanted the officer to go in

19       with him.  He mentioned his own security.  He also

20       expressed to the officer that if there was someone in

21       need of help, he wanted the officer there to be able

22       to handle the emergency response.

23           There was testimony from this officer, as well

24       as from Sergeant O'Neill.  Sergeant O'Neill I think

25       was asked if he had responded in similar situations,

1    had been called by an apartment manager.  He indicated

2    he had on -- I don't recall the precise number of

3    times, but there were at least 10 to 20 times when he

4    had found someone in need of distress based on his

5    response.

6        The other officer, Detective Blake, had only

7    recalled doing this four or five times and on two or

8    three occasions had found somebody in there, two

9    suicides and one person who simply hadn't been

10   answering.

11       He was asked regarding whether there might have

12   been inquiries from family members in at least some of

13   those situations and thought there had been.  I am not

14   sure that that question was put to Sergeant O'Neill,

15   who obviously had a greater number of occasions.

16       Officer Fisher also testified generally that

17   there had been other occasions when he had responded

18   to this kind of request and had found someone in need

19   of help.  I don't really have the specific factual

20   circumstances of most of those other situations.

21       Upon entering the apartment, Officer Fisher I

22   will find followed reasonably where he should have in

23   terms of looking to see if there was a person in the

24   apartment.  There was a living room and kitchen most

25   immediately there, where he saw in the living room a

1      shirt in a trash bag, nothing else particularly

2      unusual, nothing that he immediately noticed in the

3      kitchen.

4          Proceeding down the hallway, the bathroom door

5      was open.  Nothing, nobody in there.

6          Also the source of the music, the source of the

7      music appeared to be at the end of the hallway behind

8      a closed door.  He first knocked and then opened that

9      door.  Indeed, that's where the radio was playing.  He

10     immediately observed the two card tables with white

11     powder on top.

12         There was another closed door immediately to the

13     right as he entered, which could have, as best he

14     could tell without opening the door, could have held a

15     person, and when he opened that, saw other items in

16     plain view on the shelf at eye level, including among

17     them the mannite.

18         There is no evidence that he conducted any more

19     of a search than that necessary to look for a person

20     in distress before he left the apartment.  I don't

21     belive that's an issue, and I don't believe there is

22     any issue of his subjective motivation in going into

23     the apartment.  It appeared to be purely a response to

24     a request for help.

25         What I think remains as the question that I want

1    to look at some more cases about is the objective

2    reasonableness of his going in with the manager, given

3    what he faced, what the information was that he had

4    when he arrived on the scene.

5         Now having said that, if anyone feels that I

6    have misstated or left something important out of the

7    evidence, tell me.  Mr. Solomon.

8         MR. SOLOMON:  Yes, I do, Your Honor, with all

9    due respect.

10        When Sergeant O'Neill testified, his testimony

11   was that on the 10 to 20 occasions he had responded,

12   it was when he had been summonsed to apartment

13   complexes for people in distress.  That was the

14   information that he enunciated for the Court.  So that

15   he was talking about specific instances where there

16   was a call for people possibly in distress.

17        The other bit of information is Detective

18   Blake's testimony, and this was on cross-examination.

19        THE COURT:  Okay.  So wait.  Your recollection

20   is that the 10 to 20 was the times that he had

21   responded, not the times that he had found somebody in

22   need of help?

23        MR. SOLOMON:  That's the times he had responded.

24   My notes say has been summonsed to apartment complexes

25   for people in distress 10 to 20 times.  So that the

1   actual nature of the call was for people in distress,

2   or there was at least a speculation that it was for

3   people in distress.  That's my recollection.

4     THE COURT:  Okay.

5     MR. SOLOMON:  Then on cross-examination of

6   Detective Blake, in response to the question that I

7   asked, he had indicated on the occasions when he

8   responded to the apartments, it was based on

9   information from family members, inquiring regarding

10   family members inside the apartment, and apartment

11   managers providing information regarding known persons

12   inside the location.

13     THE COURT:  I thought I said that as to

14   Detective Blake, I do recall that he indicated on at

15   least some of the occasions there being a family

16   inquiry involved.  I don't think that came out as

17   regards to Sergeant O'Neill.  Perhaps we'll have to go

18   back and look at the transcript or the testimony if it

19   becomes relevant as to the number of times that

20   Sergeant O'Neill responded.

21     I think the question to him initially, but I'll

22   see what Mr. Jackson remembers, had to do with

23   responding to calls to assist apartment managers in

24   this kind of situation, but I don't know.

25     Mr. Jackson, do you have any recollection?

1      MR. JACKSON:  That's my recollection.  Well, I

2  think the question I put to him was how many times in

3  similar circumstances that we are talking about here

4  where an apartment manager has failed to get a

5  response to a knock at the door have you responded and

6  found people in distress or in need of assistance.

7      MR. SOLOMON:  My recollection -- I guess the

8  transcript will be the final say-so -- was that he

9  volunteered that on those 10 to 20 times, that this

10  was unsolicited, and not suggested by the question,

11  that he responded on those 10 to 20 occasions to

12  people in distress.  That may have been the nature of

13  the call.

14      Again, I may have miswritten it, but that's what

15  I have.

16      THE COURT:  Okay.  Anything else?

17      MR. JACKSON:  No.  Thank you, Your Honor.

18      THE COURT:  Okay.  Any other issues presented by

19  the motions?  Anything else that we are here to

20  resolve today?

21      MR. RAVENELL:  Judge, actually nothing to

22  resolve.  On scheduling, I want to check with Mr.

23  Jackson.

24      THE COURT:  Sure.  I was going to say if counsel

25  want to come back in on scheduling, we can do that.

1          MR. RAVENELL:  That's fine.  I can talk to Mr.

2     Jackson.  I just want to check one matter with him

3     before we come back to your chambers.

4          THE COURT:  Sure.  Why don't we just adjourn for

5     now, and I can see counsel in chambers in about ten

6     minutes.

7          MR. RAVENELL:  Fine.

8          MR. JACKSON:  Thank you, Your Honor.

9          (The proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2     GOVERNMENT'S WITNESSES                        PAGE

3     KEVIN FISHER

4     By Mr. Jackson:                               22-62

5     By Mr. Solomon:                               38

6     By Mr. Ravenell:                              55

7     DENNIS O'NEILL

8     By Mr. Jackson:                               64

9     By Mr. Ravenell:                              79

10    JOSEPH BLAKE

11    By Mr. Jackson:                               99

12    By Mr. Solomon:                               106

13    By Mr. Ravenell:                              107

14    DEFENDANT WRIGHT'S WITNESS                    PAGE

15    CALVIN EUGENE WRIGHT, II

16    By Mr. Solomon:                               14

17    By Mr. Jackson:                               19

18    DEFENDANT BUTLER'S WITNESS

19    MONIQUE JACKSON

20    By Mr. Ravenell:                              114-119

21    By Mr. Jackson:                               117

22    GOVERNMENT'S MOTION EXHIBITS         MARKED    REC'D

23    1                                    24

24    2                                    35

25    3                                    102

DEFENDANT BUTLER'S MOTION EXHIBITS   MARKED   REC'D

1-8                                                  90

<u>REPORTER'S CERTIFICATE</u>

I hereby certify that the foregoing transcript in the matter of United States of America vs. Johnnie Butler, et al., Defendants, Criminal Action No. CCB-06-0057, before the Honorable Catherine C. Blake, United States District Judge, on June 2, 2006 is true and accurate.


Gail A. Simpkins

Official Court Reporter

'

'02 [3] - 23:6, 60:7, 89:9

**1**

1 [20] - 24:7, 24:10, 66:9, 66:19, 74:7, 86:17, 86:18, 86:21, 88:14, 89:18, 89:25, 91:2, 97:18, 107:22, 109:14, 145:10, 146:5, 146:6, 151:24, 163:23
1-8 [1] - 164:2
10 [72] - 13:19, 14:22, 15:24, 23:20, 23:23, 24:19, 25:19, 27:18, 36:2, 37:15, 38:4, 38:15, 39:8, 39:13, 57:11, 57:13, 57:16, 61:5, 61:13, 61:18, 61:24, 65:17, 66:23, 67:5, 67:19, 70:14, 70:23, 72:15, 72:18, 73:19, 73:20, 79:6, 79:20, 80:15, 80:21, 81:7, 82:25, 83:11, 87:10, 88:16, 89:4, 89:6, 89:7, 89:10, 89:14, 91:6, 93:8, 93:12, 94:15, 95:18, 95:21, 95:22, 100:6, 107:12, 109:1, 109:3, 109:6, 109:22, 111:17, 120:14, 121:9, 127:18, 134:7, 151:19, 152:19, 157:3, 159:11, 159:20, 159:25, 161:9, 161:11
102 [1] - 163:25
106 [1] - 163:12
107 [1] - 163:13
10:30 [2] - 15:24, 101:10
10:56 [3] - 26:7, 26:8, 40:22
10H [1] - 26:21
11 [4] - 26:13, 27:6, 85:18, 100:20
11-page [2] - 111:9, 111:14
113 [1] - 7:4
114-119 [1] - 163:20
117 [1] - 163:21
119 [1] - 4:23

11:07 [1] - 26:13
12 [8] - 14:22, 80:15, 95:4, 95:19, 95:20, 95:22, 96:8, 134:7
1206 [2] - 128:19, 131:3
122 [1] - 57:6
128 [1] - 5:17
13 [1] - 147:18
14 [2] - 96:3, 163:16
15 [1] - 152:19
1506 [1] - 133:5
19 [3] - 13:13, 56:21, 163:17
1960 [1] - 5:10
1968 [1] - 4:21
1978 [2] - 5:17, 5:23
1979 [2] - 128:20, 131:3
1987 [1] - 65:2
1990 [1] - 6:8
1991 [1] - 65:8
1992 [1] - 129:2
1993 [1] - 6:23
1997 [2] - 4:23, 7:5
1998 [1] - 7:18
19th [12] - 2:24, 25:3, 27:6, 58:1, 60:2, 65:16, 82:10, 89:8, 100:12, 115:1, 115:8, 154:25
1:30 [1] - 35:7

**2**

2 [9] - 1:8, 35:7, 35:14, 35:16, 36:19, 91:10, 138:5, 163:24, 165:6
20 [9] - 79:6, 127:19, 157:3, 159:11, 159:20, 159:25, 161:9, 161:11
2002 [13] - 13:13, 23:6, 24:20, 25:3, 56:21, 59:24, 65:13, 65:16, 82:10, 99:16, 100:12, 115:2, 115:8
2003 [2] - 133:8, 133:17
2004 [1] - 133:22
2006 [3] - 1:8, 84:15, 165:6
20th [1] - 56:11
22-62 [1] - 163:4
2200 [2] - 68:25, 72:15
24 [1] - 163:23
257 [1] - 5:10
27 [1] - 60:6
27th [1] - 59:24

**3**

3 [5] - 91:16, 92:2, 102:11, 102:13, 163:25
30 [2] - 78:15, 79:6
313 [1] - 7:4
332 [1] - 133:22
33rd [1] - 64:24
35 [1] - 163:24
354 [2] - 133:7, 133:16
362 [1] - 5:10
364 [1] - 4:21
38 [1] - 163:5
392 [1] - 4:21

**4**

4 [2] - 92:13, 94:18
439 [1] - 5:17
48 [1] - 37:2
495 [1] - 6:8
497 [2] - 133:8, 133:17

**5**

5 [3] - 58:6, 94:9, 94:20
509 [1] - 133:17
526 [1] - 6:24
54 [1] - 75:15
55 [1] - 163:6
5:30 [1] - 58:6

**6**

6 [7] - 36:8, 66:2, 91:19, 92:10, 95:20, 97:19, 108:1
610 [2] - 128:19, 131:3
629 [1] - 6:23
637 [1] - 4:23
64 [1] - 163:8
673 [1] - 129:2
695 [1] - 149:6
6:10 [1] - 36:3
6:40 [1] - 36:13
6:56 [2] - 56:21, 108:2
6th [1] - 84:15

**7**

7 [4] - 56:12, 56:16, 71:23, 95:2
79 [1] - 163:9

**8**

8 [6] - 88:14, 89:19, 89:25, 95:1, 95:25, 97:18
8th [1] - 4:23

**9**

90 [1] - 164:2
91 [1] - 6:8
911 [1] - 25:23
923 [1] - 133:22
963 [1] - 129:1
98 [1] - 133:4
99 [1] - 163:11

**A**

a.m [2] - 40:22, 56:16, 86:18, 107:23, 109:14
abandoned [1] - 46:11
ability [1] - 5:1
able [16] - 48:21, 49:15, 51:15, 61:23, 66:18, 69:17, 74:25, 75:9, 126:12, 131:23, 141:25, 142:4, 147:4, 147:6, 155:10, 156:21
above-entitled [1] - 1:10
absence [2] - 131:25, 132:12
absolute [2] - 11:23, 103:1
absolutely [3] - 146:13, 153:13, 156:11
academy [2] - 33:13, 44:17
accelerated [1] - 74:16
acceptable [1] - 133:1
access [13] - 5:2, 7:25, 8:1, 8:4, 8:9, 8:10, 14:17, 15:13, 16:8, 132:23, 145:18, 151:1, 153:18
accident [1] - 148:25
accompanied [2] - 56:17, 155:16
accompany [2] - 28:1, 57:3
according [1] - 141:4
accurate [1] - 165:7
accurately [1] - 24:18

acquire [1] - 5:19
acronym [1] - 34:10
Action [1] - 165:4
action [6] - 74:18, 128:23, 128:24, 134:8, 141:11, 155:21
actions [2] - 140:24
activities [2] - 4:6, 7:5
activity [19] - 39:4, 43:6, 43:12, 48:8, 50:23, 51:6, 51:9, 62:22, 63:1, 76:7, 76:9, 132:5, 134:4, 151:17, 152:12, 153:7, 153:14, 154:18, 156:12
actual [6] - 36:15, 48:2, 60:18, 131:19, 137:3, 160:1
Acura [2] - 91:18, 92:8
add [1] - 147:3
addition [2] - 85:23, 152:4
additional [7] - 21:21, 33:3, 68:24, 86:22, 107:17, 144:3, 153:10
address [4] - 23:19, 66:21, 136:3, 147:8
addressed [1] - 3:5
adhering [1] - 22:1
adjacent [2] - 47:20, 47:21
adjoining [3] - 49:5, 51:24, 52:2
adjourn [1] - 162:4
Administration [1] - 77:7
admissions [1] - 9:22
advance [1] - 67:2
advise [2] - 11:3, 11:5
advised [7] - 12:10, 25:24, 26:17, 44:8, 103:1, 106:15, 108:25
aerial [2] - 24:15, 24:19
affiant [1] - 35:20
affidavits [4] - 109:11, 109:23, 110:4, 110:21
afford [1] - 103:6
afoot [1] - 146:21
after-the-fact [1] - 141:16
afternoon [7] - 25:9, 35:7, 35:8, 36:9, 99:4, 114:11, 117:15
agent [1] - 2:7

**Agent** [1] - 2:8
**agents** [1] - 33:15
**aggrieved** [2] - 5:14, 6:5
**ago** [2] - 20:14, 112:6
**agree** [2] - 103:9, 110:15
**ahead** [3] - 13:7, 90:15, 154:7
**aid** [4] - 51:19, 126:9, 128:20, 131:1
**aiding** [1] - 105:5
**al** [2] - 1:6, 165:4
**Alcohol** [1] - 2:8
**allegation** [1] - 132:9
**alleged** [1] - 113:5
**allegedly** [7] - 59:5, 59:16, 62:8, 108:14, 108:20, 109:20, 110:22
**allow** [1] - 72:9
**allowed** [3] - 69:10, 69:11, 125:15
**alluded** [1] - 134:25
**almost** [4] - 31:13, 61:24, 83:13, 153:1
**alone** [4] - 4:12, 16:2, 58:7, 66:25
**alternate** [1] - 57:8
**altogether** [2] - 23:12, 99:10
**ambulances** [1] - 51:17
**Amendment** [3] - 9:19, 123:14, 153:19
**AMERICA** [1] - 1:4
**America** [2] - 2:5, 165:3
**amount** [5] - 37:3, 43:5, 126:9, 126:24, 143:6
**amounts** [2] - 145:15, 145:16
**analogized** [1] - 132:21
**announce** [1] - 49:12
**answer** [7] - 34:25, 79:2, 103:9, 119:1, 121:4, 125:7, 138:25
**answered** [1] - 27:2
**answering** [3] - 78:21, 105:14, 157:10
**anytime** [1] - 103:10
**anyway** [4] - 122:21, 122:24, 141:21, 141:24
**apartment** [285] - 2:23, 3:4, 3:6, 3:10, 3:13, 3:17, 3:25, 4:3, 4:4, 7:20, 7:25, 8:2, 8:3,

8:11, 8:15, 8:20, 8:23, 8:24, 9:16, 9:21, 9:24, 10:3, 10:7, 10:17, 13:17, 13:18, 13:23, 14:17, 14:20, 15:2, 15:8, 15:11, 15:13, 15:16, 15:20, 16:6, 16:9, 16:13, 16:22, 17:2, 17:10, 17:13, 17:15, 17:17, 17:21, 18:1, 18:5, 18:9, 18:16, 18:24, 19:2, 19:7, 19:11, 19:20, 19:23, 19:25, 20:3, 20:24, 21:9, 24:1, 25:13, 25:16, 25:17, 25:25, 26:5, 26:22, 27:15, 27:18, 27:20, 27:25, 28:7, 28:9, 28:10, 28:15, 28:22, 28:24, 29:2, 29:21, 30:1, 30:5, 30:7, 31:23, 33:3, 33:5, 33:6, 33:11, 33:21, 35:4, 36:1, 36:12, 36:14, 37:15, 37:18, 38:18, 38:25, 39:3, 39:17, 39:22, 40:18, 40:25, 41:10, 41:12, 41:14, 41:15, 41:18, 41:21, 41:24, 42:2, 42:4, 42:8, 42:9, 42:11, 42:13, 42:16, 43:7, 43:14, 43:18, 43:20, 43:24, 43:25, 44:1, 44:3, 45:7, 45:10, 45:13, 45:16, 45:19, 45:23, 46:6, 46:10, 46:18, 47:5, 48:3, 48:7, 48:9, 48:14, 48:20, 48:21, 48:22, 48:24, 49:9, 49:10, 49:16, 49:23, 50:16, 50:18, 50:19, 51:5, 52:18, 52:24, 53:24, 54:13, 54:14, 54:16, 54:22, 54:23, 54:25, 55:1, 55:5, 55:16, 56:15, 57:3, 57:17, 57:18, 57:23, 58:15, 59:7, 60:23, 61:13, 61:18, 62:1, 62:22, 67:5, 67:25, 68:6, 68:9, 68:16, 68:24, 69:4, 69:5, 70:8, 70:10, 70:14, 72:1, 74:3, 74:10, 78:20, 78:24, 79:21, 80:8, 80:20, 80:21, 81:3, 82:21, 84:6, 89:1,

91:7, 91:12, 91:20, 92:9, 92:16, 100:6, 104:17, 104:18, 104:21, 105:7, 105:23, 106:10, 106:12, 106:21, 106:23, 107:1, 107:17, 108:4, 108:10, 108:15, 109:21, 115:20, 115:24, 116:10, 123:22, 124:2, 124:4, 124:20, 124:22, 126:8, 126:12, 126:14, 128:2, 128:5, 130:17, 130:22, 131:5, 131:6, 131:19, 131:21, 131:23, 132:8, 132:11, 133:19, 133:24, 134:5, 134:16, 137:10, 137:15, 137:19, 138:17, 139:9, 139:22, 140:13, 143:5, 146:23, 148:7, 148:8, 149:10, 149:12, 149:13, 150:19, 151:1, 151:17, 152:10, 154:15, 155:1, 155:4, 155:7, 155:15, 155:17, 156:17, 157:1, 157:21, 157:24, 158:20, 158:23, 159:12, 159:24, 160:10, 160:23, 161:4
**Apartment** [18] - 27:17, 29:22, 36:2, 38:2, 66:24, 70:24, 71:9, 107:12, 123:4, 138:9, 152:1, 152:17, 152:25, 153:7, 154:5, 154:8, 154:12, 155:4
**apartments** [14] - 24:2, 26:2, 29:3, 47:21, 69:2, 70:23, 80:15, 106:6, 118:13, 118:16, 118:21, 140:4, 155:22, 160:8
**appear** [5] - 10:22, 68:25, 88:25, 94:12, 103:20
**appeared** [10] - 4:4, 33:19, 37:9, 75:2, 80:12, 81:1, 84:20,

151:16, 158:7, 158:23
**appellate** [1] - 6:23
**appliance** [1] - 125:10
**application** [6] - 46:17, 47:10, 138:21, 138:22, 139:24, 140:1
**apply** [2] - 132:17, 132:24
**applying** [1] - 140:4
**appoint** [1] - 103:7
**appreciably** [1] - 143:11
**appreciate** [1] - 142:11
**appreciated** [1] - 4:24
**apprehend** [1] - 129:25
**apprised** [1] - 101:24
**approach** [3] - 35:9, 88:6, 102:4
**approached** [4] - 46:7, 62:23, 74:14, 81:8
**appropriate** [1] - 87:25
**approval** [1] - 60:1
**approved** [1] - 60:6
**approximate** [1] - 35:6
**area** [45] - 24:16, 24:25, 25:10, 25:12, 25:15, 26:11, 38:21, 39:3, 43:1, 43:4, 43:11, 48:25, 49:7, 50:7, 51:23, 70:22, 70:25, 71:5, 71:7, 73:12, 73:18, 74:14, 74:21, 79:23, 80:3, 83:18, 88:11, 88:12, 89:10, 93:17, 93:23, 94:12, 94:21, 94:22, 94:24, 95:21, 96:25, 97:3, 99:23, 100:1, 100:7, 131:18, 152:10, 152:14, 152:18
**areas** [1] - 38:24
**argue** [1] - 139:6
**argument** [5] - 3:21, 13:11, 126:22, 134:13, 135:7, 135:10, 135:13, 138:5, 140:19, 142:12, 146:10
**Arizona** [1] - 101:25
**arrangement** [4] - 19:19, 19:22, 20:5, 140:20
**arrest** [37] - 2:24, 3:1, 18:8, 68:18, 71:16,

71:22, 72:13, 72:24, 73:1, 73:3, 73:7, 76:21, 78:5, 101:5, 101:9, 101:21, 103:13, 109:12, 109:14, 135:17, 137:3, 137:25, 142:22, 142:23, 144:2, 148:5, 149:18, 150:5, 150:10, 150:14, 150:22, 151:5, 153:9, 153:15, 153:17, 153:18, 154:1
**arrested** [9] - 44:25, 71:21, 75:25, 101:16, 107:22, 147:12, 150:1, 150:24, 151:20
**arresting** [1] - 45:2
**arrests** [2] - 111:10, 113:6
**arrival** [3] - 26:14, 27:21, 70:4
**arrive** [4] - 38:4, 57:16, 69:21, 73:15
**arrived** [10] - 15:23, 26:12, 26:15, 27:8, 28:16, 38:3, 61:5, 109:7, 151:18, 159:4
**arriving** [5] - 67:2, 87:10, 109:2, 120:14, 152:7
**articulable** [10] - 142:20, 143:1, 143:19, 146:14, 146:18, 146:24, 147:23, 148:15, 151:13, 153:5
**ascertain** [2] - 143:20, 143:21
**aside** [1] - 45:25
**aspect** [1] - 55:2
**aspects** [1] - 146:12
**assert** [2] - 4:11, 135:25
**asserted** [1] - 3:12
**asserting** [2] - 3:9, 138:1
**assertion** [1] - 129:7
**assigned** [9] - 23:5, 23:14, 25:11, 65:13, 75:15, 99:7, 99:17, 99:23, 100:9
**assignment** [7] - 34:15, 38:20, 39:2, 64:19, 65:3, 99:6, 99:16
**assist** [4] - 77:18,

101:1, 104:21, 160:23
**assistance** [16] - 26:3, 29:10, 65:25, 79:1, 90:7, 105:7, 124:12, 124:23, 124:25, 125:13, 129:6, 129:8, 129:14, 130:5, 161:6
**assisted** [1] - 126:9
**assisting** [1] - 76:5
**associate** [1] - 149:12
**associated** [2] - 80:20, 152:11, 153:7
**association** [2] - 151:25, 152:25
**assume** [3] - 12:19, 22:6, 89:16
**assuming** [1] - 5:19
**asthma** [1] - 117:8
**attached** [1] - 110:4
**attack** [2] - 113:4, 124:6
**attempt** [4] - 28:14, 124:6, 143:21, 156:3
**attempted** [1] - 46:14
**attempting** [1] - 145:12
**attempts** [1] - 143:12
**attention** [11] - 25:2, 36:18, 37:19, 66:22, 67:24, 78:13, 78:14, 87:24, 99:15, 100:11, 115:1
**authored** [4] - 107:10, 107:17, 109:10, 109:24
**authorization** [2] - 36:1, 36:5
**automobiles** [3] - 91:8, 132:21, 132:23
**available** [1] - 21:6
**average** [2] - 14:21, 57:8
**avoid** [1] - 152:21
**aware** [9] - 4:7, 15:10, 42:3, 61:21, 69:23, 101:5, 101:8, 106:16, 148:10

## B

**bad** [2] - 123:19, 124:10
**bag** [10] - 30:13, 32:9, 32:12, 32:14, 32:16, 32:18, 50:8, 50:9, 50:13, 158:1
**baggies** [1] - 37:3

**bagging** [2] - 7:20, 8:18
**bags** [5] - 31:16, 31:19, 32:13, 32:15, 37:8
**bald** [2] - 132:9, 132:10
**ball** [1] - 142:18
**Baltimore** [25] - 1:8, 21:10, 23:3, 23:5, 36:6, 44:5, 44:17, 63:18, 64:21, 64:22, 65:1, 65:4, 65:9, 65:14, 75:14, 75:20, 98:6, 99:7, 99:9, 99:12, 99:21, 100:4, 104:19, 105:4, 154:14
**bar** [2] - 7:6, 32:7
**bare** [1] - 140:12
**bars** [3] - 32:8, 33:17, 37:2
**based** [13] - 3:19, 4:11, 9:2, 10:10, 40:8, 44:6, 140:11, 140:24, 141:9, 144:10, 157:4, 160:8
**basement** [1] - 47:24
**basing** [2] - 40:10, 61:9
**basis** [13] - 77:4, 125:5, 129:22, 130:7, 132:7, 134:21, 135:16, 135:17, 136:10, 146:1, 147:20, 149:14
**bathroom** [10] - 29:18, 30:22, 52:8, 52:11, 52:12, 52:13, 53:4, 53:5, 63:22, 158:4
**bazooka** [1] - 31:10
**bazooka-type** [1] - 31:10
**bear** [1] - 8:17
**bears** [1] - 145:20
**became** [1] - 101:5
**become** [1] - 99:25
**becomes** [2] - 87:22, 160:19
**bed** [1] - 16:22
**bedroom** [12] - 31:8, 31:10, 31:25, 32:11, 52:6, 52:7, 53:9, 53:13, 53:18, 53:23, 54:3, 54:10
**bedrooms** [1] - 52:5
**befallen** [2] - 130:22, 132:10
**begging** [5] - 18:13,

19:6, 54:21, 55:18, 79:8
**begun** [1] - 131:7
**behalf** [5] - 2:4, 22:14, 64:8, 98:15, 114:2
**behavior** [1] - 152:9
**behind** [3] - 30:3, 32:1, 158:7
**belief** [5] - 127:13, 129:4, 130:9, 134:1
**belive** [1] - 158:21
**belonged** [2] - 17:21, 149:21
**benefit** [4] - 34:6, 36:20, 67:3, 67:8
**best** [7] - 15:19, 16:22, 46:9, 47:4, 91:3, 96:17, 158:13
**between** [7] - 7:23, 10:20, 20:6, 72:24, 76:18, 92:17, 127:24
**beyond** [1] - 73:17
**big** [1] - 32:2
**bigger** [1] - 37:15
**billing** [2] - 55:2, 55:6
**bit** [3] - 138:10, 142:10, 159:17
**black** [26] - 32:9, 38:3, 42:10, 42:20, 57:22, 61:1, 61:12, 70:6, 71:2, 75:3, 75:4, 86:11, 86:24, 109:2, 109:21, 111:17, 121:10, 121:16, 121:19, 121:21, 121:23, 122:6, 139:8, 147:15, 152:7
**BLAKE** [2] - 98:14, 163:10
**Blake** [21] - 1:11, 34:14, 34:19, 34:23, 35:2, 35:23, 56:3, 58:9, 59:8, 59:13, 59:15, 61:20, 98:6, 98:25, 107:10, 121:2, 127:23, 157:6, 160:6, 160:14, 165:5
**Blake's** [1] - 159:18
**blaring** [4] - 125:10, 128:6, 134:6
**blinds** [2] - 48:10, 48:15
**blocked** [1] - 74:21
**blood** [3] - 52:22, 52:23, 131:9
**bodies** [2] - 44:8, 44:12
**body** [3] - 51:12, 123:25, 126:2

**bomb** [3] - 72:5, 72:8, 72:11
**bones** [1] - 140:12
**boom** [1] - 31:10
**borne** [4] - 140:11, 140:18, 141:12, 141:21
**bottom** [7] - 59:25, 67:14, 95:12, 123:13, 124:13, 124:24, 125:19
**box** [1] - 31:10
**boxes** [1] - 32:14
**break** [10] - 73:13, 90:12, 94:8, 112:12, 122:21, 122:24, 129:12, 130:10, 130:11, 147:6
**break-in** [2] - 129:12, 130:10, 130:11
**Breezy** [53] - 13:19, 14:11, 23:20, 23:23, 24:14, 24:20, 25:19, 26:1, 26:21, 36:2, 37:16, 38:15, 39:8, 39:13, 65:17, 66:5, 66:12, 66:20, 66:23, 67:5, 67:11, 67:16, 67:19, 70:14, 70:24, 72:19, 73:19, 73:20, 74:12, 79:20, 80:15, 80:21, 81:7, 82:25, 83:11, 89:4, 89:6, 89:7, 89:10, 89:12, 89:14, 89:16, 89:17, 91:7, 93:12, 94:15, 100:6, 101:17, 104:12, 107:12, 118:12, 118:15, 118:21
**bricks** [1] - 68:13
**brief** [4] - 63:20, 117:18, 127:12, 154:10
**briefly** [3] - 19:15, 62:17, 106:2
**bring** [5] - 87:23, 93:3, 95:5, 95:7, 96:1
**brings** [1] - 148:1
**broken** [1] - 55:7
**brown** [1] - 24:3
**building** [30] - 27:15, 37:15, 43:7, 70:8, 70:14, 70:18, 70:21, 70:23, 71:2, 71:4, 74:4, 79:21, 80:8, 81:4, 81:8, 84:7, 91:19, 94:3, 94:7, 94:23, 94:24, 139:20, 148:7,

148:8, 148:12, 148:14, 148:22, 149:11, 149:13
**Building** [2] - 95:18, 95:19
**buildings** [1] - 24:1
**bulky** [1] - 57:7
**burden** [2] - 123:10, 135:15, 142:19
**Bureau** [1] - 2:8
**burglaries** [3] - 38:17, 43:5, 128:15
**burning** [1] - 45:3
**business** [1] - 10:21
**BUTLER** [1] - 1:6
**butler** [19] - 2:13, 3:1, 3:8, 73:5, 78:8, 82:17, 82:21, 84:14, 84:19, 84:23, 84:24, 107:22, 109:14, 111:11, 115:18, 115:23, 119:13, 122:12, 153:13
**Butler** [52] - 1:18, 2:6, 3:9, 3:11, 19:5, 77:14, 77:23, 77:24, 82:8, 82:13, 84:22, 86:15, 114:2, 114:17, 114:19, 115:9, 115:11, 116:7, 116:16, 118:23, 120:6, 135:16, 135:18, 135:20, 135:25, 136:25, 137:25, 142:19, 144:2, 144:5, 144:21, 147:11, 149:18, 149:19, 149:22, 150:1, 150:4, 150:5, 150:10, 150:14, 150:18, 151:22, 152:4, 153:9, 153:14, 153:17, 153:21, 154:1, 154:2, 165:4
**BUTLER'S** [2] - 163:18, 164:1
**butler's** [2] - 73:7, 76:18
**Butler's** [3] - 89:25, 138:8, 142:15
**button** [1] - 49:20
**button-down** [1] - 49:20
**BY** [25] - 13:10, 19:17, 22:22, 35:12, 38:11, 56:1, 62:19, 64:15, 79:15, 86:10, 88:8, 88:17, 91:1, 93:10,

95:16, 96:20, 99:3, 102:9, 106:4, 107:9, 110:16, 114:10, 115:7, 117:14, 119:21

## C

**cabin** [5] - 129:12, 129:13, 129:17, 129:19, 129:23
**Cahill** [1] - 36:6
**Caldwell** [13] - 84:25, 85:2, 85:3, 85:4, 85:5, 86:1, 86:11, 120:15, 121:4, 121:5, 121:6, 121:17, 121:21
**Calvin** [5] - 2:5, 13:4, 68:19, 101:6, 101:12
**CALVIN** [2] - 12:23, 163:15
**canister** [1] - 72:10
**canisters** [2] - 72:6, 72:7
**Cannon** [11] - 74:20, 75:12, 75:13, 75:14, 76:3, 76:4, 76:12, 77:16, 78:5, 81:21, 97:4
**Cannon's** [1] - 82:3
**cannot** [2] - 103:6, 129:7
**caps** [1] - 68:14
**car** [33] - 82:14, 95:19, 95:21, 117:20, 119:5, 119:6, 119:9, 119:22, 121:17, 122:9, 135:16, 135:22, 143:9, 143:23, 145:13, 145:17, 145:20, 146:14, 147:16, 149:12, 150:20, 151:14, 151:21, 151:23, 151:24, 152:9, 152:13, 152:24, 152:25, 153:6, 153:11
**card** [8] - 31:11, 53:25, 102:3, 102:17, 102:19, 102:20, 102:24, 158:10
**cards** [6] - 78:9, 78:10, 78:11, 151:2, 153:18, 153:25
**care** [1] - 111:24
**career** [1] - 127:20

**caretaking** [9] - 123:6, 124:20, 126:22, 132:15, 132:24, 133:10, 133:14, 133:19, 133:23
**carpet** [4] - 52:19, 52:20, 52:21, 52:25
**cars** [3] - 57:9, 88:12, 89:2
**Carter** [6] - 7:10, 7:11, 7:12, 7:15, 7:18, 10:19
**case** [71] - 1:10, 2:5, 2:7, 3:19, 4:22, 4:23, 5:7, 5:8, 5:9, 5:10, 5:11, 5:15, 5:17, 5:18, 6:8, 6:23, 6:25, 7:5, 7:13, 7:19, 7:23, 7:24, 8:16, 9:17, 11:25, 12:2, 18:4, 18:8, 21:1, 28:2, 65:5, 97:17, 123:17, 125:4, 125:24, 126:24, 126:25, 127:2, 127:8, 128:6, 128:19, 128:22, 128:24, 128:25, 129:1, 129:2, 130:14, 131:2, 131:4, 131:11, 131:13, 133:3, 133:5, 133:7, 133:8, 133:12, 133:17, 138:23, 139:7, 140:3, 141:1, 145:25, 146:16, 147:19, 147:24, 147:25, 148:3
**Case** [1] - 2:6
**cases** [10] - 6:22, 7:8, 9:8, 29:14, 127:4, 134:17, 135:9, 146:15, 156:11, 159:1
**casual** [1] - 5:21
**Catherine** [2] - 1:11, 165:5
**caused** [1] - 44:21
**causes** [1] - 29:17
**CCB-06-0057** [3] - 1:5, 2:7, 165:5
**CDS** [1] - 45:25
**CDVIT** [6] - 34:1, 34:7, 34:17, 99:19, 99:20, 99:23
**center** [2] - 89:2, 91:13
**certain** [2] - 44:19, 111:24
**certainly** [16] - 3:23,

3:24, 87:21, 87:23, 96:13, 122:25, 125:2, 135:13, 136:25, 147:21, 149:14, 151:4, 151:16, 152:20, 152:22, 153:8
**CERTIFICATE** [1] - 165:1
**certify** [1] - 165:2
**challenge** [5] - 3:10, 6:1, 7:1, 136:22, 138:2
**chambers** [2] - 162:3, 162:5
**chance** [4] - 88:21, 110:13, 112:12, 135:11
**characterize** [1] - 126:21
**charges** [9] - 59:4, 59:11, 59:12, 85:18, 85:23, 86:4, 110:25, 111:10, 111:14
**check** [28] - 25:24, 26:4, 26:18, 27:24, 30:18, 30:23, 31:25, 58:23, 78:20, 83:22, 86:6, 86:8, 87:19, 98:9, 106:8, 120:10, 120:16, 120:20, 120:21, 122:15, 140:20, 144:23, 144:24, 144:25, 145:3, 147:6, 161:22, 162:2
**checked** [4] - 121:3, 136:5, 144:17, 144:18
**Cherokee** [19] - 2:25, 38:5, 61:7, 61:14, 61:19, 62:1, 62:6, 62:7, 69:1, 69:20, 70:6, 76:24, 88:3, 113:2, 121:11, 136:2, 139:10, 151:18, 152:3
**child** [2] - 116:18, 152:5
**choose** [1] - 11:15
**chronologically** [1] - 123:3
**cigarette** [1] - 46:3
**Cir** [1] - 4:23
**circle** [6] - 67:12, 81:17, 82:6, 82:10, 84:3, 153:2
**Circuit** [17] - 7:4, 123:6, 126:21, 128:19, 129:1,

129:4, 130:6, 131:3, 133:3, 133:5, 133:9, 133:13, 133:17, 133:20, 134:11, 146:16, 146:17
**circuit** [2] - 37:6, 133:6
**circuits** [3] - 132:16, 132:22, 134:12
**circumstances** [19] - 4:15, 4:25, 5:2, 8:5, 8:15, 21:3, 25:21, 65:20, 68:22, 73:6, 101:15, 126:11, 127:10, 130:1, 133:25, 134:2, 138:14, 157:20, 161:3
**cite** [2] - 4:20, 6:22
**cited** [5] - 5:15, 133:2, 133:16, 135:9, 146:15
**cites** [2] - 128:18, 148:1
**citizen** [1] - 148:20
**City** [1] - 75:14
**claiming** [1] - 3:12
**class** [1] - 23:1
**clear** [12] - 3:7, 3:19, 32:17, 32:19, 76:8, 82:12, 105:17, 117:19, 130:6, 133:25, 139:14, 146:17
**cleared** [1] - 35:4
**clearly** [6] - 28:23, 31:3, 33:17, 144:7, 153:15
**Clerk** [2] - 90:8, 97:25
**CLERK** [10] - 12:22, 13:1, 22:12, 22:17, 64:11, 98:13, 98:18, 98:23, 113:24, 114:5
**client** [4] - 135:25, 136:21, 138:1
**climb** [1] - 48:7
**close** [5] - 9:1, 81:16, 135:7, 142:8, 152:17
**closed** [7] - 37:6, 48:12, 48:15, 50:13, 52:7, 158:8, 158:12
**closed-circuit** [1] - 37:6
**closer** [1] - 93:3
**closet** [9] - 32:2, 32:5, 52:6, 54:8, 54:9, 54:11, 63:5, 63:7, 63:8
**clothing** [1] - 17:20
**co** [4] - 35:20, 47:17,

132:3, 132:4
**co-affiant** [1] - 35:20
**co-tenants** [3] - 47:17, 132:3, 132:4
**Cockeysville** [11] - 23:18, 65:18, 65:23, 65:24, 99:17, 99:23, 100:2, 100:9, 101:17, 101:20, 115:21
**color** [3] - 24:3, 70:6, 119:22
**combined** [1] - 21:8
**coming** [24] - 13:11, 27:17, 27:18, 28:21, 28:23, 31:3, 38:15, 44:2, 45:22, 46:6, 53:11, 58:5, 61:1, 61:12, 62:1, 130:16, 132:6, 139:9, 142:11, 145:11, 152:15, 153:2, 154:3, 155:3
**comings** [3] - 131:22, 131:25, 139:21
**comment** [2] - 9:7, 140:15
**commercial** [1] - 10:21
**commit** [1] - 146:20
**committed** [9] - 29:16, 39:13, 49:23, 52:25, 128:15, 128:17, 131:18, 146:20, 146:23
**common** [6] - 70:22, 70:25, 71:5, 71:7, 93:8, 94:24
**communicate** [1] - 54:25
**communicated** [3] - 54:19, 54:24, 76:12
**communication** [5] - 69:10, 69:11, 69:12, 71:8, 144:25
**communications** [3] - 55:10, 70:3, 77:3
**communities** [1] - 25:13
**Community** [2] - 34:11, 99:17
**community** [9] - 66:12, 123:6, 126:22, 132:15, 132:24, 133:9, 133:13, 133:19, 133:23
**companion** [1] - 151:21
**company** [2] - 26:1,

147:12

**compare** [1] - 128:5
**compared** [1] - 10:22
**complained** [3] -
27:16, 41:5, 128:10
**complaint** [1] - 38:14
**complaints** [9] -
26:21, 26:25, 40:4,
40:10, 41:1, 43:5,
43:11, 154:22,
155:24
**complete** [2] - 6:19,
135:10
**complex** [36] - 38:18,
39:23, 41:14, 43:12,
43:15, 45:10, 47:5,
48:7, 56:15, 57:3,
57:18, 62:1, 62:6,
74:10, 74:17, 78:20,
78:24, 89:1, 91:7,
91:12, 91:20, 92:9,
100:7, 106:10,
106:12, 106:23,
108:5, 108:10,
115:21, 115:24,
116:10, 128:2,
128:14, 130:17,
131:5, 154:16
**complexes** [7] -
25:16, 25:17, 38:25,
39:3, 106:22,
159:13, 159:24
**complicit** [1] - 144:7
**comprehension** [3] -
103:15, 103:17,
104:9
**concede** [1] - 20:22
**conceding** [1] - 20:23
**concern** [5] - 41:9,
144:8, 155:13,
156:14, 156:18
**concerned** [8] - 11:12,
40:18, 51:7, 62:21,
62:25, 63:4, 123:21,
128:3
**concerns** [1] - 137:6
**conclude** [2] - 134:3,
145:19
**concluded** [2] - 6:13,
162:9
**conclusion** [3] -
132:10, 146:6, 146:8
**concrete** [1] - 41:7
**condition** [1] - 124:8
**conduct** [2] - 37:17,
139:23
**conducted** [5] - 6:1,
26:17, 39:20, 69:2,
158:18
**conferred** [1] - 6:17

**confirm** [1] - 121:24
**confronting** [1] -
130:1
**conjecture** [1] -
128:16
**connect** [1] - 128:13
**connected** [2] - 30:9,
150:8
**connection** [3] -
33:22, 82:14, 153:14
**consequence** [1] -
129:21
**consider** [2] - 49:4,
110:17
**considerably** [1] -
74:15
**consideration** [1] -
6:3
**considering** [1] - 5:6
**consisted** [1] - 48:25
**conspirators** [1] -
145:21
**constituent** [1] -
123:21
**constitute** [2] - 48:1,
128:22
**constitutional** [1] -
123:20
**contact** [12] - 27:2,
33:7, 37:14, 46:22,
46:25, 66:4, 69:17,
138:23, 140:2,
140:6, 140:7, 156:4
**contacted** [6] - 34:1,
65:22, 65:24, 66:3,
76:1, 76:14
**contacts** [1] - 47:10
**contain** [1] - 36:20
**contained** [2] - 8:24,
140:2
**container** [1] - 32:18
**containers** [1] - 32:22
**contains** [3] - 23:23,
70:23, 100:7
**contention** [2] - 6:18,
134:22
**contest** [4] - 3:16,
6:13, 113:8, 113:9
**contested** [1] - 112:25
**contesting** [2] - 136:8,
136:10
**continuation** [1] -
138:5
**continue** [5] - 11:21,
28:16, 91:25, 92:5,
95:17
**continued** [3] - 30:15,
30:21, 153:1
**continues** [1] - 95:20
**contraband** [1] - 68:8

**control** [5] - 5:20,
6:15, 6:19, 8:23,
9:20
**controlled** [1] - 44:20
**convenience** [1] -
17:13
**conversation** [5] -
37:21, 57:24, 58:7,
58:10, 108:13
**conversations** [1] -
58:9
**copies** [1] - 122:19
**copy** [6] - 46:19,
59:22, 85:10,
102:20, 102:21,
147:10
**corner** [1] - 59:25
**corpse** [1] - 126:8
**correct** [102] - 4:1,
12:21, 22:9, 23:7,
23:13, 27:6, 28:12,
39:1, 39:6, 40:19,
40:20, 40:23, 40:24,
42:15, 42:23, 42:24,
44:10, 44:15, 47:11,
47:15, 49:17, 49:18,
50:11, 50:21, 51:6,
51:11, 53:6, 53:10,
53:17, 53:20, 53:21,
54:3, 54:6, 55:8,
56:4, 56:21, 56:22,
57:1, 57:15, 59:14,
59:17, 59:18, 59:20,
59:24, 60:4, 60:5,
60:13, 60:19, 65:11,
65:12, 66:6, 66:7,
70:11, 70:12, 71:3,
73:21, 74:4, 74:5,
74:13, 78:16, 79:22,
80:11, 80:12, 80:16,
80:21, 80:22, 81:4,
81:5, 81:14, 81:18,
82:6, 82:10, 82:11,
82:22, 83:1, 83:2,
83:8, 83:12, 84:3,
84:7, 84:11, 84:19,
86:12, 96:24,
107:13, 107:18,
107:19, 107:23,
107:24, 108:2,
109:11, 110:18,
111:12, 111:13,
111:18, 111:19,
113:8, 119:8,
137:10, 139:16,
144:15
**correspond** [1] -
152:2
**corresponded** [1] -
131:12

**counsel** [5] - 12:18,
22:10, 113:1,
161:24, 162:5
**country** [2] - 132:17,
132:22
**County** [23] - 21:10,
23:3, 23:5, 36:6,
44:5, 44:18, 63:19,
64:21, 64:22, 65:1,
65:4, 65:10, 65:14,
75:20, 98:6, 99:8,
99:9, 99:12, 99:22,
100:4, 104:19,
105:4, 154:14
**county** [1] - 118:10
**couple** [6] - 86:14,
88:5, 107:6, 108:6,
108:9, 112:5
**course** [19] - 4:20,
8:18, 45:2, 46:2,
50:3, 55:11, 55:15,
78:23, 83:3, 86:7,
99:25, 105:3,
125:14, 127:3,
135:17, 139:23,
141:8, 141:16,
153:17
**COURT** [136] - 1:1,
2:2, 2:12, 2:17, 2:20,
3:14, 3:22, 4:2, 7:9,
7:15, 7:18, 9:6, 10:8,
11:3, 11:18, 11:21,
12:11, 12:14, 13:7,
20:16, 20:19, 20:23,
21:1, 21:5, 21:12,
21:17, 21:20, 22:6,
22:10, 29:6, 29:13,
34:21, 35:11, 38:8,
55:19, 55:21, 62:16,
63:13, 63:16, 63:23,
64:1, 64:6, 79:11,
82:12, 86:2, 86:8,
87:25, 88:7, 88:13,
89:12, 89:16, 89:21,
89:23, 90:2, 90:9,
90:14, 90:20, 90:24,
91:24, 92:24, 93:6,
93:20, 95:8, 95:10,
95:15, 96:12, 97:10,
97:14, 97:17, 97:22,
98:1, 98:3, 98:8,
102:6, 105:17,
105:24, 106:1,
107:7, 110:9,
112:13, 112:16,
112:18, 112:21,
113:15, 113:20,
113:22, 115:4,
117:12, 118:25,
119:16, 119:18,

119:25, 120:3,
120:7, 120:12,
120:21, 121:25,
122:8, 122:16,
122:25, 123:11,
126:16, 135:3,
135:6, 136:7,
136:10, 136:14,
136:17, 136:21,
137:2, 137:7,
137:13, 137:17,
137:22, 138:4,
138:7, 139:13,
139:17, 140:15,
140:22, 141:6,
142:6, 144:9,
144:22, 145:4,
146:9, 151:7,
151:10, 153:24,
159:19, 160:4,
160:13, 161:16,
161:18, 161:24,
162:4
**court** [10] - 5:23, 6:20,
6:23, 6:24, 34:6,
103:3, 103:7,
129:15, 143:11,
145:11
**Court** [71] - 1:25, 3:20,
4:16, 5:8, 5:11, 5:18,
6:9, 6:13, 7:19, 8:7,
8:25, 9:14, 9:25,
11:9, 11:10, 11:16,
12:18, 13:19, 13:21,
14:12, 23:20, 23:23,
24:14, 24:20, 25:19,
26:2, 26:21, 32:24,
36:2, 36:7, 37:16,
38:15, 39:9, 39:13,
65:17, 67:3, 67:19,
68:21, 70:24, 72:19,
73:20, 74:12, 79:20,
80:15, 80:21, 81:7,
82:25, 83:11, 88:24,
89:5, 89:8, 89:10,
89:12, 89:14, 91:7,
93:12, 100:6,
101:14, 113:12,
118:12, 118:15,
118:21, 126:20,
128:21, 141:7,
142:20, 147:4,
147:23, 148:14,
159:14, 165:12
**Court's** [7] - 18:13,
19:6, 54:21, 55:18,
79:8, 87:24, 141:17
**court's** [1] - 5:24
**courtroom** [2] - 22:7,
77:25

**cover** [2] - 31:13, 33:15
**covered** [6] - 31:12, 31:14, 31:17, 32:10, 91:13, 92:11
**crabs** [1] - 31:13
**Cranbrook** [2] - 25:13, 38:21
**credit** [1] - 155:12
**crime** [9] - 131:18, 143:4, 143:7, 146:3, 146:20, 146:21, 146:22, 148:4, 149:2
**crime-ridden** [1] - 143:4
**crimes** [2] - 39:8, 39:12
**Criminal** [1] - 165:4
**criminal** [12] - 39:4, 39:18, 43:6, 43:11, 50:23, 51:5, 51:8, 62:21, 63:1, 152:11, 153:7, 156:12
**CRIMINAL** [1] - 1:5
**cross** [8] - 11:15, 12:6, 63:6, 127:6, 134:19, 134:22, 159:18, 160:5
**CROSS** [7] - 19:16, 38:10, 55:25, 79:14, 106:3, 107:8, 117:13
**cross-examination** [4] - 11:15, 12:6, 159:18, 160:5
**CROSS-EXAMINATION** [7] - 19:16, 38:10, 55:25, 79:14, 106:3, 107:8, 117:13
**crossed** [1] - 52:10
**cuffs** [2] - 104:4, 104:5
**culprits** [1] - 129:25
**current** [4] - 22:25, 64:19, 99:6, 125:23
**cursory** [2] - 53:19, 54:5
**customarily** [2] - 42:18, 46:21
**cut** [2] - 33:19, 110:24
**cutting** [2] - 19:9, 33:15

## D

**D.C** [1] - 6:23
**daily** [1] - 55:4
**damaged** [1] - 129:20
**danger** [3] - 129:19,

130:13, 134:3
**dangerous** [1] - 44:20
**database** [1] - 77:5
**date** [5] - 13:14, 28:25, 60:1, 147:9
**dated** [1] - 59:24
**dates** [1] - 14:20
**David** [1] - 1:22
**days** [5] - 18:10, 26:18, 76:10, 76:11, 132:6
**DEA** [1] - 75:18
**dead** [1] - 51:12
**deal** [4] - 55:1, 55:2, 55:4, 125:22
**dealing** [1] - 126:19
**decaying** [2] - 123:24, 126:2
**decibel** [1] - 130:24
**decide** [1] - 2:22
**decision** [4] - 5:23, 11:11, 133:5, 133:21
**decompose** [1] - 44:8
**decomposing** [1] - 44:12
**defendant** [10] - 6:9, 7:13, 9:9, 9:14, 10:1, 113:19, 146:18, 146:25, 147:9, 147:17
**DEFENDANT** [7] - 11:17, 11:20, 12:9, 13:4, 163:14, 163:18, 164:1
**Defendant** [5] - 1:18, 1:21, 12:24, 89:25, 114:2
**defendant's** [1] - 145:17
**Defendants** [1] - 165:4
**DEFENDANTS** [1] - 1:7
**defendants'** [1] - 2:10
**defense** [3] - 88:13, 91:16, 112:25
**Defense** [11] - 88:14, 89:18, 91:2, 91:10, 92:2, 92:13, 94:18, 94:20, 95:1, 95:2, 95:25
**definite** [1] - 84:17
**definitely** [1] - 121:21
**definitive** [1] - 125:12
**DeForte** [1] - 4:21
**demands** [1] - 123:14
**Demetrios** [1] - 1:20
**demise** [1] - 29:11
**demonstrably** [1] - 9:10

**denied** [2] - 151:23, 153:12
**Dennis** [2] - 63:18, 64:20
**DENNIS** [2] - 64:7, 163:7
**department** [1] - 84:1
**Department** [13] - 21:11, 23:3, 63:19, 64:23, 65:1, 65:4, 65:10, 75:21, 98:7, 99:10, 99:22, 104:20, 105:4
**depict** [1] - 88:25
**depicted** [7] - 24:8, 67:10, 88:11, 89:20, 91:3, 91:10, 92:2
**derivative** [1] - 134:23
**derive** [1] - 127:4
**describe** [14] - 23:22, 29:24, 30:4, 36:19, 36:24, 64:19, 67:8, 68:8, 68:21, 73:6, 77:19, 99:6, 101:14, 102:16
**described** [5] - 24:15, 32:24, 48:24, 50:10, 52:6
**description** [2] - 122:14, 152:6
**despite** [1] - 133:11
**destroyed** [2] - 130:12, 130:16
**details** [1] - 60:15
**detect** [3] - 44:14, 46:2, 131:7
**detection** [1] - 44:19
**detective** [13] - 34:12, 35:13, 66:9, 87:5, 99:4, 99:13, 102:10, 102:12, 104:20, 106:5, 107:10, 120:18, 121:2
**Detective** [19] - 34:14, 34:19, 35:1, 35:23, 56:3, 58:8, 59:8, 59:13, 59:15, 61:20, 98:5, 98:25, 121:2, 127:23, 144:16, 157:6, 159:17, 160:6, 160:14
**detectives** [5] - 67:1, 73:13, 87:3, 117:9
**detention** [1] - 84:13
**determination** [1] - 134:18
**determine** [4] - 51:2, 96:8, 128:21, 141:9
**determined** [1] - 33:2
**determining** [2] -

4:24, 5:12
**development** [2] - 23:25, 83:20
**device** [1] - 69:11
**devices** [2] - 69:15, 69:18
**dictate** [1] - 139:25
**died** [1] - 131:10
**difference** [4] - 7:22, 7:23, 62:11, 62:12
**different** [7] - 12:4, 38:1, 38:25, 141:2, 142:2, 147:8, 147:9
**digital** [1] - 36:21
**digits** [1] - 96:13
**diligent** [1] - 125:4
**dining** [2] - 49:5, 51:23
**dire** [1] - 124:12
**DIRECT** [5] - 13:9, 22:21, 64:14, 99:2, 114:9
**direct** [6] - 11:14, 25:2, 36:18, 63:5, 99:15, 100:11
**directing** [2] - 67:24, 78:13
**direction** [3] - 80:11, 80:13, 97:4
**directly** [6] - 13:2, 22:17, 64:12, 98:19, 98:23, 114:6
**disability** [1] - 104:2
**discern** [2] - 28:15, 113:13
**discovery** [4] - 87:19, 87:22, 141:22, 142:7
**discredit** [2] - 12:6, 12:7
**discriminate** [1] - 127:24
**discuss** [1] - 22:4
**discussion** [1] - 113:7
**dispatch** [3] - 26:16, 40:3, 154:20
**dispatched** [1] - 25:23
**dispute** [1] - 146:22
**distant** [1] - 9:16
**distinction** [1] - 10:19
**distinctions** [1] - 5:11
**distinguishing** [1] - 7:11
**distress** [22] - 29:10, 51:3, 51:20, 52:15, 79:1, 105:6, 106:6, 124:22, 125:17, 126:14, 126:15, 127:19, 131:12, 157:4, 158:20, 159:13, 159:16,

159:25, 160:1, 160:3, 161:6, 161:12
**distributed** [1] - 14:5
**district** [1] - 133:20
**DISTRICT** [2] - 1:1, 1:2
**District** [4] - 1:12, 36:7, 133:21, 165:6
**disturb** [1] - 32:23
**diverting** [1] - 78:13
**DMV** [2] - 144:22, 151:21
**doctrine** [5] - 128:20, 129:10, 133:12, 133:23, 135:2
**document** [1] - 121:7
**documents** [2] - 120:10, 121:6
**dominion** [4] - 5:20, 6:19, 8:23, 9:20
**done** [9] - 21:25, 47:8, 116:22, 138:12, 138:18, 139:2, 139:3, 141:1, 144:13
**door** [47] - 27:21, 29:4, 29:10, 30:2, 30:22, 31:4, 31:7, 31:8, 32:1, 45:7, 45:9, 52:7, 52:8, 52:10, 53:9, 53:13, 53:18, 54:8, 54:10, 54:11, 54:13, 63:10, 69:5, 70:19, 71:9, 71:10, 71:11, 71:13, 71:18, 78:21, 79:2, 96:2, 104:23, 105:14, 125:8, 127:6, 155:5, 155:17, 158:4, 158:8, 158:9, 158:12, 158:14, 161:5
**doors** [4] - 52:2, 53:7, 108:24, 155:21
**doorway** [5] - 31:24, 32:1, 54:4, 93:8, 93:9
**dotted** [1] - 38:24
**doubt** [2] - 133:13, 133:18
**down** [18] - 20:20, 30:21, 33:14, 34:19, 49:20, 51:24, 74:15, 74:25, 82:24, 83:7, 143:11, 145:11, 148:22, 149:4, 149:9, 152:17, 152:20, 158:4
**draw** [1] - 115:1
**drawing** [1] - 37:18
**drawn** [1] - 77:5
**dressed** [1] - 27:13

**drive** [6] - 79:25, 81:17, 94:24, 95:20, 115:18, 143:9
**driven** [2] - 76:24, 77:12
**drives** [3] - 143:11, 145:21, 148:25
**driveway** [1] - 92:12
**driving** [14] - 82:9, 95:17, 105:22, 116:5, 116:13, 119:5, 122:17, 135:22, 139:10, 145:17, 149:13, 150:3, 151:21, 153:12
**drove** [9] - 80:7, 82:25, 96:22, 104:16, 116:9, 117:4, 117:7, 117:9, 148:16
**drug** [6] - 4:6, 76:7, 76:8, 151:16, 152:9, 153:14
**Drug** [2] - 34:11, 99:17
**drug-related** [1] - 4:6
**drugs** [5] - 8:18, 17:18, 19:9, 137:15, 143:6
**due** [3] - 54:17, 150:13, 159:9
**duffel** [4] - 32:9, 32:14, 32:15, 32:18
**duly** [5] - 12:24, 22:15, 64:9, 98:16, 114:3
**during** [16] - 14:10, 43:3, 43:10, 55:11, 55:15, 65:10, 68:11, 78:18, 78:23, 99:25, 103:5, 127:20, 146:10, 152:7, 154:23
**duties** [2] - 29:1, 65:15
**duty** [5] - 78:18, 99:21, 100:13, 100:17
**dwelling** [2] - 132:17, 133:1, 133:11

**E**

**early** [6] - 5:9, 35:7, 109:4, 123:22, 143:8, 143:16
**easel** [1] - 24:6
**easier** [2] - 90:7, 91:23, 136:24
**easily** [2] - 30:18, 152:15

**easy** [2] - 79:6, 132:23
**eat** [1] - 31:13
**effect** [4] - 40:17, 42:17, 44:15, 54:15
**effected** [1] - 75:11
**effects** [4] - 4:7, 8:22, 17:20, 54:19
**efficiency** [1] - 154:6
**effort** [4] - 48:6, 139:4, 139:19, 140:6
**eight** [2] - 88:9, 88:21
**either** [14] - 3:7, 29:16, 41:14, 41:23, 73:4, 75:4, 90:9, 96:12, 109:22, 110:12, 110:21, 129:23, 131:24, 140:7
**elderly** [3] - 29:17, 42:3, 42:5
**electronic** [1] - 90:25
**emanate** [1] - 44:12
**emanating** [5] - 31:1, 41:14, 43:6, 131:8, 132:12
**emergencies** [2] - 138:24, 140:3
**emergency** [16] - 28:4, 46:21, 46:24, 47:1, 47:10, 51:14, 126:3, 126:4, 128:20, 128:23, 129:5, 130:3, 138:23, 140:8, 156:4, 156:22
**empty** [1] - 32:14
**enclosed** [2] - 23:24, 23:25
**encounter** [1] - 30:6
**end** [12] - 31:2, 31:3, 31:23, 33:21, 33:22, 55:3, 56:8, 56:9, 90:11, 132:6, 153:2, 158:7
**ended** [1] - 49:3
**engage** [1] - 58:9
**enlargement** [1] - 96:19
**enlarges** [1] - 96:16
**enter** [11] - 8:14, 40:17, 57:23, 107:11, 126:12, 129:23, 132:7, 133:18, 140:13, 141:5, 142:1
**entered** [20] - 3:25, 8:19, 28:5, 28:6, 28:13, 29:21, 57:5, 70:18, 70:21, 71:1, 71:4, 71:7, 74:8, 74:9, 75:7, 129:11, 131:8, 137:19,

158:13
**entering** [3] - 54:23, 78:24, 157:21
**entire** [5] - 23:15, 49:7, 56:15, 65:10, 125:21
**entirely** [2] - 105:17, 143:24
**entitled** [3] - 1:10, 25:24, 122:20
**entrance** [1] - 79:21
**entries** [1] - 133:14
**entry** [17] - 6:12, 6:13, 21:9, 29:25, 36:13, 39:21, 63:10, 123:4, 129:6, 129:20, 134:9, 136:18, 138:9, 154:4, 154:8, 154:11
**enunciated** [2] - 129:3, 159:14
**environs** [1] - 24:19
**epileptic** [1] - 124:5
**equally** [1] - 9:13
**equation** [1] - 141:17
**equipment** [1] - 37:5
**Esquire** [4] - 1:17, 1:19, 1:20, 1:22
**essentially** [3] - 10:20, 135:10, 138:11
**establish** [2] - 4:14, 150:22
**established** [2] - 5:19, 9:3
**establishing** [2] - 7:6, 11:7
**estimate** [2] - 18:15, 79:5
**et** [1] - 1:6, 165:4
**etcetera** [1] - 122:18
**EUGENE** [2] - 12:23, 163:15
**Eugene** [1] - 13:4
**evaluate** [1] - 140:23
**evening** [15] - 15:25, 18:18, 36:4, 36:9, 36:13, 57:18, 59:17, 66:6, 72:16, 82:15, 111:15, 115:12, 151:19, 152:7, 154:24
**evenings** [1] - 121:9
**events** [1] - 146:7
**evidence** [30] - 2:11, 9:19, 10:13, 11:10, 56:17, 56:23, 56:24, 57:3, 57:6, 58:4, 61:23, 68:6, 72:3, 72:5, 90:3, 121:18, 134:23, 135:21,

137:18, 137:23, 137:24, 139:14, 142:3, 142:13, 144:9, 153:16, 154:2, 155:20, 158:18, 159:7
**exactly** [5] - 61:24, 106:16, 112:7, 136:16, 144:24
**EXAMINATION** [14] - 13:9, 19:16, 22:21, 38:10, 55:25, 62:18, 64:14, 79:14, 99:2, 106:3, 107:8, 114:9, 117:13, 119:20
**examination** [5] - 11:14, 11:15, 12:6, 159:18, 160:5
**examined** [5] - 12:25, 22:15, 64:9, 98:16, 114:3
**example** [1] - 129:9
**exception** [5] - 12:1, 123:7, 132:15, 132:19, 132:24
**exclusionary** [1] - 132:19
**excuse** [6] - 63:15, 65:16, 66:14, 82:2, 87:20, 107:16
**excused** [2] - 98:1, 112:19, 120:4
**execute** [4] - 56:3, 56:14, 56:19, 107:25
**executed** [4] - 56:21, 56:23, 60:13, 107:15
**executing** [1] - 37:13
**execution** [3] - 36:15, 68:2, 68:11
**exercise** [1] - 127:1
**exercised** [1] - 5:20
**exhaustion** [1] - 141:18
**exhibit** [2] - 95:19, 110:5
**Exhibit** [7] - 24:7, 24:10, 35:14, 35:16, 36:19, 94:9, 102:13
**EXHIBITS** [2] - 163:22, 164:1
**exhibits** [1] - 88:13
**Exhibits** [3] - 89:25, 110:6, 110:8
**exigency** [2] - 126:22, 127:5
**exist** [1] - 132:20
**existed** [3] - 5:14, 6:14, 129:5
**existence** [2] - 5:3
**exists** [1] - 7:7

**exit** [4] - 75:7, 81:16, 126:14, 143:12
**exited** [2] - 70:6, 82:6
**expectation** [5] - 4:18, 5:4, 5:6, 6:16, 10:6
**experience** [10] - 44:5, 44:7, 44:23, 46:2, 78:23, 105:3, 125:6, 125:7, 139:25, 154:13
**expired** [1] - 29:16
**explained** [1] - 76:15
**express** [1] - 50:22
**expressed** [3] - 41:9, 155:13, 156:20
**expressing** [1] - 156:14
**extant** [1] - 3:20
**extends** [1] - 7:3
**extent** [3] - 44:19, 104:6, 156:2
**eye** [2] - 32:6, 158:16

**F**

**F.2d** [5] - 6:24, 7:4, 128:19, 129:1, 131:3
**F.3d** [4] - 4:23, 133:5, 133:8, 133:16
**F.Supp.2d** [1] - 133:22
**face** [3] - 138:18, 146:10, 148:18
**faced** [2] - 126:4, 159:3
**facilities** [1] - 107:22
**facility** [2] - 107:21, 137:5
**facing** [1] - 91:14
**fact** [44] - 5:13, 7:7, 8:9, 9:1, 15:10, 22:7, 39:16, 41:8, 42:8, 42:10, 42:14, 44:11, 51:20, 53:22, 81:12, 88:9, 101:11, 113:9, 117:3, 117:20, 123:24, 126:5, 126:13, 129:10, 130:18, 130:23, 131:10, 132:19, 132:21, 134:6, 134:20, 139:5, 139:7, 141:15, 141:16, 144:3, 144:4, 144:19, 149:7, 149:11, 150:15, 152:17, 156:7
**factor** [1] - 134:18
**factors** [3] - 4:21,

142:25, 143:13
**facts** [14] - 4:10, 5:7, 8:15, 9:2, 9:13, 9:25, 111:15, 128:21, 147:3, 147:22, 148:2, 148:10, 151:12, 154:7
**factual** [2] - 10:10, 157:19
**failed** [2] - 29:9, 161:4
**fair** [1] - 35:20
**fairly** [3] - 24:18, 130:23, 140:3
**faith** [2] - 124:21, 127:13
**fall** [1] - 135:1
**fallen** [2] - 29:17, 39:17
**familiar** [4] - 88:11, 89:3, 100:1
**family** [8] - 105:14, 106:17, 106:22, 128:3, 157:12, 160:9, 160:10, 160:15
**far** [11] - 10:11, 19:12, 31:9, 33:8, 33:25, 47:12, 112:23, 128:11, 142:18, 143:23, 155:19
**fashion** [4] - 29:25, 47:13, 62:14, 105:6
**favor** [1] - 10:12
**February** [1] - 84:14
**fell** [1] - 115:15
**female** [2] - 122:18, 131:15
**fetch** [1] - 64:3
**few** [5] - 26:18, 28:17, 36:18, 55:24, 117:17
**Fields** [1] - 7:4
**fighting** [1] - 124:17
**file** [1] - 58:20
**film** [1] - 31:14
**final** [2] - 154:6, 161:8
**finally** [3] - 72:18, 98:5, 136:5
**fine** [6] - 79:18, 97:22, 105:13, 123:1, 162:1, 162:7
**Firearms** [1] - 2:9
**first** [30] - 21:8, 23:1, 30:5, 30:7, 30:8, 39:21, 46:7, 48:20, 49:1, 52:10, 66:4, 71:14, 76:14, 79:22, 80:1, 80:4, 82:17, 86:15, 86:16, 88:15, 88:18, 91:2, 121:15, 123:2, 123:12,

136:25, 142:20, 154:19, 158:8
**firsthand** [1] - 45:21
**FISHER** [2] - 22:13, 163:3
**Fisher** [15] - 21:10, 22:19, 22:23, 62:20, 107:11, 108:14, 108:16, 108:20, 123:18, 127:25, 131:14, 154:12, 154:17, 157:16, 157:21
**fist** [1] - 32:13
**fist-size** [1] - 32:13
**fit** [2] - 57:8, 152:6
**five** [30] - 14:13, 14:15, 14:16, 16:14, 20:14, 23:4, 23:11, 38:3, 57:22, 61:1, 61:12, 81:10, 81:11, 83:12, 83:14, 84:9, 84:11, 94:4, 99:24, 105:2, 105:3, 114:25, 121:10, 143:8, 148:18, 148:19, 148:21, 149:8, 152:7, 157:7
**floor** [12] - 17:1, 18:21, 24:2, 30:12, 30:13, 32:9, 47:23, 47:25, 48:1, 50:8, 52:24
**flooring** [1] - 52:18
**floors** [1] - 24:2
**focus** [1] - 136:25
**follow** [1] - 138:9
**followed** [2] - 128:25, 157:22
**following** [2] - 56:11, 153:18
**follows** [6] - 12:25, 22:16, 64:10, 98:17, 114:4, 129:16
**FOR** [1] - 1:2
**force** [2] - 23:9, 75:18
**foregoing** [1] - 165:2
**formulation** [1] - 5:24
**forth** [2] - 111:15, 153:19
**forward** [6] - 6:7, 7:9, 10:25, 12:3, 36:8, 135:11
**foul** [7] - 40:8, 44:2, 44:12, 49:23, 52:25, 124:10, 128:17
**founded** [1] - 130:10
**four** [22] - 14:13, 14:15, 14:16, 16:13, 20:14, 24:2, 38:3, 57:22, 61:1, 61:11,

61:12, 72:22, 105:2, 105:3, 106:20, 112:6, 121:9, 128:1, 139:8, 143:8, 152:7, 157:7
**fours** [1] - 125:23
**Fourth** [14] - 9:18, 123:5, 123:14, 126:20, 128:19, 128:25, 129:3, 130:6, 131:3, 133:20, 134:11, 146:16, 146:17, 153:19
**free** [1] - 100:22
**frequent** [3] - 108:17, 108:20, 109:3
**frequented** [1] - 108:15
**frequenting** [1] - 109:21
**freshly** [1] - 126:7
**front** [31] - 10:11, 10:24, 69:5, 73:19, 74:3, 79:20, 80:8, 81:3, 81:6, 81:8, 81:21, 81:22, 82:4, 82:5, 82:25, 83:11, 91:19, 92:9, 92:16, 93:12, 93:25, 94:2, 94:7, 94:13, 94:15, 94:23, 94:24, 96:18, 148:12, 148:13, 148:21
**fruit** [7] - 113:4, 137:4, 140:11, 140:18, 141:12, 141:21, 151:4
**fruits** [1] - 135:1
**full** [3] - 31:17, 32:20, 142:12
**fully** [2] - 24:15
**function** [5] - 124:20, 126:22, 127:1, 132:24, 133:20
**fundamental** [1] - 4:17
**furniture** [5] - 17:20, 30:10, 49:17, 53:22, 53:23

**G**

**Gail** [2] - 1:25, 165:11
**gain** [3] - 14:17, 16:8, 29:25
**gained** [1] - 139:15
**garbage** [2] - 31:16, 31:19
**gather** [1] - 86:5,

120:12
**gel** [1] - 68:14
**general** [10] - 55:3, 73:12, 74:20, 79:23, 80:3, 90:16, 93:17, 93:23, 94:6, 97:3
**generally** [4] - 36:24, 94:8, 133:14, 157:16
**generated** [1] - 6:2
**Geo** [1] - 148:11
**Girdwood** [2] - 25:14, 38:23
**girlfriend's** [1] - 6:10
**Girwood** [1] - 67:15
**given** [7] - 9:14, 18:23, 62:9, 87:19, 139:5, 147:10, 159:2
**glance** [1] - 54:5
**glean** [1] - 147:4
**goings** [3] - 131:22, 131:25, 139:21
**Government** [4] - 1:16, 22:14, 64:8, 98:15
**government** [17] - 2:4, 11:14, 12:18, 13:12, 20:21, 20:23, 21:9, 22:1, 87:20, 89:23, 112:24, 113:16, 123:15, 128:18, 134:13, 134:20, 144:4
**GOVERNMENT'S** [2] - 163:2, 163:22
**government's** [7] - 110:5, 123:10, 125:21, 135:15, 142:19, 143:18, 148:24
**Government's** [8] - 24:7, 24:10, 35:14, 35:16, 66:9, 66:19, 102:11, 102:13
**Grand** [2] - 38:5, 61:13, 61:25
**grant** [3] - 15:13, 151:11, 153:21
**grass** [1] - 94:2
**gray** [14] - 38:5, 61:18, 61:25, 62:5, 62:7, 68:25, 69:20, 70:6, 86:24, 87:9, 88:3, 121:10, 151:18, 152:2
**great** [2] - 125:22
**greater** [2] - 147:21, 157:15
**green** [1] - 91:17
**Greenwood** [1] - 67:13

**Grindwood** [2] - 67:13, 67:15
**ground** [2] - 47:23, 48:2
**Group** [1] - 75:15
**group** [2] - 75:19, 76:4
**guess** [18] - 3:3, 61:10, 101:10, 106:15, 110:23, 111:7, 117:11, 117:12, 123:3, 123:5, 130:23, 135:23, 136:14, 138:10, 139:5, 142:16, 147:5, 161:7
**guest** [7] - 5:12, 6:10, 6:15, 6:18, 6:25, 7:14, 10:15
**guests** [1] - 6:21
**gunshots** [1] - 124:16

**H**

**hairs** [1] - 143:14
**half** [3] - 35:4, 68:12, 99:24
**hallway** [12] - 30:16, 30:18, 30:21, 31:2, 31:4, 51:25, 52:2, 52:3, 52:8, 54:8, 158:4, 158:7
**hand** [6] - 12:22, 22:12, 54:12, 90:18, 98:13, 113:24
**handle** [1] - 156:22
**handwritten** [2] - 112:9, 121:8
**hang** [1] - 112:21
**happy** [2] - 86:3, 90:6
**hard** [1] - 37:17
**hardwood** [1] - 52:19
**harm** [5] - 39:18, 129:6, 130:21, 132:10, 134:15
**Harry** [1] - 28:11
**head** [1] - 29:15
**health** [1] - 155:14
**hear** [6] - 3:20, 28:21, 28:23, 31:3, 45:15, 98:21
**heard** [16] - 13:11, 27:1, 41:13, 41:18, 41:20, 45:22, 47:18, 61:25, 106:18, 109:15, 113:13, 123:7, 124:16, 124:17, 128:9, 154:20
**hearing** [4] - 1:11,

11:6, 84:14, 124:9
**heart** [1] - 124:6
**heat** [1] - 55:7
**heck** [1] - 125:2
**held** [3] - 21:23, 133:1,
158:14
**help** [14] - 28:1, 28:3,
29:19, 33:10, 48:20,
51:14, 51:15,
124:15, 154:15,
156:13, 156:21,
157:19, 158:24,
159:22
**helpful** [1] - 122:2
**Henderson** [6] -
25:25, 27:12, 27:13,
40:1, 40:7, 40:25
**Henderson-Webb** [6]
- 25:25, 27:12,
27:13, 40:1, 40:7,
40:25
**hereby** [2] - 102:25,
165:2
**heroin** [2] - 37:9,
68:12
**hi** [2] - 114:12, 117:16
**HIDTA** [2] - 75:15,
75:19
**high** [3] - 130:23,
132:13, 152:9
**highway** [1] - 152:14
**himself** [7] - 27:11,
74:22, 76:17, 144:5,
144:6, 145:22,
151:23
**historical** [1] - 4:25
**hit** [1] - 66:18
**hitting** [1] - 152:21
**holding** [1] - 7:3
**home** [7] - 6:11, 7:2,
58:5, 117:4, 117:7,
119:4, 148:2
**homes** [1] - 133:15
**Honor** [93] - 2:3, 2:15,
3:11, 3:15, 10:4,
19:15, 20:15, 20:18,
20:21, 20:25, 21:8,
21:16, 21:25, 22:4,
34:24, 35:10, 38:6,
38:9, 56:6, 57:20,
61:10, 62:15, 63:11,
63:15, 63:17, 63:20,
64:3, 64:5, 79:10,
79:13, 80:23, 86:7,
86:14, 86:22, 87:18,
88:4, 88:5, 88:6,
89:18, 89:24, 90:5,
93:5, 93:12, 95:9,
95:13, 96:10, 96:16,
97:15, 98:2, 98:4,

98:5, 102:5, 107:5,
110:3, 110:7,
110:20, 112:11,
112:17, 112:20,
112:23, 113:21,
120:2, 120:9,
120:17, 120:25,
121:14, 122:19,
123:9, 123:13,
125:19, 126:18,
126:19, 135:5,
136:3, 136:24,
136:25, 138:6,
140:17, 141:20,
142:25, 144:15,
146:4, 146:12,
146:15, 147:3,
147:25, 148:10,
150:12, 151:8,
153:22, 159:8,
161:17, 162:8
**Honorable** [2] - 1:11,
165:5
**hooked** [1] - 37:7
**Hospital** [3] - 115:13,
115:14, 115:17
**hospital** [1] - 115:16
**host** [2] - 6:14, 6:17
**hot** [2] - 72:21, 84:7
**hour** [9] - 35:3, 83:12,
83:15, 83:23, 135:7,
143:9, 143:16,
148:18
**hours** [17] - 14:22,
68:25, 72:15, 85:14,
85:16, 85:21, 85:24,
108:6, 108:9, 117:5,
118:2, 123:23,
125:8, 125:11,
125:14, 134:7,
154:23
**house** [7] - 6:10, 6:15,
6:16, 33:20, 42:19,
100:24, 151:16
**houses** [2] - 67:5,
132:18
**human** [2] - 46:2,
155:8
**hundred** [3] - 91:6,
97:6, 97:7
**hurdle** [1] - 10:2
**hurt** [1] - 126:7
**hybrid** [1] - 126:21
**hypothetically** [1] -
137:23

**I**

**I-83** [1] - 149:6

**i.e** - 9:16
**idea** [2] - 21:12, 90:16
**identification** [9] -
24:7, 24:11, 35:14,
35:17, 78:3, 102:11,
102:14, 120:14,
130:4
**identified** [5] - 27:11,
74:22, 84:24, 99:5,
141:7
**identifies** [1] - 144:5
**identify** [3] - 41:4,
47:17, 64:18
**identifying** [1] - 5:13
**identities** [1] - 143:20
**identity** [2] - 76:22,
76:23
**II** [4] - 12:23, 13:4,
13:5, 163:15
**illegal** [5] - 7:5,
129:18, 130:10,
130:11, 151:5
**illegally** [2] - 129:17,
129:24
**Illinois** [1] - 5:17
**imagine** [1] - 43:13
**immediate** [6] - 2:7,
128:20, 129:5,
129:19, 130:3,
130:25
**immediately** [13] -
36:12, 45:11, 74:21,
76:16, 77:17, 78:6,
129:23, 143:5,
153:1, 157:25,
158:2, 158:10,
158:12
**imparting** [1] - 61:10
**implication** [1] -
122:16
**important** [6] -
110:18, 111:2,
111:21, 126:10,
135:12, 159:6
**importantly** [1] - 77:10
**impression** [1] -
144:13
**IN** [1] - 1:1
**inasmuch** [1] - 6:15
**incident** [7] - 43:17,
59:20, 60:4, 60:10,
104:12, 112:3,
142:23
**incidents** [3] - 128:12,
128:13, 135:24
**include** [3] - 23:19,
109:22, 153:22
**included** [2] - 25:12,
112:3
**including** [4] - 48:5,

58:8, 81:2, 158:16
**incorrectly** [1] -
144:10
**indeed** [2] - 130:5,
158:9
**independent** [2] -
43:9, 43:16
**INDEX** [1] - 163:1
**indicate** [16] - 8:13,
13:21, 40:7, 41:7,
41:12, 42:2, 42:5,
42:11, 46:13, 46:15,
48:14, 62:25,
103:15, 103:17,
122:18, 147:10
**indicated** [39] - 4:11,
5:18, 6:3, 6:20, 6:24,
7:13, 9:23, 27:4,
40:13, 55:9, 56:2,
57:20, 63:21, 73:25,
78:14, 79:19, 79:25,
82:20, 84:17, 87:15,
93:11, 93:13, 94:4,
95:18, 96:22, 96:24,
104:8, 104:13,
121:16, 121:20,
132:4, 144:16,
150:16, 155:4,
155:9, 156:15,
157:1, 160:7, 160:14
**indicates** [3] - 60:10,
122:7, 122:9
**indicating** [3] - 73:10,
74:11, 121:9
**indication** [4] -
129:18, 143:3,
154:17, 156:11
**indicia** [2] - 124:1,
124:10
**indifference** [1] -
125:1
**individual** [17] - 4:17,
8:9, 8:10, 18:22,
40:6, 60:23, 70:19,
71:10, 71:14, 71:15,
71:21, 77:25,
106:23, 107:1,
131:20, 140:7, 140:8
**Individual** [2] - 132:2
**individual's** [1] - 17:6
**individuals** [31] - 5:14,
5:18, 5:20, 39:17,
40:17, 41:8, 41:10,
42:4, 42:19, 42:23,
45:2, 47:6, 48:8,
58:14, 58:18, 58:21,
59:7, 60:22, 70:5,
70:8, 71:17, 75:24,
106:13, 127:19,
128:4, 130:25,

131:22, 132:11,
134:15, 138:21,
140:2
**individuals'** [1] -
40:19
**indulgence** [5] -
18:13, 19:6, 54:21,
55:18, 79:8
**inevitable** [2] -
141:21, 142:6
**infer** [2] - 125:11,
126:2
**inference** [1] - 8:8
**information** [84] -
18:3, 28:14, 37:24,
38:16, 39:7, 39:11,
39:12, 39:15, 39:25,
40:3, 40:9, 40:10,
40:15, 40:21, 41:17,
41:23, 42:7, 42:12,
42:22, 42:25, 45:18,
45:20, 45:24, 46:10,
46:16, 46:20, 47:16,
54:15, 54:19, 55:14,
57:25, 59:5, 59:8,
59:16, 61:9, 61:19,
61:21, 62:8, 84:1,
86:23, 87:9, 100:24,
106:13, 108:17,
108:19, 108:24,
109:9, 109:13,
109:15, 109:18,
109:20, 109:22,
109:24, 110:9,
110:17, 110:21,
110:22, 111:5,
111:21, 112:3,
120:13, 122:1,
127:9, 128:2,
131:13, 131:16,
131:17, 131:20,
131:24, 139:8,
139:15, 141:16,
150:16, 150:17,
150:19, 151:15,
151:22, 153:10,
155:2, 159:3,
159:14, 159:17,
160:9, 160:11
**initial** [2] - 2:23, 40:21
**initiated** [2] - 154:17,
156:10
**injured** [4] - 27:25,
50:2, 52:14, 53:1
**injuring** [1] - 50:3
**ink** [1] - 92:20
**inquiries** [2] - 155:22,
157:12
**inquiring** [2] - 37:23,
160:9

**inquiry** [5] - 4:17, 106:22, 121:13, 156:1, 160:16
**inside** [49] - 26:4, 27:2, 27:22, 27:24, 28:1, 28:15, 30:2, 30:5, 30:6, 31:5, 31:19, 31:22, 32:4, 32:5, 32:19, 33:8, 39:17, 40:14, 41:10, 41:21, 45:15, 48:9, 48:21, 50:24, 51:8, 52:18, 53:1, 53:5, 62:22, 63:4, 69:4, 71:13, 75:1, 105:7, 106:14, 106:16, 106:23, 107:1, 107:16, 126:8, 128:4, 129:19, 130:20, 130:22, 130:25, 134:16, 155:7, 160:10, 160:12
**insisted** [1] - 28:17
**insofar** [1] - 11:11
**inspect** [1] - 125:17
**instance** [4] - 41:13, 41:20, 67:11, 104:3
**instances** [2] - 128:1, 159:15
**instructed** [1] - 22:4
**intend** [1] - 18:15
**intent** [1] - 123:19
**intercepted** [1] - 8:19
**Interdiction** [2] - 34:11, 99:18
**interest** [3] - 6:5, 9:11, 9:18
**interested** [1] - 148:20
**interesting** [1] - 149:23
**interrupt** [2] - 34:21, 139:13
**interview** [1] - 104:11
**interviewed** [1] - 139:20
**interviewing** [4] - 101:19, 101:23, 105:21, 149:25
**interviews** [1] - 111:23
**intoxicated** [1] - 103:20
**introduced** [1] - 121:18
**investigate** [1] - 156:3
**investigation** [5] - 33:23, 56:8, 59:9, 68:18, 101:5
**investigative** [1] - 156:12

**investigator** [1] - 143:15
**invitee** [1] - 5:12
**involved** [5] - 76:7, 76:8, 76:13, 143:7, 160:16
**involvement** [4] - 56:7, 60:15, 62:5, 62:11
**involving** [2] - 84:14, 132:20
**inward** [1] - 54:11
**irrelevant** [1] - 118:24
**island** [3] - 89:1, 91:13, 92:10
**issue** [12] - 9:1, 9:5, 21:8, 55:23, 123:2, 123:3, 135:10, 135:14, 141:22, 151:10, 158:21, 158:22
**issues** [6] - 3:4, 21:8, 21:14, 120:16, 138:9, 161:18
**item** [7] - 4:19, 5:1, 5:5, 24:6, 35:13, 35:15, 102:12
**items** [12] - 8:24, 17:19, 36:25, 37:1, 37:11, 50:2, 56:19, 60:18, 68:10, 107:16, 113:9, 134:8
**itself** [10] - 4:3, 6:25, 46:10, 76:11, 82:5, 107:1, 129:20, 130:17, 132:14, 134:8

## J

**Jackson** [40] - 1:17, 2:2, 2:4, 9:6, 62:16, 64:1, 90:9, 97:14, 113:23, 114:8, 114:11, 114:13, 117:12, 117:15, 120:3, 123:11, 126:23, 134:25, 135:4, 138:11, 140:16, 142:16, 146:9, 147:12, 147:17, 147:18, 149:20, 149:23, 150:6, 151:7, 152:4, 160:22, 160:25, 161:23, 162:2, 163:4, 163:8, 163:11, 163:17, 163:21

**JACKSON** [66] - 2:3, 9:8, 19:15, 19:17, 20:15, 20:21, 20:25, 21:4, 21:7, 21:15, 22:3, 22:22, 34:24, 35:9, 35:12, 38:6, 62:17, 62:19, 63:11, 63:15, 63:17, 64:3, 64:15, 79:7, 86:6, 89:24, 97:15, 98:2, 98:5, 98:10, 98:12, 99:3, 102:4, 102:7, 102:9, 105:15, 107:5, 110:6, 112:17, 112:20, 112:23, 114:1, 117:11, 117:14, 119:15, 120:2, 120:9, 120:17, 120:23, 122:5, 122:11, 123:13, 135:5, 138:6, 140:17, 140:25, 141:20, 142:17, 144:15, 144:24, 145:5, 151:8, 161:1, 161:17, 162:8, 163:19
**Jackson's** [1] - 152:5
**Jameel** [6] - 114:23, 114:24, 115:2, 116:3, 116:4, 118:18
**Jeep** [29] - 2:25, 38:5, 61:7, 61:13, 61:19, 61:25, 62:5, 62:7, 86:24, 87:9, 88:3, 107:20, 113:1, 121:10, 136:2, 136:4, 136:6, 136:9, 136:11, 136:23, 137:8, 137:12, 137:16, 137:18, 139:10, 144:13, 151:18, 152:3
**Jemarl** [1] - 16:5
**jeopardy** [1] - 134:16
**Joe** [3] - 34:14, 34:23, 35:1
**jogged** [1] - 77:17
**John** [1] - 77:24
**Johnnie** [14] - 2:6, 19:5, 77:14, 82:8, 114:17, 115:9, 144:5, 144:21, 147:11, 149:19, 149:22, 150:4, 150:5, 165:3
**JOHNNIE** [1] - 1:6
**Jones** [5] - 5:9, 5:15, 5:24, 16:5, 152:1

**JOSEPH** [2] - 98:14, 163:10
**Joseph** [2] - 98:6, 98:25
**Judge** [7] - 1:12, 20:17, 36:6, 91:22, 110:11, 161:21, 165:6
**judicial** [1] - 36:1
**June** [19] - 1:8, 2:24, 13:13, 23:6, 24:20, 25:3, 56:21, 59:24, 60:6, 65:13, 65:16, 82:10, 89:8, 99:15, 100:12, 115:1, 115:8, 154:25, 165:6
**jurisdiction** [1] - 132:25
**jury** [1] - 146:5
**justification** [2] - 129:10, 142:1
**justified** [3] - 123:5, 137:11, 137:16
**justify** [2] - 133:14, 134:8
**justifying** [2] - 143:17, 151:14

## K

**keep** [9] - 10:14, 17:15, 102:17, 102:19, 102:20, 114:13, 146:9, 149:5
**Kenneth** [1] - 1:19
**kept** [2] - 17:21, 149:14
**KEVIN** [2] - 22:13, 163:3
**Kevin** [2] - 21:10, 22:19
**key** [29] - 3:25, 7:24, 8:4, 8:7, 8:8, 8:21, 9:15, 10:12, 10:13, 13:20, 13:22, 14:1, 14:6, 14:11, 14:17, 15:7, 15:10, 16:6, 16:9, 19:1, 30:1, 70:19, 71:10, 71:18, 137:19, 141:5, 150:25, 151:20, 153:19
**keys** [4] - 14:5, 14:8, 78:9, 135:20
**kilos** [1] - 68:12
**kind** [20] - 23:22, 23:23, 28:3, 33:19, 37:17, 46:5, 51:12, 60:15, 69:11, 78:10,

83:6, 94:23, 124:10, 138:18, 140:19, 148:1, 150:7, 155:6, 157:18, 160:24
**kitchen** [11] - 30:9, 30:15, 30:16, 30:18, 30:20, 37:9, 48:25, 50:6, 51:23, 157:24, 158:3
**knock** [9] - 28:16, 29:4, 29:9, 45:13, 53:13, 104:23, 125:8, 155:18, 161:5
**knocked** [6] - 45:9, 45:11, 50:2, 53:15, 155:5, 158:8
**knocking** [5] - 27:20, 108:23, 155:10, 155:21, 156:9
**knocks** [1] - 28:19
**knowing** [2] - 151:23, 153:13
**knowledge** [14] - 9:23, 15:19, 16:23, 46:9, 47:4, 68:24, 70:22, 77:11, 80:14, 82:23, 89:7, 100:8, 106:25, 108:14
**known** [7] - 23:19, 75:25, 76:3, 76:6, 106:23, 107:1, 160:11
**knows** [4] - 34:22, 90:10, 90:24, 126:20

## L

**labeled** [2] - 32:8, 33:17
**lack** [2] - 6:21, 132:5
**ladder** [1] - 48:6
**landlady** [1] - 131:5
**landlady's** [1] - 131:11
**landlord** [7] - 29:21, 62:21, 62:24, 78:25, 125:16, 132:1
**large** [9] - 30:8, 31:8, 32:17, 37:3, 76:2, 143:5, 144:8, 145:15, 145:16
**largest** [1] - 33:16
**laser** [5] - 66:15, 66:19, 67:4, 73:10, 73:17
**last** [4] - 36:18, 95:25, 99:1, 127:22
**late** [1] - 57:5
**latter** [1] - 121:15
**law** [7] - 3:19, 4:11,

103:3, 125:22, 126:24, 126:25, 134:10
**lawsuit** [1] - 125:3
**lawyer** [3] - 103:4, 103:6, 103:7
**lay** [1] - 17:1
**laying** [2] - 30:12, 30:13
**layout** [1] - 67:10
**leading** [1] - 31:24
**learn** [2] - 59:5, 109:13
**learned** [11] - 59:16, 76:22, 109:9, 109:18, 109:20, 109:24, 110:22, 111:6, 111:15, 151:2, 154:20
**lease** [7] - 10:16, 46:19, 46:20, 47:7, 131:15, 140:7, 156:4
**leased** [2] - 4:3, 19:23
**leasehold** [4] - 17:7, 42:18, 46:18, 138:22
**leaseholder** [2] - 9:21, 14:2
**least** [27] - 5:21, 9:2, 9:10, 27:21, 29:14, 35:3, 40:16, 44:18, 48:24, 49:1, 52:13, 57:11, 58:16, 76:23, 94:4, 130:9, 131:17, 142:9, 143:1, 143:13, 143:18, 154:23, 155:5, 157:3, 157:12, 160:2, 160:15
**leave** [12] - 18:17, 57:2, 62:4, 62:8, 72:18, 72:22, 74:17, 98:10, 108:4, 109:5, 145:12, 152:16
**leaves** [1] - 137:4
**led** [3] - 32:2, 50:16, 135:21
**left** [24] - 2:7, 18:5, 18:11, 27:3, 30:17, 30:22, 33:5, 33:21, 53:7, 56:24, 62:13, 66:15, 72:25, 108:6, 108:9, 108:11, 110:20, 111:20, 111:24, 115:17, 134:6, 158:20, 159:6
**legal** [1] - 3:4
**legitimate** [2] - 6:16, 152:22
**legitimately** [1] - 5:25
**length** [1] - 131:21

**less** [3] - 24:22, 39:2, 117:19
**lessee** [2] - 5:12, 105:23
**letting** [1] - 16:11
**level** [8] - 32:6, 34:2, 48:2, 48:4, 130:24, 153:4, 158:16
**liberty** [2] - 101:18, 104:6
**licensee** [1] - 5:12
**life** [1] - 134:3
**likely** [3] - 21:19, 21:20, 22:8
**limit** [1] - 83:17
**limited** [3] - 10:6, 126:12, 152:14
**line** [4] - 123:13, 124:13, 124:24, 125:19
**linen** [1] - 54:9
**lines** [4] - 29:11, 63:2, 124:18, 145:14
**links** [2] - 144:6, 144:11
**Linnea** [3] - 15:6, 17:8, 140:21
**list** [1] - 37:10
**listed** [4] - 4:23, 15:3, 47:9, 138:22, 140:8
**listing** [2] - 77:2, 77:4
**live** [15] - 112:23, 113:14, 113:15, 113:17, 113:18, 118:12, 118:15, 118:20, 118:23, 119:10, 119:11, 119:13, 120:7, 121:1, 132:2
**lived** [8] - 4:3, 8:6, 9:23, 10:18, 37:25, 119:6, 119:10, 131:21
**lives** [2] - 118:20, 130:12
**living** [11] - 30:8, 30:10, 30:11, 30:17, 42:4, 48:25, 49:3, 50:5, 51:22, 157:24, 157:25
**loathed** [1] - 132:17
**located** [2] - 4:8, 67:14
**location** [32] - 9:12, 25:24, 26:3, 56:2, 60:17, 61:2, 67:2, 68:3, 69:13, 69:21, 70:20, 76:24, 84:22, 89:4, 93:13, 100:25, 101:2, 104:16,

106:8, 107:25, 108:4, 108:6, 108:8, 108:18, 108:21, 109:3, 111:17, 119:5, 145:15, 148:9, 160:12
**locations** [3] - 113:10, 113:11, 151:3
**locked** [1] - 69:7
**locker** [3] - 113:3, 135:21, 153:23
**lockers** [5] - 3:2, 78:11, 137:24, 153:24, 154:2
**logical** [3] - 21:1, 139:11, 145:19
**logically** [1] - 131:12
**look** [26] - 4:16, 24:3, 24:22, 31:19, 52:21, 53:19, 85:10, 86:2, 87:21, 88:1, 88:10, 88:18, 89:21, 90:15, 109:25, 112:7, 121:25, 123:1, 135:12, 141:11, 141:12, 148:2, 149:4, 158:19, 159:1, 160:18
**looked** [5] - 31:16, 31:17, 88:23, 89:4, 138:20
**looking** [6] - 59:3, 88:24, 120:18, 123:18, 148:6, 157:23
**looks** [6] - 91:17, 91:18, 91:19, 92:8, 95:4
**loud** [7] - 27:1, 27:16, 128:10, 154:22, 155:2, 155:3, 155:25
**loudly** [1] - 156:8
**Love** [1] - 2:8
**luck** [1] - 120:17
**lunch** [1] - 135:7
**lying** [1] - 131:9

**M**

**ma'am** [7] - 98:21, 105:20, 114:16, 115:4, 115:8, 116:5, 119:22
**machine** [1] - 96:19
**Madam** [2] - 90:7, 97:25
**magnifies** [2] - 96:16, 96:17
**main** [7] - 53:9, 74:11,

75:8, 81:18, 137:5, 143:9, 152:13
**maintained** [1] - 68:23
**maintaining** [3] - 3:16, 7:6, 47:7
**maintenance** [1] - 55:3
**major** [2] - 65:5, 145:10
**majority** [2] - 132:16, 134:11
**male** [4] - 86:11, 92:17, 122:6, 122:18
**males** [26] - 38:3, 42:10, 57:22, 61:1, 61:12, 70:6, 71:2, 75:3, 75:4, 80:24, 81:1, 84:18, 84:21, 86:24, 109:2, 109:21, 111:17, 121:10, 121:16, 121:19, 121:21, 121:23, 139:8, 147:16, 152:7
**malodorous** [2] - 124:8, 126:5
**man** [2] - 82:19, 114:16
**manage** [1] - 46:16
**management** [4] - 14:3, 131:14, 132:1, 138:20
**manager** [51] - 3:5, 25:25, 27:12, 27:20, 30:1, 33:5, 40:1, 40:6, 40:25, 41:12, 41:18, 42:2, 42:8, 42:11, 42:16, 43:21, 45:13, 45:19, 46:13, 47:16, 48:14, 48:21, 49:10, 50:17, 50:18, 50:19, 54:14, 54:22, 62:25, 78:25, 104:22, 105:5, 106:9, 106:12, 106:25, 125:16, 154:16, 154:19, 155:1, 155:4, 155:9, 155:12, 155:17, 155:18, 155:19, 156:10, 156:14, 156:16, 157:1, 159:2, 161:4
**manager's** [1] - 51:5
**managers** [6] - 26:1, 26:22, 29:2, 55:1, 160:11, 160:23
**Mancusi** [2] - 4:20, 4:22
**mannite** [6] - 32:8,

33:16, 33:17, 37:2, 68:13, 158:17
**marijuana** [2] - 44:25, 45:4
**marked** [9] - 24:6, 24:10, 35:14, 35:16, 66:8, 82:2, 91:19, 102:10, 102:13
**MARKED** [2] - 163:22, 164:1
**Marsh** [2] - 118:9, 118:11
**MARYLAND** [1] - 1:2
**Maryland** [5] - 1:8, 65:18, 91:18, 118:6, 118:7
**masks** [1] - 36:22
**match** [1] - 21:16
**matter** [26] - 6:8, 13:12, 44:11, 53:1, 53:22, 62:23, 111:10, 124:2, 132:18, 140:5, 148:1, 148:6, 162:2, 165:3
**mean** [7] - 15:9, 18:25, 62:24, 83:6, 112:6, 139:13, 140:22
**meant** [1] - 89:17
**meanwhile** [1] - 144:17
**measures** [1] - 141:13
**medical** [1] - 129:14
**meet** [3] - 9:15, 27:8, 33:4
**meeting** [1] - 101:15
**member** [2] - 106:17, 106:22
**members** [6] - 76:4, 76:16, 128:3, 157:12, 160:9, 160:10
**memorandum** [5] - 3:18, 4:12, 4:20, 5:16, 133:2
**Memorial** [3] - 115:13, 115:14, 115:17
**mention** [1] - 149:24
**mentioned** [6] - 12:18, 63:5, 85:5, 85:7, 152:2, 156:19
**mentions** [1] - 60:11
**message** [1] - 126:11
**met** [6] - 29:11, 34:3, 43:23, 43:25, 101:11
**middle** [3] - 31:12, 47:25, 48:1
**midnight** [2] - 26:20, 26:25
**might** [18] - 11:16,

49:4, 50:23, 51:3, 68:25, 106:13, 106:14, 106:22, 129:13, 130:20, 132:6, 132:13, 132:20, 134:13, 138:14, 155:7, 155:14, 157:11
**mike** [8] - 13:2, 22:17, 64:12, 98:19, 98:23, 114:6, 114:14, 115:5
**miles** [4] - 83:12, 83:14, 83:23, 148:18
**milling** [4] - 94:8, 148:19, 149:9, 152:19
**mind** [3] - 8:18, 51:5, 143:18
**mine** [1] - 17:24
**minivan** [1] - 92:16
**Minnesota** [8] - 6:7, 7:10, 7:11, 7:12, 7:15, 7:16, 7:18, 10:19
**minute** [2] - 63:23, 154:4
**minutes** [7] - 27:21, 28:17, 84:9, 84:11, 155:5, 155:18, 162:6
**Miranda** [5] - 101:24, 102:3, 102:17, 102:24, 102:25
**missed** [3] - 3:22, 4:9, 97:17
**misstated** [1] - 159:6
**mistaken** [1] - 133:4
**miswritten** [1] - 161:14
**mitigate** [1] - 126:3
**mixers** [1] - 68:14
**moment** [5] - 38:16, 78:14, 79:9, 86:5, 124:12
**money** [1] - 135:23
**Monique** [5] - 113:23, 114:8, 147:12, 147:16, 147:18
**MONIQUE** [2] - 114:1, 163:19
**month** [2] - 13:24, 14:10
**morning** [35] - 2:3, 18:17, 19:18, 22:23, 22:24, 25:8, 26:8, 27:16, 38:12, 38:13, 56:11, 56:12, 60:17, 64:5, 64:6, 64:16, 64:17, 72:23, 74:8, 79:16, 79:17, 100:20, 109:4,

117:2, 123:22, 143:9, 143:16, 143:25, 145:11, 145:22, 146:5, 146:7, 147:13, 149:13, 154:24
**Moss** [4] - 129:1, 129:9, 129:15, 130:9
**most** [6] - 24:2, 25:12, 37:1, 132:21, 157:20, 157:24
**motion** [5] - 2:10, 3:18, 110:5, 151:12, 153:21
**MOTION** [2] - 163:22, 164:1
**Motion** [4] - 24:10, 35:16, 89:25, 102:13
**motions** [3] - 1:10, 2:21, 161:19
**motivation** [1] - 158:22
**Motor** [1] - 77:7
**move** [5] - 7:9, 22:2, 89:18, 91:9, 142:15
**movement** [1] - 132:23
**moving** [4] - 6:7, 91:8, 94:22, 95:21
**MR** [189] - 2:3, 2:15, 2:19, 3:11, 3:15, 4:1, 4:10, 7:12, 7:17, 7:22, 9:8, 10:4, 11:1, 11:5, 12:10, 12:12, 12:21, 13:6, 13:10, 18:13, 19:6, 19:14, 19:15, 19:17, 20:15, 20:17, 20:18, 20:21, 20:25, 21:4, 21:7, 21:15, 21:19, 21:22, 22:3, 22:9, 22:22, 29:5, 29:12, 34:24, 35:9, 35:12, 38:6, 38:9, 38:11, 54:21, 55:18, 55:20, 55:24, 56:1, 62:15, 62:17, 62:19, 63:11, 63:14, 63:17, 63:17, 63:20, 63:24, 64:3, 64:5, 64:15, 79:7, 79:13, 79:15, 86:6, 86:9, 86:10, 86:13, 87:18, 88:4, 88:8, 88:14, 88:17, 89:14, 89:18, 89:22, 89:24, 90:5, 90:11, 90:19, 90:22, 91:1, 91:21, 93:1, 93:5, 93:10, 95:9, 95:13, 95:16, 96:10, 96:15, 96:20, 97:9,

97:12, 97:15, 97:20, 97:24, 98:2, 98:5, 98:10, 98:12, 99:3, 102:4, 102:7, 102:9, 105:15, 106:2, 106:4, 107:4, 107:5, 107:6, 107:9, 110:3, 110:6, 110:8, 110:11, 110:16, 112:11, 112:14, 112:17, 112:20, 112:23, 113:18, 113:21, 113:23, 114:10, 115:7, 117:10, 117:11, 117:14, 118:24, 119:7, 119:15, 119:17, 119:19, 119:21, 119:24, 120:1, 120:2, 120:5, 120:9, 120:17, 120:23, 121:14, 122:3, 122:5, 122:11, 122:19, 123:9, 123:13, 126:18, 135:5, 136:3, 136:8, 136:12, 136:16, 136:20, 136:23, 137:3, 137:8, 137:14, 137:21, 138:3, 138:6, 138:19, 139:16, 139:18, 140:17, 140:25, 141:7, 141:20, 142:17, 144:15, 144:24, 145:5, 146:12, 151:8, 153:22, 159:8, 159:23, 160:5, 161:1, 161:7, 161:17, 161:21, 162:1, 162:7, 162:8
**multiple** [1] - 40:4
**music** [12] - 27:16, 28:21, 31:1, 31:3, 125:10, 128:10, 154:23, 155:2, 155:3, 155:25, 158:6, 158:7
**must** [1] - 146:17
**MVA** [2] - 144:18, 145:3

**N**

**name** [27] - 4:4, 13:2, 15:2, 15:5, 17:6, 17:7, 22:18, 46:21, 47:2, 58:11, 64:13,

64:20, 77:22, 77:23, 98:20, 98:24, 99:1, 114:6, 114:22, 116:1, 140:21, 144:11, 145:17, 145:20, 147:1, 149:19, 153:11
**names** [4] - 42:17, 58:17, 75:24, 76:15
**narcotics** [14] - 33:13, 33:15, 33:20, 34:2, 64:21, 65:5, 65:24, 99:8, 99:12, 143:4, 144:8, 145:15, 145:16, 152:11
**narcotics-ridden** [1] - 143:4
**natural** [1] - 29:16
**nature** [7] - 10:6, 37:21, 76:2, 78:12, 105:11, 160:1, 161:12
**near** [5] - 79:21, 82:21, 90:11, 96:24, 97:7
**nearby** [2] - 149:2, 155:21
**neatly** [1] - 32:8
**necessarily** [2] - 51:8, 55:5
**necessary** [5] - 8:4, 8:7, 8:22, 129:23, 158:19
**neck** [1] - 143:14
**need** [25] - 5:25, 6:19, 10:9, 27:25, 28:3, 29:10, 51:10, 51:13, 51:14, 77:8, 79:1, 90:24, 105:6, 113:13, 124:12, 124:22, 124:25, 125:13, 129:8, 130:25, 156:21, 157:4, 157:18, 159:22, 161:6
**needed** [3] - 57:7, 117:8, 130:5
**needs** [1] - 105:11
**negligence** [1] - 125:1
**neighbor** [1] - 154:22
**neighborhood** [3] - 23:23, 143:4, 149:7
**neighboring** [1] - 132:4
**neighbors** [8] - 37:19, 40:11, 40:16, 108:25, 120:13, 152:2, 155:22, 155:25
**neighbors'** [2] -

108:23, 152:6
**never** [8] - 39:22, 47:5, 82:19, 83:4, 83:10, 150:16, 150:17, 150:18
**newspaper** [1] - 31:12
**next** [14] - 5:8, 21:2, 33:25, 63:17, 70:16, 74:6, 78:2, 92:13, 95:22, 104:10, 110:12, 114:16, 135:14, 149:17
**night** [8] - 10:15, 26:20, 27:18, 38:5, 41:2, 101:10, 108:11, 109:1
**nightly** [1] - 109:3
**nights** [1] - 119:3
**NO** [1] - 1:5
**nobody** [7] - 22:7, 29:3, 53:19, 119:6, 119:10, 131:23, 158:5
**noise** [7] - 26:21, 26:24, 31:9, 38:14, 40:4, 40:11, 40:12
**noises** [1] - 27:1
**non** [1] - 5:3
**non-existence** [1] - 5:3
**none** [2] - 58:17, 89:24
**normal** [1] - 29:1
**normally** [5] - 55:2, 61:5, 76:1, 109:7, 148:20
**notation** [1] - 58:20
**notations** [1] - 87:8
**note** [2] - 111:5, 121:8
**noted** [3] - 48:18, 59:1, 151:25
**notes** [1] - 159:24
**nothing** [35] - 19:14, 30:19, 41:17, 51:1, 51:24, 52:23, 53:5, 55:20, 62:15, 80:19, 86:4, 86:13, 97:9, 104:17, 107:4, 112:14, 117:10, 120:1, 122:17, 128:13, 130:14, 130:21, 130:24, 132:12, 132:13, 141:23, 147:19, 149:20, 152:5, 152:10, 158:1, 158:2, 158:5, 161:21
**notice** [2] - 44:1, 52:17
**noticed** [1] - 158:2

**Nottingham** [2] - 118:6, 118:7
**notwithstanding** [2] - 8:5, 8:16
**Number** [4] - 2:6, 24:10, 35:16, 102:13
**number** [18] - 28:9, 47:1, 47:2, 70:7, 91:19, 92:9, 93:8, 95:4, 95:8, 95:9, 96:3, 97:19, 140:9, 146:12, 154:23, 157:2, 157:15, 160:19
**numbers** [6] - 46:22, 46:24, 92:19, 138:23, 140:2, 156:5
**numerous** [5] - 68:10, 68:12, 78:22, 85:22, 87:15

**O**

**o'clock** [30] - 15:24, 27:6, 27:18, 35:7, 36:8, 38:5, 56:12, 57:11, 57:13, 57:17, 66:2, 72:15, 72:16, 74:8, 86:17, 86:21, 87:10, 100:20, 108:2, 109:1, 109:4, 109:7, 120:14, 121:9, 138:5, 145:10, 146:5, 146:6, 151:19, 151:24
**O'Neil** [1] - 64:20
**O'Neill** [14] - 63:18, 64:16, 79:16, 121:2, 121:20, 127:17, 144:16, 156:24, 157:14, 159:10, 160:17, 160:20
**O'NEILL** [3] - 64:5, 64:7, 163:7
**objection** [5] - 29:5, 29:12, 89:23, 118:24, 119:7
**objective** [7] - 5:5, 130:7, 134:1, 134:14, 134:21, 147:22, 159:1
**objectively** [7] - 127:5, 127:9, 129:4, 129:21, 130:2, 132:7, 138:13
**objects** [4] - 32:22, 33:8, 36:21
**observation** [3] - 75:1, 80:14, 140:25

**observations** [4] - 32:23, 33:1, 45:21, 131:11
**observe** [4] - 30:16, 68:5, 69:20, 75:9
**observed** [11] - 7:20, 34:4, 79:22, 79:24, 80:1, 80:5, 86:16, 89:4, 92:4, 142:4, 158:10
**observing** [1] - 120:13
**obtain** [2] - 15:7, 17:9
**obtained** [6] - 13:25, 14:6, 42:13, 56:24, 58:4, 60:12
**obviously** [12] - 33:9, 70:17, 82:4, 87:18, 121:18, 138:16, 141:11, 142:10, 150:24, 155:7, 155:24, 157:15
**occasion** [4] - 15:22, 18:14, 104:21, 115:20
**occasions** [22] - 14:16, 14:25, 15:17, 16:14, 16:16, 16:20, 17:3, 17:25, 19:8, 72:20, 78:22, 79:4, 104:25, 105:9, 105:10, 157:8, 157:15, 157:17, 159:11, 160:7, 160:15, 161:11
**occupant** [9] - 19:25, 20:2, 78:21, 122:14, 129:18, 131:6, 131:9, 131:10, 145:6
**occupants** [10] - 26:4, 54:16, 55:11, 55:15, 122:2, 129:13, 130:4, 139:21, 145:7, 145:9
**occupied** [4] - 125:9, 129:17, 129:25, 152:3
**occurred** [6] - 60:18, 128:12, 129:13, 142:22, 148:5, 149:2
**occurring** [1] - 39:8
**odd** [1] - 140:19
**odor** [7] - 45:3, 46:6, 123:24, 124:16, 126:1, 131:8, 156:6
**odors** [2] - 44:2, 44:20
**OF** [2] - 1:2, 1:4
**office** [2] - 27:15, 43:23
**Officer** [12] - 21:10, 22:19, 107:11,

108:13, 108:16, 108:20, 123:18, 127:25, 131:14, 154:12, 154:17, 157:21
**officer** [40] - 22:23, 23:1, 23:2, 23:6, 23:12, 29:11, 38:12, 44:6, 46:1, 62:20, 75:15, 78:15, 78:19, 83:25, 89:19, 92:1, 104:20, 110:13, 112:2, 116:13, 121:20, 123:17, 127:22, 138:12, 138:13, 138:20, 154:14, 155:9, 155:11, 155:12, 155:13, 155:16, 156:15, 156:17, 156:18, 156:20, 156:21, 156:23, 157:6, 157:16
**officer's** [1] - 140:24
**officers** [28] - 22:3, 26:25, 58:8, 61:20, 69:12, 69:18, 73:13, 74:1, 81:2, 81:6, 81:12, 93:16, 94:5, 108:23, 116:10, 117:21, 122:22, 125:4, 127:14, 143:11, 143:24, 148:19, 148:21, 149:8, 152:19, 153:4
**officers'** [1] - 125:6
**Official** [2] - 1:25, 165:12
**old** [5] - 42:20, 114:24, 115:2, 147:17, 147:18
**Olson** [4] - 6:7, 6:20, 6:24, 7:16
**once** [16] - 27:8, 28:16, 30:5, 30:17, 31:7, 32:4, 33:2, 77:19, 78:24, 91:5, 91:12, 92:8, 101:18, 104:8, 136:5, 142:21
**one** [62] - 4:25, 5:25, 7:6, 8:12, 11:25, 14:10, 21:19, 21:20, 24:1, 27:2, 30:23, 31:24, 33:2, 33:14, 33:16, 34:21, 40:4, 40:5, 43:10, 44:23, 49:19, 52:6, 53:8, 53:9, 54:5, 54:7, 69:15, 69:24, 70:19, 81:20, 82:20, 84:18,

87:3, 91:8, 91:14, 92:6, 95:11, 95:17, 96:6, 103:6, 107:20, 112:9, 113:21, 119:19, 121:4, 121:14, 132:5, 132:25, 134:18, 136:13, 138:7, 138:19, 146:13, 151:19, 152:10, 152:20, 154:13, 156:8, 157:9, 162:2
**one's** [4] - 7:2, 50:3, 53:2, 152:23
**ones** [4] - 33:16, 61:16, 61:17, 112:7
**ongoing** [1] - 69:8
**open** [13] - 30:22, 32:11, 45:11, 49:3, 49:4, 50:6, 50:13, 52:9, 53:14, 54:10, 69:6, 125:2, 158:5
**open-ended** [1] - 49:3
**opened** [4] - 30:2, 31:7, 32:1, 48:20, 49:9, 53:18, 63:6, 63:8, 70:19, 71:10, 71:18, 158:8, 158:15
**opening** [2] - 32:21, 158:14
**opens** [1] - 54:11
**operating** [1] - 68:25
**operation** [1] - 37:18
**operator** [1] - 74:15
**opportunity** [1] - 68:5
**order** [6] - 4:13, 8:22, 54:24, 127:1, 127:6, 130:4
**organization** [1] - 76:11
**ostensibly** [1] - 7:25
**otherwise** [3] - 29:19, 55:11, 134:7
**outer** [1] - 68:23
**outlay** [1] - 30:4
**outlined** [1] - 142:24
**outside** [22] - 22:3, 24:4, 28:22, 33:6, 33:11, 41:20, 43:23, 43:25, 48:6, 48:11, 63:9, 69:1, 72:20, 73:8, 84:5, 143:5
**overcome** [1] - 113:12
**overdue** [1] - 54:17
**overhead** [1] - 77:22
**overlooked** [1] - 110:23
**overnight** [6] - 6:10, 6:25, 7:14, 15:20, 26:24, 128:9

**overruled** [3] - 29:6, 29:13, 118:25
**own** [7] - 7:2, 9:22, 9:25, 45:21, 50:20, 133:6, 156:19
**owned** [3] - 104:18, 105:21, 144:19
**owner** [8] - 76:23, 77:12, 104:18, 136:15, 144:19, 144:23, 151:23, 153:11
**owns** [1] - 136:5

**P**

**p.m** [10] - 56:21, 57:13, 57:17, 61:5, 61:13, 61:18, 61:24, 108:2, 109:22, 111:17
**package** [1] - 56:18
**packaging** [1] - 61:22
**PAGE** [2] - 163:2, 163:14
**pages** [2] - 36:19, 85:19
**paid** [3] - 20:8, 20:12, 54:16
**papers** [2] - 136:3, 142:24
**parallel** [1] - 148:11
**paramedics** [1] - 51:19
**park** [2] - 129:11, 152:24
**parked** [4] - 89:2, 91:8, 91:14, 92:16
**parking** [4] - 145:13, 148:11, 148:12, 148:13
**part** [8] - 34:17, 62:10, 66:12, 75:20, 90:25, 100:4, 127:13, 141:16
**partially** [2] - 32:11, 91:13
**participate** [3] - 36:15, 72:25, 73:4
**participated** [3] - 68:1, 68:17, 146:3
**particular** [36] - 5:10, 8:16, 10:2, 15:22, 18:14, 25:10, 30:4, 38:17, 43:6, 43:12, 46:6, 50:9, 58:11, 65:6, 65:23, 90:17, 92:5, 127:2, 127:8, 128:14, 128:24,

130:14, 131:4,
131:5, 131:11,
131:13, 134:16,
139:22, 147:20,
147:24, 148:6,
148:9, 149:10,
149:11, 152:25,
153:5
**particularized** [1] -
147:22
**particularly** [4] - 82:3,
88:12, 156:6, 158:1
**parties** [1] - 41:4
**partly** [1] - 154:5
**pass** [1] - 127:11
**passenger** [4] - 77:21,
116:8, 116:16,
122:13
**past** [8] - 26:18, 82:25,
95:17, 127:19,
128:12, 128:14,
128:15, 150:9
**patrol** [5] - 23:1, 23:2,
25:10, 29:1, 100:23
**patrolled** [1] - 43:10
**patrolling** [4] - 24:24,
43:1, 43:4, 44:24
**Pause** [3] - 58:25,
120:24, 122:4
**pay** [2] - 20:8, 20:10
**Payne** [1] - 4:22
**Payton** [2] - 127:3,
127:4
**pen** [1] - 92:20
**people** [38] - 7:20,
10:14, 27:2, 29:9,
29:15, 29:17, 38:1,
42:8, 42:17, 46:22,
47:9, 57:21, 57:25,
58:5, 58:8, 58:9,
59:6, 61:12, 61:15,
61:17, 106:6,
106:18, 120:13,
122:9, 143:7, 143:8,
143:20, 144:7,
149:3, 151:17,
159:13, 159:16,
159:25, 160:1,
160:3, 161:6, 161:12
**per** [5] - 24:2, 83:12,
83:15, 83:23, 101:24
**percent** [3] - 91:6,
97:6, 97:8
**perception** [1] - 130:3
**perhaps** [16] - 3:22,
4:9, 8:14, 50:1, 90:9,
90:17, 120:17,
126:2, 128:9,
130:20, 132:1,
135:11, 143:7,

145:20, 154:9,
160:17
**period** [5] - 14:10,
43:3, 44:13, 44:14,
134:7
**periodically** [1] - 84:6
**perish** [1] - 124:19
**permission** [3] -
10:16, 17:9, 18:23
**person** [26] - 6:5, 8:8,
9:10, 9:15, 9:16,
10:16, 16:4, 58:12,
124:15, 131:12,
137:18, 145:20,
146:2, 146:19,
148:6, 148:7, 149:1,
149:9, 150:2, 150:4,
155:6, 157:9,
157:23, 158:15,
158:19
**personal** [3] - 4:7,
10:22, 17:19
**personally** [3] - 39:22,
68:15, 69:20
**persons** [4] - 42:6,
51:8, 129:6, 160:11
**persuade** [1] - 142:19
**Phil** [1] - 2:4
**Philip** [1] - 1:17
**phone** [8] - 19:11,
29:18, 46:14, 47:2,
138:23, 140:2,
140:8, 156:4
**photograph** [9] -
24:16, 89:9, 91:4,
92:15, 93:3, 93:19,
95:3, 96:5, 96:18
**photographs** [5] -
88:5, 88:9, 88:22,
97:18, 97:24
**physical** [1] - 104:2
**picture** [6] - 23:25,
24:5, 24:14, 90:18,
96:13, 142:12
**pictures** [1] - 90:15
**piece** [1] - 153:10
**pieces** [1] - 57:7
**place** [12] - 9:3, 10:5,
50:23, 51:6, 69:3,
74:18, 124:2,
133:18, 134:5,
141:5, 143:12,
145:21
**placed** [6] - 71:10,
71:16, 71:22, 78:5,
130:13, 134:16
**plain** [3] - 49:15,
52:13, 158:16
**plainly** [1] - 54:4
**planning** [1] - 90:3

**plastic** [2] - 30:13,
37:3
**plausible** [1] - 9:13
**play** [6] - 40:8, 49:23,
52:25, 124:10,
128:17, 139:5
**playing** [6] - 18:4,
41:25, 130:23,
155:2, 156:8, 158:9
**plus** [1] - 78:15
**point** [33] - 21:17,
24:8, 31:23, 41:19,
42:3, 55:9, 57:21,
60:16, 69:8, 71:12,
81:16, 86:4, 90:14,
93:14, 94:13, 96:9,
122:24, 122:25,
124:14, 125:2,
125:17, 125:18,
125:25, 134:14,
134:17, 136:18,
142:2, 142:3,
152:23, 154:5,
155:8, 155:11,
155:16
**pointer** [6] - 66:15,
66:19, 67:4, 73:11,
73:17, 96:23
**pointing** [5] - 92:19,
92:20, 94:22, 95:3,
96:2
**poisonous** [4] - 113:4,
135:1, 137:4, 151:4
**police** [73] - 3:5, 6:12,
23:6, 23:12, 26:3,
26:16, 37:17, 40:3,
44:6, 49:12, 59:19,
64:21, 70:2, 70:5,
71:8, 72:10, 74:18,
75:15, 78:15, 78:19,
81:2, 81:6, 83:25,
84:1, 85:5, 85:7,
85:22, 87:14, 87:16,
111:6, 111:21,
112:1, 112:8,
116:10, 116:13,
116:21, 117:1,
117:3, 117:21,
120:10, 121:6,
121:8, 122:7, 122:8,
124:14, 125:13,
125:15, 126:1,
126:4, 126:10,
131:4, 131:8,
139:19, 141:19,
142:2, 143:2,
143:24, 145:5,
147:6, 147:9,
147:14, 148:4,
148:19, 148:21,

149:4, 149:8,
149:24, 149:25,
150:16, 151:15,
152:19, 154:14,
154:21
**Police** [1] - 21:11,
23:3, 63:19, 64:23,
65:1, 65:4, 65:10,
75:21, 98:6, 99:10,
99:22, 104:19, 105:4
**police's** [1] - 124:25
**pool** [1] - 131:9
**popularly** [1] - 99:19
**position** [10] - 66:18,
82:5, 83:7, 125:21,
138:16, 141:2,
141:17, 141:25,
142:2, 143:25
**possession** [4] - 8:21,
13:22, 44:25, 102:18
**possibility** [2] -
152:21, 152:22
**possible** [5] - 3:23,
12:20, 126:4
**possibly** [5] - 12:19,
86:23, 124:19,
130:12, 159:16
**posture** [1] - 2:10
**potential** [1] - 59:6
**powder** [11] - 7:21,
31:18, 32:10, 32:13,
32:20, 33:18, 37:4,
50:10, 54:1, 54:2,
158:11
**powdery** [1] - 31:14
**practical** [1] - 44:7
**practice** [1] - 140:4
**precinct** [15] - 23:14,
23:17, 23:18, 23:19,
34:2, 34:3, 56:25,
57:4, 101:18,
101:20, 108:8,
117:21, 117:23,
117:24, 134:24
**Precinct** [1] - 71:23
**precinct-level** [1] -
34:2
**precise** [1] - 157:2
**preclude** [1] - 154:1
**preliminarily** [1] - 3:3
**premises** [10] - 4:19,
5:4, 5:21, 5:25, 6:2,
6:5, 10:20, 34:5,
142:1, 153:23
**prepacked** [1] - 37:4
**preparation** [1] -
101:1
**prepare** [3] - 34:19,
100:25, 109:16
**prepared** [9] - 6:4,

8:25, 10:5, 11:1,
35:19, 109:17,
110:22, 147:8,
151:11
**preparing** [1] - 34:13
**presence** [4] - 45:14,
49:12, 115:9, 149:4
**present** [6] - 6:11,
22:7, 60:10, 74:1,
96:10, 150:15
**presentation** [2] -
90:3, 90:6
**presented** [4] - 11:10,
140:12, 141:10,
161:18
**Presler** [4] - 125:24,
128:18, 128:25,
131:2
**press** [1] - 10:8
**pretrial** [1] - 2:10
**pretty** [2] - 32:5,
106:15
**prevent** [2] - 129:6,
129:21
**previous** [4] - 16:14,
26:20, 154:21,
154:24
**previously** [6] - 12:24,
22:15, 64:9, 84:13,
98:16, 114:3
**primary** [2] - 113:5,
113:12
**privacy** [6] - 4:18, 5:4,
5:6, 6:16, 10:7
**private** [2] - 129:12,
133:15
**probable** [13] -
136:13, 136:17,
137:12, 137:16,
141:9, 142:22,
146:1, 150:6,
150:12, 150:14,
150:22, 153:9,
153:15
**problem** [1] - 141:8
**problems** [3] - 55:4,
55:5, 132:20
**proceed** [3] - 13:8,
120:25, 154:9
**proceeded** [1] - 29:24
**proceeding** [3] -
11:24, 120:19, 158:4
**proceedings** [2] -
120:20, 162:9
**process** [1] - 4:5
**processing** [1] - 71:23
**procession** [1] - 13:21
**producing** [1] - 31:9
**product** [1] - 153:19
**proffer** [3] - 9:11,

120:25, 122:23
**profiling** [1] - 42:23
**promise** [1] - 117:18
**promises** [1] - 103:22
**proper** [1] - 80:11
**property** [14] - 5:1,
26:1, 27:12, 30:1,
55:4, 62:25, 78:25,
104:22, 105:5,
108:8, 125:16,
129:7, 130:11,
130:15
**proposition** [1] -
149:16
**prospective** [1] -
145:8
**protected** [1] - 9:18
**provide** [2] - 46:16,
131:23
**provided** [5] - 45:18,
45:20, 54:14, 77:7,
147:13
**provides** [1] - 7:25
**providing** [2] - 8:4,
160:11
**proximity** [1] - 145:14
**prudent** [1] - 125:14
**public** [1] - 76:14
**pull** [2] - 79:25, 148:11
**pulled** [3] - 81:21,
81:24, 82:3
**purely** [2] - 113:11,
158:23
**purpose** [1] - 10:23
**purposes** [7] - 11:6,
11:7, 19:8, 24:7,
35:15, 77:10, 102:11
**pursuant** [2] - 26:10,
37:11
**put** [12] - 48:6, 73:16,
94:14, 110:24,
110:25, 111:1,
111:3, 111:25,
147:5, 154:7,
157:14, 161:2

### Q

**questioned** [1] -
104:15
**questioning** [3] -
103:5, 103:8, 104:14
**questions** [25] - 11:14,
11:15, 12:19, 20:15,
20:17, 38:7, 55:22,
55:24, 79:10, 89:19,
97:11, 97:13, 97:19,
97:20, 103:9,
103:10, 105:15,

107:6, 112:16,
117:17, 119:15,
120:12, 138:8,
138:19, 150:10
**quick** [3] - 53:5, 53:18,
125:25
**quickly** [4] - 32:7,
51:15, 74:16, 148:16
**quiet** [1] - 70:17
**quite** [3] - 3:8, 57:7,
102:22
**quote** [1] - 129:15

### R

**radio** [29] - 17:22,
17:23, 17:25, 18:4,
18:6, 18:11, 27:1,
31:8, 41:25, 45:17,
45:22, 45:24, 47:18,
53:11, 61:25, 70:2,
70:5, 125:9, 128:6,
128:8, 130:23,
134:6, 144:20,
144:24, 145:2,
155:2, 155:7, 156:7,
158:9
**radios** [2] - 17:20,
69:10
**Raise** [1] - 22:12
**raise** [3] - 12:22,
98:13, 113:24
**raised** [1] - 138:11
**Rakas** [3] - 5:16, 5:17,
5:23
**ran** [3] - 77:2, 77:17,
149:21
**rang** [1] - 123:25
**ranger** [2] - 129:11,
130:9
**Ranger** [1] - 130:2
**rank** [1] - 22:25
**rapidly** [1] - 126:14
**rash** [1] - 38:17
**rather** [2] - 125:1,
145:1
**RAVENELL** [77] -
2:15, 3:11, 20:17,
21:19, 22:9, 55:24,
56:1, 62:15, 79:13,
79:15, 86:9, 86:10,
86:13, 87:18, 88:4,
88:8, 88:14, 88:17,
89:14, 89:18, 89:22,
90:5, 90:11, 90:19,
90:22, 91:1, 91:21,
93:1, 93:5, 93:10,
95:9, 95:13, 95:16,
96:10, 96:15, 96:20,

97:9, 97:20, 97:24,
107:6, 107:9, 110:3,
110:8, 110:11,
110:16, 112:11,
112:14, 113:21,
113:23, 114:10,
115:7, 117:10,
118:24, 119:7,
119:19, 119:21,
119:24, 120:1,
120:5, 121:14,
122:3, 122:19,
136:3, 136:8,
136:12, 136:16,
136:20, 136:23,
137:3, 137:8,
137:14, 137:21,
146:12, 153:22,
161:21, 162:1, 162:7
**Ravenell** [20] - 1:19,
2:13, 12:20, 20:16,
21:17, 55:22, 78:2,
79:12, 107:7,
113:20, 119:18,
120:11, 135:24,
139:6, 146:10,
152:18, 163:6,
163:9, 163:13,
163:20
**Ravenell's** [2] -
121:12, 151:11
**reach** [3] - 26:6,
29:18, 95:19
**read** [5] - 36:23,
102:3, 102:23,
103:12, 104:8
**reading** [1] - 128:11
**ready** [3] - 91:9,
142:15, 154:10
**realize** [2] - 127:18,
140:18
**really** [13] - 19:24,
30:20, 108:12,
115:5, 124:2,
125:22, 126:3,
126:20, 140:22,
140:23, 144:3,
148:1, 157:19
**rear** [1] - 81:25
**reason** [5] - 10:21,
111:20, 133:18,
139:2, 156:12
**reasonable** [28] - 4:18,
123:15, 123:16,
124:13, 125:5,
125:11, 125:15,
127:5, 127:10,
129:4, 129:22,
130:2, 132:7, 134:2,
134:21, 138:13,

141:13, 143:19,
143:24, 145:19,
146:6, 146:8,
146:13, 146:18,
146:24, 147:23,
148:15, 153:5
**reasonableness** [4] -
5:5, 125:20, 140:23,
159:2
**reasonably** [4] - 3:19,
126:1, 143:15,
157:22
**reasons** [2] - 67:25,
152:23
**REC'D** [2] - 163:22,
164:1
**recalled** [1] - 157:7
**receipts** [1] - 20:12
**receive** [4] - 36:5,
46:10, 54:24, 108:19
**received** [21] - 26:24,
28:14, 38:14, 38:16,
39:7, 39:11, 39:16,
40:9, 42:7, 43:4,
47:16, 60:16, 90:1,
106:5, 127:18,
128:3, 155:24
**receiving** [2] - 100:23,
108:17
**recent** [1] - 124:7
**recently** [1] - 125:9
**recess** [8] - 63:21,
63:23, 63:25, 86:3,
86:7, 87:25, 98:9,
135:13
**recite** [1] - 151:12
**recognize** [6] - 6:4,
24:8, 35:15, 66:9,
75:4, 102:12
**recollect** [1] - 43:13
**recollection** [12] -
25:3, 25:6, 43:9,
43:16, 80:24, 91:3,
139:14, 159:19,
160:3, 160:25,
161:1, 161:7
**reconnoiter** [1] - 39:3
**record** [31] - 2:4, 3:23,
10:10, 10:24, 13:3,
22:18, 24:6, 34:7,
36:20, 36:23, 64:13,
64:18, 67:4, 67:9,
68:22, 73:10, 73:16,
73:17, 74:11, 98:20,
98:24, 99:6, 101:14,
102:16, 102:23,
114:7, 145:3, 147:5,
154:7, 156:2
**records** [1] - 77:5
**recover** [2] - 72:6,

72:12
**recovered** [6] - 36:21,
37:6, 37:8, 60:19,
68:10, 72:3
**recruits** [1] - 33:14
**REDIRECT** [2] - 62:18,
119:20
**redirect** [4] - 20:18,
62:17, 97:15, 107:5
**reference** [21] - 24:5,
59:15, 60:22, 60:25,
61:4, 61:7, 66:4,
68:18, 76:9, 85:25,
100:21, 100:23,
104:11, 108:16,
111:16, 121:3,
121:5, 121:6, 121:7,
122:5, 122:12
**references** [1] -
133:11
**referencing** [1] - 71:5
**referred** [1] - 123:6
**referring** [2] - 59:11,
122:23
**reflect** [1] - 67:9
**reflects** [1] - 156:2
**regard** [16] - 9:4,
13:12, 34:13, 39:8,
41:17, 42:23, 44:19,
46:17, 51:16, 55:14,
106:13, 113:14,
121:13, 130:15,
142:24, 154:11
**regarding** [20] - 19:20,
38:17, 43:5, 46:21,
54:25, 58:14, 59:6,
59:20, 60:9, 104:22,
105:18, 106:6,
108:14, 111:10,
112:2, 122:1,
127:19, 157:11,
160:9, 160:11
**regards** [2] - 11:4,
160:17
**region** [1] - 100:9
**registered** [6] - 76:23,
77:11, 144:19,
145:17, 150:4,
151:22
**regular** [1] - 63:10
**regularly** [1] - 121:10
**regulate** [3] - 5:1, 8:1,
8:10
**regulations** [1] - 72:9
**reiterate** [1] - 3:17
**reiterates** [1] - 155:1
**reiterating** [1] - 12:12
**reject** [1] - 5:24
**rejected** [4] - 5:11,
6:18, 133:9, 133:22

**relate** [1] - 154:8
**related** [6] - 2:21, 4:6, 40:16, 41:19, 147:8, 154:19
**relating** [3] - 2:22, 2:24, 21:3
**relationship** [3] - 34:23, 114:19, 119:2
**relayed** [1] - 61:19
**released** [2] - 116:22, 117:3
**relevant** [2] - 88:2, 160:19
**rely** [1] - 122:23
**relying** [1] - 144:22
**remain** [3] - 56:13, 56:14, 103:1
**remains** [1] - 158:25
**remedies** [1] - 141:18
**remember** [6] - 13:13, 47:3, 50:15, 57:10, 58:11, 61:15
**remembering** [1] - 144:9
**remembers** [1] - 160:22
**render** [2] - 129:6, 129:8
**rent** [3] - 20:8, 54:16, 54:24
**rental** [1] - 27:15
**repeated** [1] - 156:9
**report** [26] - 48:18, 58:21, 58:22, 59:1, 59:2, 59:19, 59:22, 59:24, 60:9, 60:21, 62:3, 62:13, 85:6, 85:7, 85:11, 85:17, 111:6, 111:21, 121:5, 121:8, 121:16, 121:22, 122:7, 122:8, 122:17, 147:13
**Reporter** [2] - 1:25, 165:12
**reporter** [1] - 34:6
**REPORTER'S** [1] - 165:1
**reports** [22] - 85:22, 87:14, 87:16, 87:21, 87:22, 88:1, 90:13, 98:8, 112:1, 112:8, 112:12, 112:22, 122:20, 122:22, 123:1, 124:16, 124:17, 128:15, 135:12, 147:7, 154:21, 155:25
**represent** [1] - 24:18
**representation** [1] -

92:3
**representative** [2] - 60:23, 89:9
**request** [7] - 78:24, 103:7, 138:18, 154:15, 156:13, 157:18, 158:24
**requested** [2] - 28:1, 33:4
**requesting** [1] - 26:3
**require** [1] - 129:13
**required** [3] - 127:1, 129:5, 130:3
**reserve** [1] - 142:9
**residence** [6] - 7:2, 14:12, 117:22, 118:3, 134:9
**residential** [1] - 10:23
**residents** [4] - 27:14, 37:15, 39:23, 42:13
**resolve** [2] - 161:20, 161:22
**respect** [2] - 150:13, 159:9
**respirator** [1] - 36:22
**respirators** [2] - 32:12, 68:13
**respond** [5] - 26:10, 26:23, 29:3, 29:9, 72:11
**responded** [20] - 25:19, 27:1, 27:5, 34:2, 65:17, 75:25, 76:16, 123:23, 127:21, 128:1, 154:15, 156:25, 157:17, 159:11, 159:21, 159:23, 160:8, 160:20, 161:5, 161:11
**responder** [2] - 28:4, 51:14
**responding** [6] - 29:3, 66:23, 104:23, 154:24, 156:8, 160:23
**response** [17] - 27:22, 28:19, 49:13, 53:16, 66:25, 104:13, 105:5, 135:3, 156:6, 155:10, 155:19, 156:13, 156:22, 157:5, 158:23, 160:6, 161:5
**responsibility** [1] - 47:6
**rest** [2] - 53:24, 120:19
**restraint** [1] - 104:6
**result** [5] - 129:14, 130:11, 131:9,

134:20, 153:25
**resulted** [3] - 124:6, 124:7, 124:8
**resume** [1] - 138:4
**retract** [1] - 130:19
**retrieved** [1] - 153:25
**retrospective** [1] - 145:8
**return** [1] - 72:5
**revealed** [1] - 53:19
**reveals** [1] - 155:20
**review** [6] - 5:8, 88:21, 90:13, 110:14, 112:12, 135:8
**reviewed** [3] - 110:11, 112:4, 112:5
**ridden** [2] - 143:4
**right-hand** [1] - 54:12
**rightly** [2] - 126:23, 141:7
**rights** [9] - 11:4, 101:24, 102:25, 103:12, 103:15, 103:18, 104:8, 104:9, 123:20
**rise** [2] - 132:6, 153:4
**road** [4] - 38:22, 74:12, 75:8, 143:9
**Road** [5] - 25:13, 25:14, 38:21, 38:23, 67:13
**roadway** [2] - 74:21, 92:11
**Rohrig** [2] - 133:4, 133:12
**role** [2] - 33:25, 101:4
**rolling** [1] - 142:18
**room** [21] - 30:6, 30:8, 30:10, 30:12, 30:17, 30:25, 31:3, 31:4, 31:12, 31:15, 48:25, 49:3, 49:5, 50:5, 51:23, 71:14, 71:15, 131:8, 157:24, 157:25
**room-wise** [1] - 30:6
**rooms** [1] - 47:21
**Rose** [1] - 6:22
**rose** [1] - 151:13
**roughly** [1] - 23:11
**RPR** [1] - 1:25
**Rubbermaid** [1] - 32:17
**rubberneck** [1] - 149:3
**rubbernecking** [2] - 148:25, 152:20
**rule** [2] - 132:19, 151:11
**rules** [1] - 72:9
**ruling** [4] - 142:9,

142:13, 154:6, 154:10
**running** [1] - 59:9
**rush** [1] - 115:15

# S

**safety** [10] - 27:23, 28:2, 40:14, 40:19, 41:9, 50:20, 51:7, 51:10, 63:4, 155:14
**sandwich** [1] - 32:15
**satisfy** [1] - 121:12
**saw** [18] - 48:16, 49:19, 51:23, 53:5, 54:5, 68:16, 80:18, 80:24, 82:17, 93:16, 95:20, 95:21, 149:8, 150:20, 157:25, 158:15
**say-so** [1] - 161:8
**scale** [2] - 36:22, 144:8
**scene** [9] - 40:5, 61:21, 69:13, 72:2, 87:4, 101:16, 116:23, 123:18, 159:4
**scheduling** [3] - 21:12, 161:22, 161:25
**scoot** [2] - 13:1, 114:5
**screams** [2] - 41:23, 42:1
**screen** [5] - 93:21, 94:10, 94:14, 95:6, 95:14
**scuffling** [2] - 41:20, 41:22
**search** [70] - 2:23, 3:1, 3:3, 3:10, 3:13, 3:17, 5:3, 6:1, 6:2, 7:1, 21:3, 26:17, 30:14, 31:22, 34:4, 34:13, 34:19, 35:18, 36:1, 36:10, 36:11, 36:14, 36:16, 39:21, 56:3, 56:14, 58:3, 60:11, 60:12, 60:17, 68:2, 69:2, 69:8, 107:11, 107:12, 107:17, 107:20, 107:21, 108:1, 108:7, 109:10, 109:16, 109:18, 109:23, 110:4, 110:21, 113:1, 113:2, 126:13, 133:10, 133:23, 134:25, 135:20, 135:22,

136:8, 136:10, 137:5, 137:9, 137:12, 137:16, 142:23, 144:13, 147:7, 147:11, 150:11, 150:22, 150:23, 153:20, 153:23, 158:19
**searched** [4] - 78:6, 144:17, 150:25, 151:3
**searches** [6] - 5:14, 112:25, 113:6, 123:15, 123:16, 138:2
**searching** [2] - 84:10, 108:7
**seat** [3] - 116:8, 116:16, 116:19
**seated** [7] - 13:1, 64:11, 73:5, 78:2, 98:18, 114:5, 114:16
**second** [7] - 34:22, 48:1, 48:4, 71:15, 77:23, 121:14, 127:15
**Second** [1] - 7:4
**secondhand** [1] - 45:20
**secured** [3] - 33:6, 36:10, 36:11
**security** [1] - 156:19
**see** [63] - 2:12, 2:23, 8:25, 10:24, 23:24, 26:18, 31:5, 32:4, 32:7, 32:19, 48:8, 48:10, 48:21, 49:7, 49:15, 49:22, 50:1, 50:6, 52:13, 54:2, 54:4, 54:13, 66:8, 66:15, 70:13, 77:25, 83:22, 85:15, 88:1, 88:10, 90:20, 92:13, 92:20, 92:22, 92:23, 92:24, 94:13, 94:15, 94:17, 94:20, 95:2, 95:6, 95:14, 96:1, 110:15, 120:20, 120:21, 121:3, 121:15, 121:22, 121:24, 122:22, 125:17, 126:13, 148:11, 148:22, 149:4, 150:21, 153:3, 157:23, 160:22, 162:5
**seeing** [4] - 82:8, 84:2, 148:18, 148:20
**seem** [4] - 8:13, 62:10, 122:1, 134:17

**sees** [1] - 148:25
**seized** [11] - 37:11, 68:6, 68:9, 113:10, 142:4, 142:5, 143:6, 146:19, 146:25, 153:17
**seizure** [15] - 5:3, 7:1, 56:3, 56:14, 60:18, 68:2, 107:11, 107:18, 108:1, 109:10, 109:23, 110:4, 124:5, 147:7, 147:11
**self** [2] - 50:3, 53:2
**semblance** [1] - 41:8
**seminal** [2] - 131:2, 133:12
**sent** [1] - 67:1
**sequestration** [1] - 22:2
**Sergeant** [18] - 63:18, 64:20, 75:13, 76:3, 76:12, 77:16, 78:5, 79:16, 81:20, 82:3, 127:16, 127:17, 156:24, 157:14, 159:10, 160:17, 160:20
**sergeant** [13] - 64:16, 64:25, 65:9, 65:22, 73:24, 74:20, 75:12, 75:14, 76:4, 77:22, 97:4, 98:10, 120:18
**serve** [1] - 36:14
**service** [3] - 19:11, 76:14, 123:20
**set** [1] - 111:15
**seven** [4] - 25:8, 95:8, 95:9, 99:14
**several** [16] - 2:21, 24:1, 26:20, 27:14, 69:1, 72:20, 73:12, 74:2, 81:9, 89:2, 91:14, 108:23, 108:25, 109:2, 150:7, 155:18
**shackles** [1] - 104:3
**sham** [1] - 140:20
**shelf** [2] - 32:5, 158:16
**shift** [3] - 25:6, 25:18, 26:21
**shirt** [6] - 30:12, 49:19, 49:20, 50:5, 50:8, 158:1
**shooting** [1] - 21:15
**shorter** [1] - 6:20
**shots** [3] - 41:13, 41:16, 123:25
**show** [10] - 20:12, 67:4, 88:9, 92:2,

92:13, 94:9, 95:25, 96:4, 121:10, 152:24
**showed** [1] - 151:24
**shower** [1] - 29:18
**showing** [6] - 10:2, 35:13, 91:2, 91:10, 95:1, 102:10
**shows** [1] - 145:22
**shut** [1] - 31:4
**side** [5] - 30:22, 31:9, 31:15, 54:12, 118:9
**sidewalk** [4] - 73:9, 79:20, 93:24, 94:2
**signed** [1] - 46:17
**significant** [1] - 7:23
**signs** [2] - 49:22, 50:1
**silent** [1] - 103:2
**similar** [4] - 148:3, 148:7, 156:25, 161:3
**Simpkins** [2] - 1:25, 165:11
**simply** [9] - 5:21, 11:9, 46:1, 53:14, 54:25, 128:6, 139:11, 156:13, 157:9
**single** [1] - 31:8
**sire** [1] - 66:23
**sister** [6] - 115:25, 116:18, 118:15, 119:11, 147:18, 152:5
**sister's** [1] - 116:1
**sit** [1] - 34:18
**sitting** [1] - 124:11
**situated** [1] - 73:11
**situation** [9] - 106:7, 106:8, 124:5, 125:20, 125:23, 126:7, 129:11, 142:15, 160:24
**situations** [4] - 72:11, 156:25, 157:13, 157:20
**six** [3] - 97:21, 97:22
**Sixth** [5] - 133:3, 133:5, 133:9, 133:13, 133:17
**size** [1] - 32:13
**sized** [1] - 32:7
**skim** [1] - 86:3
**sleep** [3] - 16:25, 18:18, 18:23
**slept** [6] - 14:23, 14:25, 16:20, 16:25, 17:2, 18:20
**slow** [5] - 83:7, 148:22, 149:4, 152:20, 152:23
**slowed** [7] - 74:15, 74:24, 82:24, 83:11,

83:14, 148:17, 149:9
**slowing** [1] - 145:11
**slows** [2] - 143:11, 152:17
**small** [3] - 32:2, 32:13
**smell** [5] - 44:12, 45:6, 45:25, 46:3, 46:5
**smelled** [2] - 45:3, 124:15
**smoke** [2] - 46:3, 46:5
**snow** [2] - 91:13, 92:10
**soap** [2] - 32:7
**society** [1] - 6:4
**SOLOMON** [47] - 2:19, 3:15, 4:1, 4:10, 7:12, 7:17, 7:22, 10:4, 11:1, 11:5, 12:10, 12:12, 12:21, 13:6, 13:10, 18:13, 19:6, 19:14, 20:18, 21:22, 29:5, 29:12, 38:9, 38:11, 54:21, 55:18, 55:20, 63:14, 63:20, 63:24, 97:12, 106:2, 106:4, 107:4, 113:18, 119:17, 123:9, 126:18, 138:3, 138:19, 139:16, 139:18, 141:7, 159:8, 159:23, 160:5, 161:7
**Solomon** [20] - 1:22, 2:18, 38:8, 62:20, 97:11, 106:1, 113:17, 119:16, 123:8, 125:25, 126:17, 135:9, 137:22, 138:15, 141:23, 156:2, 159:7, 163:5, 163:12, 163:16
**Solomon's** [1] - 123:3
**someone** [16] - 4:4, 8:23, 16:2, 16:3, 50:2, 51:3, 51:13, 68:24, 86:24, 104:22, 130:18, 149:8, 149:21, 156:20, 157:4, 157:18
**sometimes** [1] - 48:16
**somewhere** [4] - 85:9, 97:7, 115:18, 116:24
**son** [8] - 114:21, 114:22, 115:15, 115:25, 116:3, 117:7, 118:18, 147:17
**soon** [4] - 18:8,

142:11, 142:13, 154:10
**sorry** [8] - 7:17, 14:14, 82:12, 86:19, 98:22, 102:21, 115:6, 117:6
**sort** [7] - 10:22, 19:20, 49:4, 54:7, 67:10, 125:10, 140:20
**sound** [1] - 132:12
**sounds** [5] - 34:9, 41:24, 42:1, 45:22, 130:16
**source** [2] - 158:6
**space** [1] - 49:4
**speaking** [1] - 60:22
**Special** [1] - 2:8
**specific** [13] - 5:6, 27:5, 28:9, 34:12, 43:13, 43:17, 43:18, 65:3, 66:21, 67:24, 131:16, 157:19, 159:15
**specifically** [9] - 23:17, 25:2, 41:15, 61:15, 61:18, 99:22, 100:12, 133:11, 143:10
**speculation** [1] - 160:2
**sped** [6] - 74:25, 83:1, 83:5, 83:6, 148:12, 148:16
**speed** [3] - 83:17, 149:5, 152:23
**spell** [6] - 13:2, 22:18, 34:7, 64:13, 98:20, 98:24
**spending** [1] - 152:8
**spent** [1] - 10:15
**spoken** [1] - 58:21
**Sprinkle** [4] - 146:16, 147:22, 148:1, 149:16
**squad** [4] - 72:5, 72:8, 72:11, 76:16
**stacked** [1] - 32:8
**stains** [1] - 52:21
**stake** [1] - 139:11
**stand** [7] - 9:4, 10:5, 11:2, 11:8, 11:18, 12:16, 149:16
**standard** [2] - 129:3, 140:3
**standards** [1] - 5:13
**standing** [42] - 3:9, 3:12, 3:16, 3:19, 4:12, 4:14, 4:15, 4:24, 5:19, 6:12, 6:21, 7:7, 9:2, 9:4, 9:9, 10:2, 10:9,

10:12, 11:7, 11:11, 20:22, 20:24, 73:8, 73:13, 74:3, 80:3, 81:2, 81:3, 81:6, 92:17, 93:11, 93:16, 93:17, 94:1, 94:6, 135:25, 136:12, 136:15, 136:22, 137:11, 138:1
**stands** [1] - 34:9
**start** [2] - 34:18, 92:3
**started** [3] - 41:2, 74:17, 104:11
**stash** [2] - 100:24, 151:16
**state** [11] - 13:2, 22:18, 35:20, 64:12, 87:19, 98:19, 98:24, 114:6, 128:23, 134:8
**statement** [10] - 59:4, 59:11, 59:12, 85:18, 85:23, 86:3, 110:25, 111:9, 111:14, 134:24
**statements** [2] - 8:5, 8:16
**states** [1] - 102:25
**STATES** [2] - 1:1, 1:4
**States** [7] - 1:12, 2:5, 5:10, 7:3, 134:12, 165:3, 165:6
**station** [8] - 56:18, 57:12, 57:14, 57:16, 61:22, 92:18, 117:1, 149:25
**stationed** [3] - 69:1, 74:20, 97:7
**stay** [7] - 14:19, 15:20, 17:10, 69:17, 71:24, 72:2, 91:22
**stayed** [8] - 14:23, 16:19, 17:3, 19:7, 70:17, 72:1, 117:5, 117:9
**staying** [2] - 18:15, 119:3
**step** [4] - 20:20, 21:2, 91:23, 149:17
**stepped** [1] - 72:20
**steps** [1] - 141:23
**stick** [1] - 98:8
**sticking** [2] - 32:12, 32:15
**still** [4] - 24:24, 69:8, 100:1, 116:16
**stood** [1] - 28:21
**stop** [25] - 2:25, 30:14, 75:9, 75:11, 76:18, 76:19, 103:9, 135:16, 137:1,

137:24, 142:17, 142:21, 143:2, 143:19, 143:23, 144:1, 146:14, 147:20, 148:15, 149:1, 149:15, 150:9, 151:5, 151:14

**stopped** [20] - 74:22, 75:6, 77:16, 77:20, 81:15, 82:24, 83:10, 83:13, 96:25, 97:1, 116:10, 116:13, 116:21, 117:20, 119:6, 121:20, 149:10, 149:18, 153:1, 153:6

**stops** [1] - 113:5

**storage** [7] - 3:1, 78:11, 107:21, 113:3, 137:5, 154:2

**storehouses** [1] - 132:18

**straight** [1] - 146:10

**street** [5] - 67:10, 67:11, 67:16, 67:18, 81:18

**strike** [5] - 52:17, 56:6, 79:25, 83:4, 95:1

**stroke** [1] - 124:5

**strongest** [1] - 145:25

**struck** [4] - 46:8, 61:16, 61:21, 62:2

**structure** [1] - 23:22

**stuff** [1] - 106:18

**subject** [3] - 27:11, 28:2, 84:24

**subjective** [4] - 5:4, 127:12, 127:13, 158:22

**subjects** [4] - 30:19, 108:17, 108:20, 108:24

**submit** [3] - 137:8, 137:20, 151:9

**subsequently** [1] - 145:1

**substance** [3] - 37:8, 37:10, 72:6

**substances** [2] - 44:20, 44:21

**substantial** [1] - 146:1

**subtle** [1] - 5:11

**sufficient** [5] - 4:14, 6:12, 7:1, 127:5, 128:22

**suggest** [18] - 8:22, 9:25, 49:23, 50:1, 52:14, 52:22, 52:23, 52:25, 126:25,

130:21, 130:24, 132:12, 132:13, 134:10, 134:15, 135:6, 142:25, 146:4

**suggested** [2] - 141:22, 161:10

**suggestion** [1] - 148:24

**suicide** [2] - 29:16, 124:5

**suicides** [2] - 105:12, 157:9

**sum** [1] - 37:10

**summon** [1] - 51:15

**summoned** [1] - 78:19

**summonsed** [2] - 159:12, 159:24

**Sundiata** [4] - 147:25, 148:2, 148:10, 149:16

**supervisor** [1] - 60:6

**supplemental** [1] - 48:18

**support** [1] - 144:4

**supports** [2] - 142:23, 147:19

**suppose** [1] - 21:1

**supposed** [1] - 87:9

**supposing** [1] - 137:23

**suppress** [2] - 2:10, 136:1

**suppressed** [2] - 135:2, 137:25

**suppression** [1] - 11:6

**Supreme** [1] - 7:19

**surety** [1] - 41:8

**surmounted** [1] - 10:1

**surrounding** [1] - 5:2

**surveillance** [3] - 33:10, 37:5, 68:23

**survive** [1] - 151:6

**suspected** [2] - 40:8, 50:22

**suspicion** [15] - 129:24, 130:15, 130:18, 130:20, 131:17, 142:21, 143:1, 143:19, 146:14, 146:18, 146:24, 147:24, 148:15, 151:13, 153:5

**suspicious** [4] - 33:9, 33:12, 132:14, 143:16

**SUV** [1] - 109:2, 111:18

**swipe** [2] - 78:11, 153:25

**sworn** [5] - 12:24, 22:15, 64:9, 98:16, 114:3

**system** [4] - 90:3, 90:6, 90:10, 91:21

**T**

**table** [2] - 2:16, 73:5

**tables** [4] - 31:11, 33:18, 53:25, 158:10

**tag** [6] - 70:7, 77:8, 91:18, 149:21

**taint** [2] - 113:5, 113:12

**tan** [1] - 24:3

**tangible** [4] - 39:12, 40:9, 40:15, 134:15

**task** [1] - 75:18

**teach** [1] - 33:14

**Team** [2] - 34:11, 99:18

**temporary** [1] - 9:12

**ten** [19] - 27:21, 32:6, 63:23, 72:16, 80:21, 81:10, 81:11, 83:22, 84:9, 84:11, 92:24, 94:5, 94:14, 99:11, 148:19, 148:21, 149:8, 155:5, 162:5

**ten-minute** [1] - 63:23

**tenancy** [2] - 55:12, 55:15

**tenants** [12] - 41:19, 46:11, 46:14, 47:17, 47:18, 128:9, 132:3, 132:4, 139:20, 155:23

**Tenesha** [1] - 116:2

**term** [1] - 6:21

**termed** [1] - 99:19

**terms** [3] - 10:12, 154:10, 157:23

**testified** [17] - 9:10, 12:25, 16:19, 22:15, 38:20, 40:22, 64:9, 84:13, 84:20, 98:16, 106:21, 114:3, 127:16, 127:22, 127:23, 157:16, 159:10

**testify** [11] - 9:4, 10:6, 11:8, 11:9, 11:13, 11:23, 11:24, 12:2, 12:3, 12:4

**testimony** [25] - 4:13, 12:5, 18:3, 19:18, 19:24, 20:22, 21:2, 22:5, 48:19, 86:25,

112:24, 113:14, 113:15, 113:17, 113:18, 121:1, 127:24, 127:25, 141:4, 144:11, 156:16, 156:23, 159:10, 159:18, 160:18

**THE** [162] - 1:1, 1:2, 2:2, 2:12, 2:17, 2:20, 3:14, 3:22, 4:2, 7:9, 7:15, 7:18, 9:6, 10:8, 11:3, 11:18, 11:21, 12:11, 12:14, 12:22, 13:1, 13:4, 13:7, 20:16, 20:19, 20:23, 21:1, 21:5, 21:12, 21:17, 21:20, 22:6, 22:10, 22:12, 22:17, 22:19, 29:6, 29:13, 34:21, 35:11, 38:8, 55:19, 55:21, 62:16, 63:13, 63:16, 63:23, 64:1, 64:6, 64:11, 79:11, 82:12, 86:2, 86:8, 87:25, 88:7, 88:13, 88:16, 89:12, 89:16, 89:21, 89:23, 90:2, 90:9, 90:14, 90:20, 90:24, 91:24, 92:24, 93:6, 93:7, 93:20, 95:8, 95:10, 95:11, 95:15, 96:12, 97:10, 97:14, 97:17, 97:22, 98:1, 98:3, 98:4, 98:8, 98:11, 98:13, 98:18, 98:21, 98:23, 98:25, 102:6, 102:8, 105:17, 105:20, 105:24, 105:25, 106:1, 107:7, 110:9, 110:15, 112:13, 112:16, 112:18, 112:21, 113:15, 113:20, 113:22, 113:24, 114:5, 114:8, 114:4, 115:6, 117:12, 118:25, 119:16, 119:18, 119:25, 120:3, 120:7, 120:12, 120:21, 121:25, 122:8, 122:16, 122:25, 123:11, 126:16, 135:3, 135:6, 136:7, 136:10, 136:14, 136:17, 136:21, 137:2, 137:7, 137:13, 137:17,

137:22, 138:4, 138:7, 139:13, 139:17, 140:15, 140:22, 141:6, 142:6, 144:9, 144:22, 145:4, 146:9, 151:7, 151:10, 153:24, 159:19, 160:4, 160:13, 161:16, 161:18, 161:24, 162:4

**themselves** [3] - 22:5, 126:7, 143:25

**thereabouts** [1] - 108:2

**therefore** [1] - 145:24

**thereof** [1] - 131:25

**thereon** [1] - 24:9

**third** [1] - 32:20

**Thomas** [1] - 2:8

**thoroughfare** [2] - 143:10, 145:10

**threats** [1] - 103:25

**three** [23] - 16:18, 21:7, 21:13, 24:1, 25:8, 29:14, 37:25, 58:16, 58:17, 58:21, 59:6, 60:22, 72:22, 83:12, 83:14, 91:20, 91:25, 105:10, 106:20, 118:2, 128:1, 148:18, 157:8

**threshold** [6] - 127:6, 127:11, 134:19, 134:22, 141:3

**tingle** [1] - 143:15

**title** [1] - 135:23

**Tobacco** [1] - 2:9

**today** [7] - 2:9, 12:5, 61:10, 78:1, 79:17, 144:11, 161:20

**together** [3] - 34:4, 94:14, 114:21

**took** [5] - 35:1, 35:2, 53:4, 74:18, 155:20

**top** [2] - 29:15, 158:11

**total** [3] - 21:13, 21:15, 37:2

**totality** [1] - 5:2

**touch** [2] - 93:20, 94:10

**tour** [2] - 78:18, 99:21

**tours** [1] - 78:18

**toward** [6] - 13:2, 70:13, 98:19, 98:23, 114:6, 118:9

**towards** [7] - 22:17, 64:12, 70:8, 74:10, 77:17, 80:8, 81:18

**traffic** [1] - 132:13
**trafficking** [1] - 144:8
**trained** [3] - 44:7, 44:18, 46:1
**training** [2] - 33:13, 44:6
**trample** [1] - 123:19
**transcript** [3] - 160:18, 161:8, 165:2
**transmissions** [1] - 145:2
**transpired** [1] - 146:7
**transpires** [1] - 145:23
**transport** [3] - 57:8, 72:10, 108:7
**transportation** [1] - 72:4
**transported** [4] - 71:23, 101:17, 101:18, 144:7
**trash** [5] - 30:13, 50:8, 50:9, 50:13, 158:1
**traveling** [4] - 80:10, 80:11, 80:13, 83:7
**treatment** [1] - 117:8
**Tree** [41] - 13:19, 23:20, 23:23, 24:14, 24:20, 25:19, 26:2, 26:21, 36:2, 37:16, 65:17, 66:5, 66:12, 66:20, 66:24, 67:6, 67:11, 67:16, 67:19, 70:14, 70:24, 72:19, 73:19, 73:20, 74:12, 79:20, 80:15, 80:21, 81:7, 82:25, 83:11, 89:12, 89:14, 89:17, 100:6, 101:17, 104:12, 107:12, 118:12, 118:15, 118:21
**tree** [4] - 113:5, 135:1, 137:4, 151:4
**trees** [1] - 91:7
**tremendous** [1] - 126:24
**trial** [8] - 2:16, 11:25, 12:3, 12:4, 12:7, 73:5, 142:11
**tried** [1] - 27:2
**truck** [1] - 73:14
**true** [4] - 19:25, 20:2, 20:5, 165:6
**try** [4] - 12:6, 28:18, 90:20, 91:22
**trying** [6] - 37:24, 100:24, 136:1, 146:9, 152:21, 155:6
**turn** [7] - 74:11, 91:15, 117:11, 117:12,

137:22, 146:11, 152:15
**turnaround** [1] - 81:17
**turned** [4] - 63:6, 80:7, 90:10, 155:8
**turning** [1] - 80:6
**turns** [1] - 67:21
**TV** [1] - 37:6
**TVs** [1] - 37:6
**twice** [1] - 15:1
**two** [5] - 7:19, 14:7, 14:8, 16:21, 18:10, 31:11, 31:16, 52:4, 52:5, 53:7, 53:25, 67:23, 68:11, 70:5, 70:6, 71:2, 71:17, 75:3, 78:9, 80:24, 81:1, 84:18, 84:20, 86:23, 95:12, 96:13, 105:10, 105:12, 107:17, 107:21, 109:10, 109:23, 115:3, 115:6, 118:2, 120:12, 120:15, 121:7, 121:16, 121:19, 121:21, 121:23, 138:7, 144:7, 146:12, 146:15, 147:15, 147:17, 151:17, 157:7, 157:8, 158:10
**type** [5] - 31:10, 32:17, 39:18, 46:5, 134:4
**typically** [2] - 14:19, 106:20

## U

**U.S** [12] - 4:21, 4:22, 5:10, 5:17, 6:8, 6:22, 127:3, 128:18, 129:1, 133:4, 133:6, 133:16
**ultimate** [1] - 6:15
**ultimately** [1] - 141:12
**unable** [3] - 29:18, 79:1, 124:19
**unchecked** [1] - 134:7
**under** [21] - 4:15, 4:24, 8:4, 8:15, 9:13, 68:22, 71:16, 71:22, 78:5, 101:15, 123:5, 126:11, 127:10, 132:15, 133:19, 134:2, 134:10, 135:1, 138:14, 144:12, 148:24
**undershirt** [1] - 49:19
**understandings** [1] -

66:11
**understood** [3] - 17:12, 71:8, 103:19
**undertaken** [1] - 141:19
**uniform** [3] - 27:13, 73:22, 81:13
**unimportant** [1] - 6:14
**Union** [3] - 115:13, 115:14, 115:17
**unit** [12] - 33:14, 34:1, 34:2, 34:17, 65:5, 65:7, 65:23, 65:24, 82:2, 82:3, 99:8
**UNITED** [2] - 1:1, 1:4
**United** [7] - 1:12, 2:5, 5:9, 7:3, 134:12, 165:3, 165:6
**units** [4] - 33:3, 33:7, 33:10, 69:1
**unknown** [1] - 106:8
**unlawful** [1] - 154:1
**unless** [1] - 120:25
**unlike** [1] - 156:10
**unlocked** [2] - 30:2, 71:11
**unreasonable** [1] - 153:20
**unsolicited** [1] - 161:10
**unsure** [1] - 50:25
**untoward** [5] - 55:10, 128:13, 130:8, 130:16, 134:4
**unusual** [6] - 43:4, 46:6, 62:3, 131:7, 156:6, 158:2
**up** [32] - 3:20, 9:3, 11:10, 13:1, 33:4, 33:10, 37:7, 39:20, 41:18, 43:15, 44:23, 48:16, 51:17, 60:17, 74:9, 74:25, 83:6, 96:4, 104:16, 114:5, 114:14, 121:10, 123:2, 131:18, 138:9, 142:11, 145:22, 148:11, 149:5, 151:24, 153:18, 154:4
**upper** [1] - 47:23
**urgent** [1] - 126:6

## V

**vague** [1] - 129:7
**validate** [1] - 133:10
**van** [6] - 92:18, 94:13, 94:15, 94:17, 94:20

**variety** [1] - 124:3
**various** [3] - 4:5, 67:5, 69:12
**Vehicle** [1] - 77:7
**vehicle** [104] - 70:4, 72:10, 74:8, 74:14, 74:22, 74:24, 75:1, 75:6, 76:19, 77:2, 77:8, 77:12, 77:15, 77:17, 77:19, 77:21, 79:22, 79:24, 80:2, 80:4, 80:7, 80:10, 80:18, 80:19, 80:20, 80:25, 81:7, 81:15, 81:20, 81:21, 81:22, 81:24, 81:25, 82:4, 82:5, 82:6, 82:9, 82:18, 82:24, 83:3, 83:4, 83:5, 83:6, 83:10, 84:2, 84:18, 84:21, 84:23, 86:16, 86:20, 91:17, 92:9, 92:11, 92:18, 93:16, 94:21, 96:21, 96:24, 104:15, 104:18, 105:19, 105:22, 107:16, 113:2, 113:3, 115:23, 116:5, 116:11, 116:14, 116:21, 120:15, 121:19, 122:6, 122:13, 134:25, 143:19, 144:1, 144:6, 144:12, 144:18, 144:19, 145:1, 145:6, 145:7, 145:9, 147:2, 147:19, 147:20, 148:11, 148:13, 148:15, 148:17, 149:15, 149:18, 150:2, 150:3, 150:15, 150:17, 150:21, 151:25
**vehicles** [5] - 57:9, 91:14, 91:20, 93:25, 122:2
**verify** [3] - 22:10, 129:24, 131:24
**versus** [20] - 2:5, 4:21, 4:22, 5:9, 5:17, 6:7, 6:22, 7:4, 7:10, 7:11, 7:12, 7:15, 7:16, 10:19, 127:3, 128:18, 129:1, 133:4, 133:6, 133:16
**via** [1] - 144:20
**vicinity** [4] - 65:17, 72:18, 94:6, 131:19

**victim** [1] - 39:17
**view** [10] - 11:9, 24:19, 32:18, 49:15, 52:13, 88:15, 96:18, 136:19, 154:5, 158:16
**violation** [1] - 153:20
**Violence** [2] - 34:11, 99:18
**violence** [2] - 124:1, 124:9
**Virginia** [1] - 133:21
**virtue** [1] - 100:8
**visible** [1] - 93:7
**vision** [1] - 90:25
**visiting** [1] - 111:17
**visitor** [1] - 6:10
**visitors** [1] - 5:22
**visually** [1] - 30:23
**voice** [1] - 114:14
**volume** [2] - 120:10, 121:3
**volunteer** [1] - 42:16
**volunteered** [1] - 161:9
**vomit** [1] - 131:10
**vs** [1] - 165:3
**VS** [1] - 1:5

## W

**wait** [2] - 90:21, 159:19
**waiting** [4] - 58:3, 72:4, 72:5, 73:14
**walk** [14] - 30:8, 32:3, 52:6, 54:8, 54:12, 63:5, 63:7, 63:8, 69:6, 70:13, 96:4, 96:23, 124:14, 124:19
**walk-in** [5] - 52:6, 54:8, 63:5, 63:7, 63:8
**walked** [8] - 49:15, 49:22, 51:22, 54:3, 70:8, 71:9, 71:13, 71:15
**walking** [1] - 55:16
**wallet** [1] - 102:17
**warm** [1] - 72:21
**warrant** [33] - 34:4, 34:13, 34:20, 35:18, 36:10, 36:11, 36:14, 36:16, 37:11, 37:13, 56:4, 56:14, 56:19, 56:20, 56:23, 58:4, 60:11, 60:12, 68:2, 68:11, 100:25,

101:1, 107:11, 108:1, 109:18, 127:7, 127:11, 134:9, 134:19, 140:14, 147:8, 147:11, 148:5

**warranted** [3] - 128:24, 130:2, 144:2

**warrantless** [9] - 6:12, 123:4, 133:10, 133:14, 136:18, 142:17, 154:4, 154:8, 154:11

**warrantlessly** [1] - 142:1

**warrants** [4] - 107:15, 107:18, 109:10, 109:16

**ways** [1] - 148:3

**Webb** [6] - 25:25, 27:12, 27:13, 40:1, 40:7, 40:25

**welfare** [2] - 123:21, 128:4

**well-being** [3] - 26:4, 128:4, 155:14

**Western** [1] - 133:21

**white** [37] - 7:20, 31:14, 31:18, 32:10, 32:13, 32:20, 33:18, 42:20, 50:10, 53:25, 54:2, 74:8, 74:24, 76:19, 77:15, 79:22, 79:24, 80:1, 80:4, 80:19, 80:20, 81:7, 82:9, 83:10, 84:1, 86:20, 92:17, 92:18, 93:16, 96:21, 113:2, 119:23, 120:15, 121:17, 150:17, 151:25, 158:10

**White** [2] - 118:9, 118:11

**whole** [2] - 21:15, 30:16

**Williams** [2] - 133:7, 133:16

**window** [2] - 48:11, 55:7

**windows** [2] - 48:7, 48:12

**wise** [1] - 30:6

**wish** [3] - 11:9, 11:13, 11:18

**wishes** [1] - 3:20

**WITNESS** [16] - 22:19, 88:16, 93:7, 95:11, 98:4, 98:11, 98:21, 98:25, 102:8, 105:20, 105:25,

110:15, 114:8, 115:6, 163:14, 163:18

**witness** [24] - 12:16, 22:8, 22:14, 35:9, 38:7, 47:13, 62:14, 63:12, 63:15, 63:17, 64:2, 64:8, 72:25, 73:4, 88:6, 98:1, 98:15, 102:4, 105:16, 112:23, 113:21, 114:2, 120:8, 127:16

**witnessed** [1] - 68:15

**WITNESSES** [1] - 163:2

**witnesses** [8] - 21:5, 21:7, 21:13, 21:18, 21:21, 21:24, 22:7, 120:5

**Wood** [6] - 89:5, 89:7, 89:10, 89:16, 93:12, 94:16

**word** [1] - 38:14

**words** [2] - 9:25, 154:16

**world** [1] - 145:25

**worried** [2] - 27:23, 40:13

**Worthington** [4] - 15:6, 17:8, 19:19, 141:3

**WRIGHT** [5] - 11:17, 11:20, 12:9, 12:23, 163:15

**wright** [2] - 103:12, 134:24

**Wright** [47] - 1:21, 2:6, 2:18, 2:25, 3:7, 3:15, 3:24, 4:8, 4:13, 7:24, 8:17, 9:1, 9:3, 10:5, 11:1, 11:4, 11:5, 12:17, 13:4, 13:11, 19:18, 20:20, 20:24, 63:21, 68:19, 71:14, 71:20, 72:13, 76:21, 76:24, 77:12, 84:14, 101:6, 101:12, 101:24, 103:23, 105:18, 111:11, 135:22, 140:20, 149:25, 151:20, 151:22, 152:1, 153:12

**WRIGHT'S** [1] - 163:14

**Wright's** [4] - 10:11, 72:24, 73:3, 141:4

**write** [1] - 85:17

**written** [5] - 3:18,

59:12, 60:2, 60:3, 102:23

**wrote** [11] - 34:4, 59:19, 60:9, 60:21, 62:3, 62:13, 110:25, 111:9, 112:2, 112:7

## Y

**year** [8] - 23:10, 43:1, 43:10, 44:24, 64:24, 147:17, 147:18, 154:13

**years** [10] - 20:14, 23:4, 23:11, 61:11, 78:15, 99:11, 99:14, 99:24, 104:19, 112:6

**yell** [3] - 49:9, 49:10, 115:5

**young** [3] - 42:10, 42:19, 114:16

**yourself** [6] - 16:14, 16:17, 17:4, 64:18, 81:3, 99:5

## Z

**Zacharopoulos** [2] - 1:20, 2:16